UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

_____

UNITED STATES OF AMERICA,              CRIMINAL ACTION

              Plaintiff              Docket No: 2:14-cr-83-DBH


          -versus-


F. WILLIAM MESSIER,

DAVID EVERETT ROBINSON,

          Defendants

_____

Transcript of Proceedings

Pursuant to notice, the above-entitled matter came on for **Oral Argument** held before **THE HONORABLE D. BROCK HORNBY,** United States District Judge, in the United States District Court, Edward T. Gignoux Courthouse, 156 Federal Street, Portland, Maine on the 18th day of March, 2015 at 11:00 a.m. as follows:

Appearances:

For the Government:  James W. Chapman, Jr.,Esquire

                     Karen E. Kelly, Esquire
                     Assistant United States Attorneys

For Defendant Messier:  Michael L. Minns, Esquire
                        Ashley Blair Arnett, Esquire
                        William Maselli, Esquire

For Defendant Robinson:  Joel Vincent, Esquire

Dennis R. Ford
Official Court Reporter

(Prepared from manual stenography
 and computer aided transcription)

1             (Open court.  Defendants present).

2         THE COURT:  Good morning.  This is criminal

3    No. 14-83, United States versus F. William Messier and

4    David Robinson.  The matter is on this morning for

5    hearings on motions, pending motions.

6         I know that you've empanelled the jury and we are

7    proceeding to trial in, what, ten days or something

8    along those lines and I've read your motion papers,

9    including the attachments.  I've read a number of the

10   cases and I'm looking forward now to hearing your

11   argument.

12        There's two motions that I'm aware of.  One is the

13   Government's motion to exclude the defendant Messier's

14   expert, Dr. Voss, and the other is the Government's

15   motion in limine to exclude certain arguments,

16   statements, testimony, et cetera.

17        I'd like to hear them in that order, to hear the

18   expert dispute first of all, and I understand that Ms.

19   Kelly, you're going to argue that; is that correct?

20        MS. KELLY:  That's correct, Your Honor.

21        THE COURT:  And just for the record, the

22   defendants are both present with their lawyers and let

23   me hear from you, Ms. Kelly.  You can either speak from

24   counsel table or the podium, as long as you use the

25   microphone wherever you are.

 1            MR. MINNS:  Your Honor, I believe the

 2   Government's expert is present in the courtroom and

 3   we're about to talk about him and I prefer to do it

 4   behind his back.

 5            THE COURT:  Okay.  I thought we were going to

 6   be having Dr. Voss.  Is there a motion to exclude the

 7   Government's expert also?

 8            MR. MINNS:  Um, I don't -- depends on the

 9   Court's ruling.  Obviously, if the Court excludes our

10   expert, we won't be too happy if the Government's

11   expert takes the stand, but I don't know what argument

12   is going to pursue, whether or not the Court -- my

13   speculation is the Court may say the experts can say X,

14   Y and Z, but not A, B and C and in that case, I think

15   it would be inappropriate for either of the experts to

16   listen to the argument if that, in fact, takes place.

17            THE COURT:  Ms. Kelly?

18            MS. KELLY:  Your Honor, in truth, we were

19   expecting that Dr. Voss would be here as well and we

20   would have an opportunity to cross-examine him from him

21   opinions and basis for opinions, so we brought our

22   expert in the event we were going to have dueling

23   experts.  If the Court excludes Dr. Voss, of course we

24   wouldn't have Dr. Wisch testifying in trial obviously.

25        We don't have any objection to him being in the

```
1    courtroom or leaving the courtroom.  We don't
2    anticipate talking about him.  You have his report and
3    his supplement to the report.  I don't anticipate any
4    prejudice to him listening to what the Court's
5    questions are and the issues with regard to the Daubert
6    hearing.
7         We certainly can't change the testimony with
8    regard to anything Dr. Voss says since Dr. Voss is
9    indeed not here and won't be taking the stand, but as I
10   said, if you rule that Dr. Voss --
11             THE COURT:  I understand.
12             MS. KELLY:  -- will not testify, nor will Dr.
13   Wisch.
14             THE COURT:  Does that allay your concern?
15             MR. MINNS:  I still would like him excluded.
16   I did not understand this to be a Daubert hearing.
17             THE COURT:  It's not a Daubert hearing.  I
18   know the Government requested it, but the first stage
19   is to have oral argument.
20             MR. MINNS:  Yes, Your Honor.  If the
21   Government has no objection to him leaving, it seems
22   like it shouldn't be any problem with him waiting
23   outside.
24             THE COURT:  You can act voluntarily or seek a
25   ruling then.
```

```
 1              MR. MINNS:  Then I --
 2              MS. KELLY:  Your Honor, we have him here as an
 3    expert to help us -- understanding that it might be
 4    complicated or confusing with regard to these issues,
 5    but we will defer to the Court with regard to his
 6    presence or not.  We don't pretend to be experts in
 7    this field by any stretch, which is why we retained a
 8    doctor in this matter.
 9              THE COURT:  Alright.  I'm not going to require
10    him to leave for these reasons.  First of all, I'm not
11    the factfinder, I'm sitting here as the judge.
12    Obviously, there are times when witnesses are excluded
13    before the testimony of others, but I don't see
14    prejudice in this case and certainly Dr. Voss is
15    welcome to read the transcript of anything I say here
16    to the extent that would bear on his testimony.
17         So I'm not going to exclude the Government's
18    witness from being here present.  I don't intend to
19    take evidence.  That was not the purpose of the
20    hearing.
21              MR. MINNS:  Thank you.
22              THE COURT:  All set?  Thank you.  Go ahead,
23    Ms. Kelly.
24              MS. KELLY:  Your Honor, at the risk of being
25    redundant, the Government did file two pleadings in
```

1    this matter, we do think that it's the Court's role to

2    be the gatekeeper and scrutinize the expert testimony

3    proffered in this case particularly because the expert

4    testimony is regarding mental health issues, which is

5    complicated, confusing, misleading and can really

6    undermine the understanding of the case by the jury,

7    the ultimate factfinders.

8        We rely initially on *Daubert* saying that you, Your

9    Honor, have the duty to be the gatekeeper.  The 1st

10    Circuit accepts *Daubert* as the standard in that regard

11    and as you know, *Daubert* codifies Federal Rule of

12    Evidence 702.

13        THE COURT:  Let's stop right there.  You did

14    request a *Daubert* hearing.

15        MS. KELLY:  We did.

16        THE COURT:  What would that provide me that I

17    don't already have in the proffered opinions that have

18    been given to me?

19        MS. KELLY:  Well, we think it would

20    demonstrate for you and for the record that the report

21    is completely inadequate, that Dr. Voss failed to rely

22    on the standards as set forth in the DSM-V in making

23    his evaluation that the defendant suffers from a

24    delusional disorder.

25        THE COURT:  But you've argued that.

1            MS. KELLY:  Yes.

2            THE COURT:  You gave me his report and you've

3    given me your expert's report.

4            MS. KELLY:  Yes.

5            THE COURT:  What more would I learn at a

6    hearing?

7            MS. KELLY:  Well, perhaps -- we're not sure

8    what more you would hear, but we would think that you

9    would be able to ascertain the inadequacies in his

10   report when we ask him additional questions.

11        For example, Your Honor -- and this is also

12   covered in our pleadings -- but the temporal

13   relationship between when he had his 1990 -- his

14   15 years ago -- according to the report, Dr. Voss's

15   report, he says the defendant told him that when he

16   moved to Arizona, he was in a spy store and he came

17   upon a magazine that said 35 million people do not pay

18   taxes and according to Dr. Voss's report, that is when

19   he had his -- I don't -- for lack of a better term, his

20   ah-ha moment.  Defense counsel calls it a surprisal

21   moment, but the doctor does not refer to it as a

22   suprisal moment.  The doctor says that --

23           THE COURT:  Excuse me, does he tie that down

24   to a date?

25           MS. KELLY:  He didn't tie it down to a date.

1    He said 15 years ago.  Let me pull it up from the

2    report.  So 15 years ago, Your Honor, is 2000 by my

3    math.  Okay, so it's in the --

4            THE COURT:  The first report or the second?

5            MS. KELLY:  Yes.  It's in the December 11th

6    report on Page 3.

7            THE COURT:  Page 3?

8            MS. KELLY:  Where it says, while there in the

9    bookstore, he picked up a book about federal taxes.  He

10   learned 35 million people were not filing federal tax

11   returns.  He began to study the issue --

12           THE COURT:  Okay, got it.  Go ahead.

13           MS. KELLY:  Sorry, and right above that it

14   says, it occurred when he moved to Arizona about

15   15 years ago.  So not great at math, but that's about

16   2000, the year 2000.

17       Well, indeed he stopped filing taxes, as he told

18   Dr. Wisch in his report, around 1995, 1996.  So

19   temporally, the opinion doesn't correlate with the

20   conduct that's at issue in this case specifically and

21   temporally, that would be something we would want to

22   plumb with the expert as we put in our -- as we wrote

23   in our pleadings.

24       I think the Chance case out of the District Court

25   in Maryland talks about the need under 402 for there to

1    be a temporal relationship.  Can you say that when the

2    defendant failed to file his 2007 income tax returns,

3    was he suffering from a delusion, the alleged delusion

4    then?  How about in 2008, how about in 2009, how about

5    in 2010, how about in April of 2011?  I mean there has

6    to be a temporal relationship and there's none of that.

7    There's no attempt for reverse extrapolation, if such a

8    thing can even be done.

9         THE COURT:  You need to slow down so the court

10   reporter can get everything you say.

11        MS. KELLY:  Sorry.  There's no indication in

12   the report whether a retroactive temporal extrapolation

13   can be done when you're trying to diagnose someone with

14   a purported mental illness.  So that's just one aspect

15   that we would have questioned the doctor about.  The

16   report's completely vague and absent on that issue and

17   inconsistent with the facts in this case.

18        There are a number of facts that are omitted from

19   Dr. Voss's report that one would think would be

20   relevant if you're conducting a psychological or

21   psychiatric evaluation, just individual facts about the

22   defendant's life.

23        Now, part of this is because the whole report is

24   based on what the defendant told him.  There were no

25   psychological tests, no medical test, no scientific

1   tests.  It's all basically a conversation and the

2   analysis is made after a conversation with the

3   defendant.

4       Some of the issues that Dr. Voss omitted or failed

5   to include in his report, failed to learn about in his

6   report include simple things, but things that a

7   psychiatrist or psychologist might think are important.

8   Things like that the defendant had been married a

9   second time after his first marriage; the second

10  marriage was seven years long, which is as long as his

11  first marriage; that the wife in his second marriage

12  ultimately committed suicide; that there was a child, a

13  stepchild in that second marriage who suffered from

14  intellectual disabilities with whom Mr. Messier was

15  allegedly very close to.

16      Those are certain facts that a thorough interview,

17  one would assume, would be important and something that

18  a psychiatrist or psychologist would want to consider

19  when they are doing a mental evaluation that, again, is

20  based only on what the defendant reported to him or

21  questions that he asked, the level of thoroughness in

22  his evaluation.

23      Something that we discuss at length, Your Honor,

24  in our pleadings, and I don't want to bore you, I know

25  obviously you've read this stuff, but I do want to

1    point it out because we think that under the 702

2    standard, it's important for the Court to take into

3    consideration is that Dr. Voss failed to follow the

4    protocol of the DSM in making his diagnosis.

5         The DSM, under delusional disorder, specifically

6    requires the examiner to consider the patient in light

7    of similarly situated patients and the language that

8    the DSM-V uses is they are referred to a subculture.

9         Basically, the taxonomy of the DSM requires a

10   practitioner to compare apples to apples and oranges to

11   oranges so that you don't misdiagnose or pathologize

12   folks who might have thoughts that are inconsistent

13   with the doctor; for example, certain religions,

14   political groups, people that are outside of what the

15   doctor considers mainstream.

16        So the DSM, both in the section where it requires

17   a diagnosis -- I think that's Page 918 or 819, I have

18   it in my pleadings, Your Honor -- and also in the

19   definition section in the back of the DSM-V

20   specifically requires a practitioner to compare the

21   patient and his, quote, thought processes -- what Dr.

22   Voss refers to as delusions -- but his thought

23   processes to the subculture from which that patient

24   thrives.

25        So for 702 to allow Dr. Voss's opinion in, not

only does the scientific knowledge help the trier of
fact, the jury, to understand the evidence or determine
a fact in issue, the testimony has to be based on
sufficient facts or data which, Your Honor, we would
submit to you we don't think it is; has to be a product
of reliable, principled methods, which we would argue
is arguable with regards to the DSM-V and the whole
taxonomy, but most importantly, the expert has reliably
applied the principles and methods to the facts of the
case.  So we think that under 702, the fourth prong,
that Dr. Voss did not reliably apply the principles and
methods of the DSM to the facts of this case.

　　　　Now, Mr. Messier told Dr. Voss that there were
other people who think like him, that he belongs to a
subculture.  He described himself as a
constitutionalist and, let's see, he said I'm a
constitutionalist, we want our country back.  So he
identified for the doctor his subculture.  No questions
were asked about his subculture.

　　　　So if you look at the top of Page 6 on his
December 11th report, it says --

　　　　　　　　THE COURT:  Go ahead.

　　　　　　　　MS. KELLY:  -- he has contact with others with
similar beliefs.  Quote, I hang around with
constitutionalists.  We want our country back.  We want

1    the Government to do what it should do, follow the

2    constitution, end quote.  So that's included in his

3    December 11th report.

4         The defendant, identifying his subculture for the

5    evaluator, nevertheless in his conclusions, Dr. Voss in

6    his opinion one states to a reasonable degree of

7    medical certainty, to a reasonable degree of medical

8    certainty in his opinion section, one, William Messier

9    has firmly fixed beliefs that are not amenable to

10   change.  It is my opinion that Mr. Messier does not

11   have the ability to consider other points of view on

12   these matters.  He is not able to change these beliefs.

13   While he has information that in his judgment supports

14   his beliefs, his beliefs about federal income taxation

15   are not shared by the great majority of people in his

16   culture and country.

17        So he basically glosses over completely what the

18   DSM requires an examiner to do, which is compare

19   patients with people within their subculture.

20        On Page 819 in the glossary of technical terms,

21   the DSM describes a delusion and it says, a belief not

22   ordinarily accepted by other members of the person's

23   culture or subculture, i.e., it is not an article of

24   religious faith.

25             THE COURT:  Do I derive any significance from

```
1    the fact that that's an i.e. rather than an e.g.?  I.e.
2    means that is, whereas e.g. would mean for example.  So
3    is it defining --
4            MS. KELLY:  Your Honor --
5            THE COURT:  -- subculture as being religious
6    based subcultures?
7            MS. KELLY:  I don't think you actually really
8    want to derive it from your legal technical
9    understanding of the DSM, which is written for
10   psychiatrists and psychologists who are trying to
11   evaluate patients and use it as a taxonomy so that they
12   can use the same language, even as a yardstick so that
13   everyone's speaking in the same language when they are
14   describing symptoms that are reported to them and
15   preparing treatment plans for the patients.  Indeed,
16   the DSM on Page 25 does warn against the use of the DSM
17   for forensic purposes.
18       So when we try to take their legalist -- when we
19   try to take their semantic words for psychiatric and
20   psychological diagnosis and translate it into our legal
21   semantics where we're trying to get to elements,
22   intent, mens rea and identify and label people for
23   purposes of culpability, the languages don't
24   necessarily translate.
25           THE COURT:  What's your point, though; we
```

```
1    shouldn't consider DSM-V at all because of the
2    cautionary statement?
3          MS. KELLY:  No, I think we should certainly
4    consider it, it's considered regularly, but I think
5    that we should consider it in light of the cautionary
6    statement and not ignore the cautionary statement,
7    which is that the semantics are different.
8          No, I'm not --
9          THE COURT:  I think Strunk and White would say
10   i.e. means that is.  It's not a legal term.
11         MS. KELLY:  It probably would, Your Honor.
12         THE COURT:  Go ahead.
13         MS. KELLY:  You're right, but nevertheless, I
14   think that it's defining a subculture as only a
15   religion.  I think they're using religion as an
16   example, but I can give other examples that include
17   evolutionists who, despite overwhelming information to
18   the contrary, refuse to consider and believe in
19   principles that science has considered to be fact or
20   based on fact for years.  There are groups of people
21   who are called birthers who refuse to believe that
22   President Obama was born in America.
23         There's -- typically it's in political groups
24   where you see outlying groups that they have a
25   subculture, they believe these opinions, these
```

1   thoughts, these -- they share these -- they share these

2   thoughts, they educate themselves on these thoughts,

3   they study these thoughts, they adopt a creed, a joint

4   creed and I would submit to you that the sovereign

5   citizens, the tax defiers, they are a subculture.

6       They teach themselves, based on the Internet,

7   based on books --

8           THE COURT:  I understand your argument.  Let

9   me change your focus a little bit.

10      You're arguing that Dr. Voss did not appropriately

11  use the DSM-V.  I understand that and I understand the

12  reasons for it, but what's your position on whether

13  expert testimony is relevant in this case.

14      This is not an insanity defense, this is the

15  defendant arguing that the Government can't meet the

16  burden of proof on scienter and that Dr. Voss's opinion

17  is relevant there.  Could you address that for me in

18  terms of how that works.

19      For example, we know that under Rule 704(b), that

20  Dr. Voss is not permitted -- nor Dr. Wisch -- permitted

21  to state an opinion about whether the defendant did or

22  did not have a mental state or condition that

23  constitutes an element of the crime charged.

24      What's your position on -- assuming that Dr. Voss

25  was qualified and did follow all the procedures under

1    DSM-V, what's your position on the relevance of his

2    testimony?

3            MS. KELLY:  Your Honor, I would submit that

4    it's extraordinarily confusing and misleading and

5    distracting to the factfinders for them to listen to

6    Dr. Voss, tell them what the defendant told him because

7    basically Dr. Voss is being put up -- being offered to

8    testify to what the defendant told him in his

9    interview.

10           THE COURT:  Would it be different if the

11   defendant took the stand first and testified and Dr.

12   Voss were listening and then Dr. Voss were asked to

13   testify after that?

14           MS. KELLY:  I think that the way to get the

15   information before the jury is indeed to have the

16   defendant testify about his beliefs, and then if Dr.

17   Voss is in the courtroom and he's going to come in and

18   say that the defendant is incapable of forming the

19   intent to fail to file his income taxes --

20           THE COURT:  He can't say that under 704(b);

21   can he?

22           MS. KELLY:  Well, it's a slippery slope.  It's

23   almost like they're going to offer a temporary insanity

24   defense that's not permitted under the IDRA or under

25   704(b).

1          I would submit that if the doctor's going to come
2     in and try to say that -- I mean what's the point of
3     testifying if he doesn't come in and say he can't form
4     the intent, which is what his opinion is.  He can come
5     in and say well, he did tell me that he really believes
6     this.  He told me he really believes that in 1933, the
7     United States went off the gold standard and that birth
8     certificates were issued on bond paper which meant that
9     individuals, people were slaves for the Government's
10    debt and if you turn that paper in to the Treasury,
11    there's a secret account with more than $600,000 in
12    there for you and you can pay your bills with that.  He
13    told me that, members of the jury.
14         And he told me that the tax code doesn't apply to
15    him because he doesn't live in the District of Columbia
16    or he's not a federal employee or doesn't live on the
17    docks or the shores of the federal territory and he
18    told me that -- and he told me this for four hours and
19    I think he really believes it and that's what the
20    doctor is going to be offered to say.  I think he
21    really believes it based on what he told me.  And --
22              THE COURT:  Why would he be allowed to say
23    that?  Obviously, I'll ask Mr. Minns all of this, but
24    usually one witness doesn't get to testify about the
25    credibility of another witness.

1      I assume that what he's being offered for is to

2 testify that he suffers from a delusion and that he

3 suffered from a delusion on the relevant dates in

4 question.  That's really all that 704 allows; isn't it?

5      MS. KELLY:  Well, Your Honor, you know as well

6 as I do that an expert can testify to the basis for his

7 conclusion.  Well, in this case the only basis he has

8 is his interview.  The only thing he can testify to is

9 what the defendant told him.

10      THE COURT:  All right.  That's often true with

11 psychiatric testimony.

12      MS. KELLY:  Well, there are tests that can be

13 performed and there is lots of psychiatric reports over

14 a long period of time that can be evaluated and there's

15 third-party interviews that psychiatrists and

16 psychologists can do, and then there's consultation

17 with other experts that psychologists and psychiatrists

18 regularly do do.

19      THE COURT:  But then it goes down again to

20 whether he did the right things under *Daubert*.  I'm

21 trying to stick to the relevance questions.

22      We seem to agree that he is permitted under the

23 rule to give an opinion about a condition that's listed

24 in DSM-V if he does the proper steps.

25      MS. KELLY:  Um, if it's relevant to the

 1    defendant -- if it's relevant to the case.

 2            THE COURT:  Is it relevant here where the

 3    question is whether you can prove scienter, willfulness

 4    on the tax charges?

 5            MS. KELLY:  Well, no because he can't actually

 6    speak to the defendant's intent because that's excluded

 7    under 704(b), so there's nothing he could offer that

 8    would be relevant.

 9        He talks to the motivation of the defendant in two

10    different places in his report.  He actually assumes

11    that he can diagnose the defendant's motivation.  If

12    you take a look on the January 8th report on Page 5, he

13    says, monetary gain is not supportive of motivation for

14    not filing 1040 forms.  He states that to a reasonable

15    degree of medical certainty.

16        Well, motivation is not relevant and it certainly

17    can be excluded and I would submit that the doctor has

18    no way of knowing what the defendant's motivation is.

19            THE COURT:  Right.  But just because

20    something's in a report doesn't necessarily mean I'll

21    let him testify about everything in his report.  I

22    guess what I'm asking you is are there segments of his

23    opinion that are excludable, whereas other segments are

24    not.

25        If you get past the *Daubert* challenge, is it your

1   position that nothing is admissible even if he *Daubert*

2   qualifies, or is it your position there's simply too

3   much in the report and that I can limit some of it, but

4   not all of it.

5          MS. KELLY:  Your Honor, I think this is a

6   slippery slope and that they're trying to get around

7   the IDRA Act of 1984 and get a temporary insanity in

8   front of the jury.  He can't be held responsible for

9   his conduct because he's suffering from some type of

10  delusional disorder.

11      I think that the report -- not only does it just

12  in one line say delusional disorder and non-bizarre

13  type crimes and then failed to explain in any way how

14  that's related to his conduct.  The report then goes on

15  to talk about motive, that he allegedly had money to

16  pay the alleged tax crime years, he talked about how he

17  allegedly was motivated to protect red-blooded

18  Americans and let them know that federal taxes are

19  illegal.  There's -- he's rigid, inflexible and

20  preoccupied with details and rules.

21      I think that this report, and testifying to this

22  report, is simply a slippery slope that can do nothing

23  but mislead and confuse the jury and is really allowing

24  Dr. Voss to be a mouthpiece for the chief argument that

25  willfulness -- that the defendant was incapable of

 1   violating an intentional but known legal duty because

 2   he suffered from this delusion disorder, and that's the

 3   exact testimony that shouldn't be allowed in under the

 4   Insanity Reform Defense Act of 1984 that --

 5         THE COURT:  I think it's Insanity Defense

 6   Reform Act.

 7         MS. KELLY:  Did I get it backwards too?

 8         THE COURT:  Go ahead.

 9         MS. KELLY:  Yes.  I didn't -- I mean DSM,

10   excuse me.  So I do think it's a slippery slope and I

11   do think that it is not relevant and it should not be

12   admitted under 401, under 402 and under 403.

13         Temporally, there is absolutely no relationship

14   between the doctor's report and the conduct in the

15   indictment.  There isn't even an attempt to relate up

16   the two, which I think is an important fact that needs

17   to be considered and something that the Maryland court

18   considered in United States versus Chance, the case as

19   cited in our pleadings, and I think that this is the

20   type of slippery slope that the 1st Circuit discouraged

21   courts from letting into evidence for the factfinders,

22   that it would confuse the factfinders.

23         It's confusing to the court, it's confusing to the

24   prosecutors if you look at the case law, and it's

25   confusing to the benches and it's not consistent with

```
 1     the case law in the 1st Circuit to let this information
 2     in before the jury.
 3          Your Honor, I'd also like to point out that Dr.
 4     Voss in his first report used the phrase "Messier
 5     believes" more than six times in his December report
 6     and more than eight times in his January report.  I
 7     mean what Dr. Voss is being called to do is testify as
 8     to what he believes the defendant believes and you
 9     can't have that type of expert testimony.
10          The jury will hear him come in and say I believe
11     Mr. Messier believes, and that completely subsumes all
12     of the rules that prohibit that and it's completely
13     irrelevant to the issue of intentional violation of a
14     known legal duty in the context of violating 26 USC
15     7203, willful failure to file income tax returns.
16               THE COURT:  Thank you, Ms. Kelly.
17               MS. KELLY:  Thank you, Your Honor.
18               THE COURT:  Mr. Minns, I'll hear from you for
19     the defendant.
20               MR. MINNS:  Thank you, Your Honor.
21               THE COURT:  Welcome to Maine in March.  I hope
22     it's warmer than this in Houston.
23               MR. MINNS:  I was just grateful for the sun
24     this morning, Your Honor.
25          I'm just reading one short section of the report
```

1   on Page 3, next to the last paragraph.  He was asked

2   about the issue of sovereignty, whether it was

3   individual or collective.  He said that was a dilemma.

4   He had difficulty describing his beliefs about

5   sovereignty clearly.

6       The doctor did go into this sovereignty issue.

7   Internal Revenue Service special agent in his report

8   said that Mr. Messier believes he's a sovereign and the

9   definition of sovereign -- the Government has been

10  handing its expert many, many definitions of sovereign.

11  I don't know whether my client fits any of those

12  definitions or not.  I think he's told many, many

13  people that he believes he's a sovereign, so that will

14  be an issue at trial, whatever sovereign means, but the

15  doctor obviously talked about that issue.

16      I guess the question really is this, and I'm not

17  -- I'm not a psychiatrist, Your Honor, or psychologist

18  and I'm not nearly as knowledgeable on the DSM as

19  Government counsel, but I took that to be an i.e. and I

20  also took it to be not all inclusive; in other words,

21  there's things that tend to show delusional conduct.

22  Delusional conduct ranges from a wide, wide range of

23  things and none of the delusional disorders use all of

24  the things.

25      And so the Government is complaining that it fails

1    to show delusional conduct because apparently that's a

2    cult exception.  If you're a member of a cult, nobody

3    in a cult can have a delusion.  That's how I, as a

4    layman, kind of understood that explanation.  It sounds

5    kind of bizarre.

6         THE COURT:  Let me have you address a couple

7    of the issues Ms. Kelly raises which are a concern to

8    me.  One, the temporal part of this.

9         I've got in front of me an indictment in one count

10   that starts in 1999, I've got other failure to files

11   that are, what, 2006 and forward, I've got a conspiracy

12   charge in 2012.  Dr. Voss's report doesn't address

13   retroactivity of any views he might have based upon his

14   interview in 2013; does it?

15        MR. MINNS:  Um, I don't disagree with that,

16   and again, I'll go back to what learned counsel said

17   about that, Your Honor.  There's no -- there's no exact

18   art of going back in time and saying what someone

19   thought at a specific point in time.

20        There's an ah-ha moment where he stops filing tax

21   returns.  He went to a libertarian committee and saw

22   people that said this and he had this moment.  From

23   that moment on, everything else that he saw or read

24   confirmed what he thought and --

25        THE COURT:  Well, I understand that's your

1    interpretation, but I'm asking a narrower question.

2    Dr. Voss, if I permit him to testify --

3          MR. MINNS:  Yes.

4          THE COURT:  -- is going to testify as an

5    expert, a psychologist, someone who can diagnose

6    conditions.  My question to you, is Dr. Voss able to

7    offer a diagnosis that he had this delusion back in

8    1999?

9          MR. MINNS:  He would be able to say he had it

10    when he stopped filing his tax returns.  I don't know

11    if he will be able to say an exact date or not because

12    I -- one thing we have not done, we have not handed our

13    interpretations to the doctor.  We haven't brought our

14    psychiatrist into the courtroom as a part of our team.

15    We just told him we want an opinion and we've asked him

16    to do that.  So his opinion hasn't been set to line up

17    against the indictment or anything, but those will be

18    the questions that would be asked.

19        His opinion is that Messier's been delusional for

20    a long period of time.  An exact date?  He's not going

21    to be able to do that.  If the law requires him to say

22    that he was delusional on X date -- I think he will be

23    able to say he was delusional during the entire period

24    of all of these charges though and I think that's

25    what's more important.

1          THE COURT:  Let me ask you the other -- a

2     second question that I also asked Ms. Kelly, which is

3     how do you interpret Rule 704(b) in terms of what Dr.

4     Voss actually can say in a criminal case, which this

5     is?

6          MR. MINNS:  The cases seem to go both ways,

7     Your Honor.  Some of them say that he can testify to

8     the statements in some of the cases the Government's

9     offered, that he can testify in the cases and some of

10    them say that he can't and in dicta, I don't know if

11    there's an exact case --

12         THE COURT:  Let's set that aside for the

13    moment, whether he can testify about what Mr. Messier

14    told him; what can his opinion be?

15         MR. MINNS:  I think that he can --

16         THE COURT:  He can't, according to the rule --

17    I'm just reading here -- he must not state an opinion

18    about whether the defendant did or did not have a

19    mental state or condition that constitutes the element

20    of the crime charged.  So he can't testify as to

21    whether Mr. Messier was or was not willful in terms of

22    what he did, correct?

23         MR. MINNS:  Yes, Your Honor, I believe so.

24         THE COURT:  So what can he testify?

25         MR. MINNS:  He can testify that he is

1    delusional, that he was -- he can testify within a

2    medical certainty that when he examined him, he was

3    delusional, he can testify with a high amount of

4    probability that he was delusional when the ah-ha

5    moment occurred 15 or 20 years ago, and he can testify

6    to that and he can testify -- what I understand the

7    delusion is, we all have automatic pilots when we're

8    driving home and automatic pilot makes us move in one

9    direction or the next.  And then we have our

10   intellectual thought process that says no, we can't

11   turn here because there's no road.

12        The delusion says there is a road and it's -- it

13   avoids the fail/safes that most of us have.  I think he

14   can testify to that.  It's something I didn't

15   understand until I got involved in this case.

16        He can testify to that.  It's up to the jury, one,

17   to believe whether our psychiatrist is correct.  It's

18   up to the jury, two, to believe whether the Government

19   psychologist is correct.  He didn't do any testing

20   either, by the way, and he had access to him to do

21   whatever he wanted to do, and then it's up to them to

22   apply his mental disorder to the issue of willfulness.

23        I think the jury can legally still find

24   willfulness.  We haven't asserted an insanity defense,

25   and I think the jury can still find that he is willful.

1          THE COURT:  Well, let's then come to the issue

2     that you started to address and I turned you aside from

3     it and, that is, what -- if I allow Dr. Voss to

4     testify, what he can say about what the defendant told

5     him and let me put the question to you slightly

6     differently.

7          Is it your contention that Dr. Voss can testify

8     even if your client does not take the stand?

9          MR. MINNS:  Yes, sir.

10         THE COURT:  And why?

11         MR. MINNS:  Well, that's what psychiatrists

12    do, they testify on the basis of the statements that

13    they have.  The hearsay is admissible.

14         THE COURT:  But you're then offering it for

15    the truth certainly, you're offering it to show what

16    your client's beliefs were at the time of the events in

17    question and your client's not going to be subject to

18    cross-examination on that.

19         MR. MINNS:  I think that's a troubling thing

20    whenever you have an expert testify based on hearsay

21    and the rules allow it to come in, allow experts to do

22    that.

23         THE COURT:  You'd be on a lot stronger ground,

24    would you not, if your client took the stand first and

25    then you said now, I want to have Dr. Voss, whose been

```
 1   sitting here in the courtroom, testify as to whether
 2   these statements are consistent with something that
 3   might be delusional.
 4           MR. MINNS:  Yes, I think we would have an
 5   impregnable stand at that point, Your Honor.  I
 6   understand the argument against it.  I still believe
 7   that the hearsay is admissible, but it's not based on
 8   hearsay if the client takes the stand.
 9           THE COURT:  Would I be correct or incorrect if
10   I let you do that and then told the jury that they
11   could not consider the truth of what your client said
12   to Dr. Voss in terms of deciding whether he had
13   willfulness at the time in question.
14           MR. MINNS:  If he does not take the stand, I
15   believe you'd be correct, Your Honor.
16           THE COURT:  I would or would not?
17           MR. MINNS:  I believe you would.
18           THE COURT:  So you're saying -- I mean the
19   reason I ask that is under the medical hearsay
20   objection, it arguably comes in for the truth, which
21   arguably lets your client therefore to advance things
22   without taking the stand himself to testify, which
23   gives me concern.  That's certainly not the norm in a
24   criminal case.
25           MR. MINNS:  You've posed a question which
```

1    wasn't in the briefs which is making me want to -- it's

2    a very interesting, reasonable question, Your Honor.

3         I think it may come in for the truth of the matter

4    asserted.  I know now, having faced this interesting

5    dilemma with the Court at the point that we offered it,

6    we will definitely research that if, indeed, we don't

7    put my client on the stand.

8         And there's -- there's -- he's a sweet and

9    intelligent elderly gentleman, but any layman -- as a

10   layman, Your Honor, there's things missing there,

11   but --

12             THE COURT:  Can you pause just a moment.

13             (Discussion off the record between the Court

14   and the law clerk.)

15             Sorry, go ahead.

16             MR. MINNS:  When -- as the doctor said when he

17   went right into -- when our doctor went right into the

18   meat of the thing, he said he had difficulty describing

19   his beliefs about sovereignty.  Here's something he's

20   been studying for 20 years every day of his life,

21   except when he was in the hospital for cancer, and he

22   can't give --

23             THE COURT:  Now, you just said things the jury

24   won't hear, right?  If your client doesn't take the

25   stand, they won't know that.

1      MR. MINNS:  Um --

2      THE COURT:  Unless you're saying he told all

3  that detail to Dr. Voss.

4      MR. MINNS:  Well, I think he gave a great deal

5  of that detail to Dr. Voss.  I think Dr. Voss's report

6  said that he studied it constantly, consistently, and I

7  don't have the exact language, but the Court has the

8  report.

9      THE COURT:  So you're saying that Dr. -- so

10 Dr. Voss, you're saying, should be able to give an

11 opinion that he suffers from a delusion.

12     MR. MINNS:  Yes, Your Honor.

13     THE COURT:  And you're saying he should also

14 be able to tell the jury the things that Mr. Messier

15 told him.

16     MR. MINNS:  Yes, Your Honor.

17     THE COURT:  Do you agree that he can't comment

18 on his credibility to the jury in terms of if Mr.

19 Messier should take the stand, he can't comment on

20 credibility, correct?

21     MR. MINNS:  Yes, I don't think that -- I don't

22 think that --

23     THE COURT:  All right.  So what, if anything,

24 would you be asking him about credibility about the

25 things that Mr. Messier said to him outside of court?

1          MR. MINNS:  I can't -- I can't think of a

2     question on that.  I guess for credibility, he can

3     say -- he can talk about his nervousness, his attitude,

4     his appearance, things like that, which is what laymen

5     testify to also.  A mental intent crime is almost --

6     unless someone says I had that mental intent, it always

7     has to be proven through the witnesses and the

8     circumstances around them.

9          I think he can say that as a psychiatrist, I think

10    -- I don't remember the exact amount of time, 25 years

11    of study, I think he can say that based on his

12    experience, he appeared credible.  The ultimate

13    decision is the jurors.

14          THE COURT:  I understand.

15          MR. MINNS:  He's not going to take that out

16    there.  What troubles me deeply, and in almost all of

17    the cases there's a balancing test, but when there's --

18    there's never been one excluded when it goes to the --

19    the exclusion is always based on well, he's nuts or

20    he's this or that and therefore he doesn't have the

21    scienter and those have been sometimes kept out.

22          Never has -- there's a case cited before this

23    Court where they are -- and they all say goes to the

24    element itself of the state of mind.  If it goes to the

25    element of state of mind and that's an issue in the

1    case, then it's admissible.

2        I don't think there's any authority to prevent

3    that from happening.  I think it would be a tragedy too

4    -- I mean Mr. Messier paid double, triple, quadruple

5    taxes because of the seizures on his property.  No

6    rational person would continue to do that, even --

7            THE COURT:  That sounds like closing argument,

8    but this is not Dr. Voss.

9            MR. MINNS:  Yes, Your Honor, no.  Well, I do

10   -- there is some -- it's an irrational -- delusion is

11   an irrational act.  If you don't want to pay taxes, but

12   you end up paying double your taxes because you're

13   violating the rules --

14           THE COURT:  But does Dr. Voss say that?  I

15   understand that's your position.

16           MR. MINNS:  Dr. Voss -- Dr. Voss has said that

17   the fact that these signs didn't mean anything means

18   that it was not economically motivated because he's

19   losing money by this.

20           THE COURT:  I understand.

21           MR. MINNS:  So Dr. Voss -- and this is part of

22   Dr. Voss's opinion, I believe, that it doesn't -- why

23   does he keep doing this?  He keeps losing -- I mean net

24   money, he loses net money.

25       I mean he doesn't have a -- if there's a criminal

1   mind, there's an issue to make a profit doing this.  He

2   should not pay the taxes and conceal the money in

3   Switzerland or something and benefit from it, but if

4   he's constantly being forced to pay the taxes -- when

5   you're going down the highway of life and you keep

6   taking the turns and there's no exit, that's delusional

7   behavior.  It doesn't make any sense.

8       I don't see him being -- I haven't spent as much

9   time with him as the Government has, as the special

10  agent has, they have because he is so far -- and both

11  of these gentlemen, until they got counsel, never

12  dreamed of remaining silent.  They gave up all 5th

13  Amendment rights and so the Government's heard

14  everything that they've got to say in a multitude of

15  different things and I don't foresee the possibility of

16  justice or acquittal if the jury does not know that

17  there's something mentally wrong and all of these

18  factors add up to that.

19      Whatever -- and I'll take the Court's suggestion,

20  whatever the Court rules.  If the Court gives specific

21  limitations, those will be, you know, pulled off by the

22  court reporter and then we'll hand them to our expert

23  so that he will follow them and we will ask questions

24  and answers.

25      I think the doctor should be able to give his

1   analysis.  I think if the jurors find that this conduct

2   is -- if the jurors find that he is not delusional,

3   then they will convict him and if I don't have -- and

4   he is delusional.  These things are -- the conduct is

5   irrational and -- but the jurors will see that.

6          We're -- my client and I, I really like this man,

7   but he doesn't agree with anything that I'm doing in

8   this case, and I have to apologize to him a little bit

9   because he does not believe that he's delusional so it

10  creates an awkwardness.  He's functional, he does

11  normal, valuable things, he has -- he's totally

12  isolated because whenever the delusion takes over,

13  people who he's been good to, who should love him,

14  begin to hate him.  They can't stand him when the

15  delusion takes over and it's a fact of his life and

16  that's who he is and that's who the jury should get to

17  see.

18         I don't know what will happen if I -- this is one

19  of the struggles that both lawyers are having, whether

20  or not to put clients on the stand when they don't have

21  a clue what they're going to say.  And so I mean if I'm

22  forced to put a delusional man on the stand in order to

23  get the doctor on, I'll obey that order.  I don't, I

24  don't like to be forced to do that, but if that is --

25  if that is the distinction, then I'll put him on the

1    stand and they'll cross-examine him, but --

2            THE COURT:  I understand.  Thank you, Mr.

3    Minns.

4            MR. MINNS:  Thank you, Your Honor.

5            THE COURT:  Mr. Vincent, are you impacted by

6    this at all?

7            MR. VINCENT:  I am, Your Honor, if you will

8    permit me to make a few comments.

9            THE COURT:  All right.

10           MR. VINCENT:  As I'm sure the Court is

11   well-aware, my client is charged in Count 2, an

12   allegation of conspiracy to defraud the United States.

13   The time period of the claimed conspiracy is 2012.

14       I disagree with the Government, first of all, in

15   its assertion that the issue of Dr. Voss being able to

16   opine on his evaluation of Mr. Messier is a slippery

17   slope.  I believe a proper ruling from any Court, along

18   with proper jury instructions, will prevent the type of

19   dilemma that the Government insists will happen in this

20   case.

21       I also disagree with the assertion that in this

22   case, it was only potentially one, what's been called,

23   an ah-ha moment.  I'm obviously concerned about both my

24   client's state of mind and Mr. Messier's state of mind

25   at the time of the claimed conspiracy in Count 2.

1          Certainly information about 1999 and 2006 might be

2     relevant to some degree to my client, but ultimately,

3     it's Mr. Messier's state of mind and my client's state

4     of mind in 2012 that's going to be relevant to my

5     client's case.

6          THE COURT:  And how are you impacted by

7     whether Dr. Voss does or doesn't testify since he's not

8     examined your client?

9          MR. VINCENT:  Well, if -- for example, if Dr.

10    Voss testifies not necessarily about the client's

11    statements and beliefs, but his rigidity of thought,

12    his lack of being insightful, his psychological

13    investment in his tax positions which, Judge, could

14    fluctuate over time, he could very well have a very

15    deeply rooted psychological position to his taxes in

16    2012 that he didn't have in 2006 and 2000.  I'm not

17    saying that he does, but I'm just saying that certainly

18    it's a possibility.

19         I think Mr. Messier and my client both have

20    provided ample information to the Government that their

21    thought processes on taxes evolved over time, and there

22    were other things that came to their attention in

23    succeeding years -- in years past that -- not just 2000

24    and 2006, but in 2012 there were things that came to

25    their attention that reinforced their beliefs.

1          I had a client several years back, Judge, he was a

2     victim of the Nigerian lottery scam and it was a

3     situation where he believed he was going to get a lot

4     of money and he had to send a few hundred dollars to

5     Nigeria in order to get it and over time, he ended up

6     selling his house, selling his business, sending all of

7     that money to Nigeria and he ended up then defrauding

8     through mail fraud, wire fraud some individuals.

9          He came to court, admitted that conduct, insisted

10    that the reason for the conduct was simply because he

11    was steps away from millions of dollars.  The point was

12    he was so psychologically invested at that point in

13    time that he, in fact, asked the Court for a stay of

14    execution of the sentence because he needed to send one

15    more payment to Nigeria.

16         And I think this is the type of psychological

17    investment that Dr. Voss might be able to speak to, and

18    not necessarily any specific statement of the defendant

19    that would be important and obviously, Mr. Messier's

20    state of mind is just as important to the conspiracy

21    count as my client's because there has to be a concert

22    between two people in order --

23              THE COURT:  Let me make sure I understand what

24    you're saying.  I had been thinking up until now that

25    you were hoping for maybe a spillover effect from what

1  Dr. Voss might say about Mr. Messier, that maybe the

2  jury might infer that your client was in the same

3  position, even though you're not offering a

4  psychological evaluation.  Now I hear you saying

5  something different.

6      You're saying -- are you saying that if the jury

7  concluded that Mr. Messier was not able to meet the

8  willfulness requirement of a conspiracy, that then your

9  client can't be guilty?

10         MR. VINCENT:  Well, I don't think there's a

11  willfulness requirement for conspiracy.

12         THE COURT:  Not on the tax story, but there is

13  a willfulness element.  It's a different element.

14         MR. VINCENT:  Yes, and it's to defraud.  So if

15  Mr. Messier obviously does not believe that he's

16  defrauding the Government in his actions, there

17  couldn't be a conspiracy.  I would say --

18         THE COURT:  I think I need some briefing on

19  that.  That's an interesting question.  You're

20  basically saying two people can conspire to do

21  something, but if one person has a misconception about

22  it, then the conspiracy -- as to the legal --

23         MR. VINCENT:  Then it's not a conspiracy.

24         THE COURT:  I think I need some research on

25  that before --

 1         MR. VINCENT:  I mean basically, could the jury

 2    find one defendant guilty and the other defendant not

 3    guilty and have it still be a conspiracy?  The

 4    Government has to charge a substantive offense --

 5         THE COURT:  I suspect it can.  Well, they

 6    can -- for example, they might find proof beyond a

 7    reasonable doubt as to one, but not as at to the other.

 8    There could still be a conspiracy, but a failure of

 9    proof.

10       I understand your argument, but I would like some

11    briefing on that, but go ahead.

12         MR. VINCENT:  That's basically the comments

13    that --

14         THE COURT:  While you're on your feet, I

15    should say for the record that I did receive in the

16    mail the last couple of days ago some publications from

17    your client.  I haven't read them and I won't read them

18    because I'm about to preside at trial, but I did

19    receive something called "Patriot Publication" and

20    something called "You Know Something's Wrong", just for

21    the record.

22         MR. VINCENT:  Oh, I received those too, Judge,

23    so I don't feel left out.  Thank you.

24         THE COURT:  Thank you, Mr. Vincent.  Brief

25    rebuttal, Ms. Kelly.

1          MS. KELLY:  Your Honor, just to clear up a

2    misconception, when Dr. Voss talks about it making no

3    sense -- when Dr. Voss basically adopts Mr. Messier's

4    statement that it makes no sense, he could have paid

5    his taxes and he would have paid less than what he's

6    paid for his defense, Mr. Messier misrepresents the

7    amount of outstanding taxes that are due and owing and

8    the doctor takes what Mr. Messier tells him at face

9    value, includes it in his opinions, his conclusions,

10   and says that if he just paid his taxes, he would have

11   paid less than what he's paying in his criminal

12   defense.

13         Well, indeed the amount of money in this case only

14   involves the taxes for 2000 and 2004 and if you take a

15   look at Dr. Voss's report, he misstates it at least

16   three times that the defendant has paid the outstanding

17   taxes due and owing to the IRS from 2000 to 2012 and

18   the only amounts remaining is from 2012 going forward.

19         So Dr. Voss is suffering from a fundamental

20   misunderstanding from Mr. Messier and his attorney who

21   explained to him the charges in the indictment.  He

22   seems to think that Mr. Messier doesn't owe outstanding

23   taxes.  Only the 2000 to 2004 years were part of that

24   lien.  So I just want to point that out because that's

25   a factual misunderstanding that Dr. Voss has from

1    speaking to the client and the defense attorney

2    regarding the charges.

3        Your Honor, I think that what you're saying with

4    regard to 704(b) is that basically Dr. Voss is

5    prohibited from giving his conclusory opinion that the

6    defendant suffers from this delusion and therefore

7    couldn't form mens rea.  I think 803(4) speaks to

8    allowing the defendant's statements to Dr. Voss into

9    testimony as non-hearsay and speaking to the truth of

10   the matter asserted.  So that presents Dr. Voss

11   basically as an expert on what the defendant believes

12   and the credibility of his beliefs.

13       I think that what the defense attorney -- what the

14   defendant is trying to do in this case is do an end run

15   around the Insanity Defense Reform Act and what's

16   really going on here, the argument is my client is not

17   guilty because he couldn't form the mens rea, and so

18   he's really not guilty by reason of insanity and if

19   that's really what they're trying to do, and if that's

20   what I heard his argument to be without actually saying

21   it, then they need to prove that by clear and

22   convincing evidence and they need to comply with the

23   statute and put that before the jury, if that's what

24   they want to put before the jury.

25       But if they are constrained by 704(b) and what the

1   IDRA says, then that can't come before the jury and

2   then it's just pieces of the report and that's not

3   relevant to the finding of mens rea.  It's confusing,

4   it's misleading, it's distracting, it's being the final

5   factfinder for the jury and that's their job.

6        It introduces all kinds of confusement -- which is

7   not a word -- all kinds of confusing issues to the jury

8   that they are not capable of resolving.  It becomes a

9   total mess basically.  But if what he's saying is his

10  client can't form the necessary intent, the intentional

11  violation of a known legal duty, then that's insanity

12  under the IDRA, and if that's not what he's saying,

13  then what he's saying is exactly what the IDRA

14  prohibits coming from evidence under 804(b).

15       Then the rest of the report then is irrelevant

16  under 402 -- 401, 402 and 403.  It's not temporally

17  related, it's confusing, it's misleading and it's

18  simply not relevant under that analysis.

19       Finally, I just want to point out, Your Honor,

20  that defendant's rhetoric that he provided to Dr. Voss,

21  as was brought to your attention in Dr. Wisch's report,

22  is the standard chapter and verse recitation of

23  information and propaganda that the sovereign citizen

24  subculture subscribes to and sovereign citizens are a

25  substantial portion of the population.  They're, at

1    this point, a minority population of the criminal

2    defendants, but nevertheless, it is a subculture and

3    those beliefs are part of their subculture and they

4    espouse them.  They're anti-Government beliefs.

5        I think that it's a slippery slope to label those

6    beliefs and the espousing of those beliefs and their

7    recitation of those learned and fixed beliefs as

8    delusion.  I think that's a slippery slope for labeling

9    an anti-Government group as insane under the DSM as not

10   able to form intent.  I think that's problematic for

11   the courts and for the country and for the law.

12              THE COURT:  Thank you, Ms. Kelly.

13              MS. KELLY:  Thank you, Your Honor.

14              THE COURT:  Let's turn then to the other

15   motion.  Let me organize my papers here and let me make

16   just an introductory comment.

17       I know that there are what we judges call local

18   legal cultures that vary around the country, even in

19   federal courts in terms of practice of what takes

20   place, et cetera, and on motions in limine, in Maine we

21   do not frown on them.  However, it's also the case that

22   sometimes they raise issues that a judge will say I

23   cannot or will not rule until trial, or a judge may say

24   this is what I'm likely to do, but I will revisit it

25   depending upon how the evidence comes in, whether the

1    foundation is laid or whatever.

2         So I don't reject the motion out of hand and I'll

3    hear your argument, Mr. Chapman.

4         MR. CHAPMAN:  Thank you, Judge, and I was

5    going to start off with something along those lines.  I

6    understand it's difficult for the Court to give a

7    pretrial ruling on a lot of these issues, but I did

8    want to raise these issues for the Court's attention

9    because I anticipate some of them coming up at trial.

10        Nevertheless, you know, for purposes of opening

11   statements, I think the Court could make a ruling that

12   certain types of statements or arguments during opening

13   statements would not be permissible in this case, and

14   certainly until the Court makes a ruling on whether Dr.

15   Voss would testify, I would think that any statements

16   about what Dr. Voss may say shouldn't be brought up in

17   open court or during the opening statements.

18        In addition, certainly statements about whether or

19   not the defendants were going to pay the tax, whether

20   Mr. Messier was going to pay the taxes due in this case

21   regardless of the jury's verdict in this case, you

22   don't have to worry about that, they are going to pay

23   those taxes, that's inappropriate in opening statement

24   and it would be inappropriate at any time during the

25   trial because it's inviting jury nullification.

1          This Court should be giving an instruction in this

2     case -- and we haven't submitted one yet and probably

3     will -- that this is a criminal case, not a civil case

4     and so your role in this case is to determine whether

5     or not the defendants violated the criminal statute and

6     not be concerned about whether or not taxes will or

7     haven't been paid at any point along the line.

8          Similarly, they shouldn't be allowed to state

9     during opening statements or questioning of witnesses

10    at any point during the trial about the civil remedies

11    that the Government has to collect taxes.  Again,

12    that's beside the point in a criminal case.  The jury's

13    going to be asked to decide whether or not the

14    defendant willfully failed to file his tax returns on a

15    given date and it's really not relevant that the IRS

16    has civil means to collect those taxes.

17         On the other hand, in this case a lot of this case

18    has to be about what the defendants did to obstruct the

19    IRS, so certainly there has to be some type of

20    testimony about the collection process from Government

21    witnesses, to explain how that process was interrupted

22    and obstructed, but it ultimately would be

23    inappropriate for the defendants to suggest to the jury

24    or to argue to the jury that whatever your verdict in

25    this case, you should know that all the taxes will be

1   collected and the Government would be made whole.  I

2   think that's something the Court could rule on prior to

3   trial.

4        In addition, statements about the penalties that

5   the defendants are facing in this case, Mr. Vincent

6   concedes that that type of statement is not

7   permissible.  Mr. Minns concedes that it's usually not

8   admissible unless it's appropriate to cross-examine a

9   witness who has some type of benefit from a reduction

10   in sentence.  That's how I construed his argument.

11        We don't have any of those witnesses in this case.

12   We don't have any witnesses also that will say that the

13   defendant is not afraid to go to jail.  We do have

14   witnesses who will say that they warned them that you

15   could go to jail if you continue with this conduct.

16   That's relevant to the defendant's knowledge and

17   intent, but we don't have witnesses that will say the

18   defendant's not afraid to go to jail and so I think the

19   maximum penalties in this case that the Court might

20   impose is never really relevant for the jury to

21   consider.

22        So in opening statement or anything along the

23   lines of questioning the witnesses about the defendant

24   could go to jail for up to five years on this

25   conspiracy count and up to one additional year for each

1    count of conviction on the failure to file, that would

2    certainly be inappropriate and I know the Court's given

3    instructions on that many -- in many cases that the

4    jury is not to considered the penalty.

5         With respect to the questions I anticipate from

6    defense counsel, questions to IRS employees about their

7    understanding of the tax code and how confusing the tax

8    code is, well, we're not offering any witness as a tax

9    expert and whether or not they understand the tax code

10   is really not the issue in this case.  It's what the

11   defendant understood with respect to his duty to file a

12   tax return on the date that it's due.  So whether or

13   not the witness knows some of the minutia of the tax

14   code is really not the point and shouldn't be allowed

15   as questions.

16        With respect to the defense exhibits, obviously we

17   don't know what they're going to offer.  I know that

18   from Mr. Robinson, I received probably 25 publications

19   that he wrote.  I don't know if he's going to take the

20   stand, I don't know if he's going to be offering those

21   books as exhibits, but certainly those are books that

22   he wrote so he can't really say he relied on them.

23   What they contain are one misstatement after another

24   about the state of the law.

25        So those books -- and I know the Court from the

1   civil cases that these two defendants were involved in

2   probably saw a lot of those books as exhibits so you're

3   probably familiar with them.  Those should not be

4   allowed in front of the jury.  They are not relied upon

5   by the defendant because he wrote them and they do

6   nothing but mislead the jury about the law.

7       With respect to Mr. Messier's exhibits, again I

8   don't know what exactly he's planning on presenting.  I

9   do know that if he wants to present any of those

10  documents as evidence of things that he relied on, Mr.

11  Messier can take the stand and say that, unless there's

12  some other way you can put that before the jury.  And

13  even then those documents, again from what I've

14  reviewed so far of the 3100 pages or so of reciprocal

15  discovery I received, again that's basically tax

16  protester literature, packets from various antitax

17  groups about how to beat the IRS, instructions on how

18  to formulate a cheap defense, various other -- just

19  misstatements about what the law is and those shouldn't

20  go in front of the jury as full exhibits for them to

21  pour over during jury deliberation.  That would do

22  nothing but confuse and mislead the jury when it's the

23  Court's role to instruct the jury.

24      So I just wanted to tee up these issues for the

25  Court and hopefully get some guidance about the types

1   of things that would not be appropriate during opening

2   statement for defense counsel.

3           THE COURT:  Before you sit down, just let me

4   look at my notes here.  The defendant has referred to

5   use of the term tax protester and has referred me to, I

6   think it was, an internal memorandum concerning IRS

7   employees use of the term and there are some decisions

8   that talk about whether that pertains or does not

9   pertain in court.

10       What's your position on that?  Do you expect that

11  term to be used by any of your witnesses or by counsel?

12          MR. CHAPMAN:  Um, I expect to use it in

13  closing argument because that's what this case is.  The

14  law that was amended applies to the IRS or Treasury

15  employees.

16          THE COURT:  Do you think any of those who take

17  the stand would be using the term?

18          MR. CHAPMAN:  No.

19          THE COURT:  So you're saying it won't come up,

20  except at closing.

21          MR. CHAPMAN:  Right.  It won't come up through

22  IRS employees.

23          THE COURT:  Right, thank you.

24          MR. CHAPMAN:  Does the Court have any other

25  questions?

```
 1              THE COURT:  That's fine, thank you.  Mr. Minns
 2    for the defendant Messier.  Is it Messier or Messier?
 3    In Maine, we sometimes use the French and sometimes we
 4    don't.
 5              MR. MESSIER:  It's French, Your Honor.
 6              THE COURT:  Messier?
 7              MR. MESSIER:  Messier.
 8              THE COURT:  You Anglicize it.
 9              MR. MESSIER:  I pronounce it Messier.
10              THE COURT:  Messier, alright.  Very good.
11              MR. MINNS:  You exposed one of my shortcomings
12    in the profession.  I get names wrong constantly and
13    this has been difficult and we have local counsel named
14    Bill and the client's named Bill.
15              THE COURT:  He's Maselli, not Messier.
16              MR. MINNS:  I know, but both first names start
17    with an M and somehow in my mind, I don't think it
18    rises to the level of delusion, but I mix names up and
19    I apologize.
20         I'd point out to the Court the Government has
21    cited United States versus Garber and said that the --
22    in the briefs said that Ms. Garber's conviction was
23    sustained by the 5th Circuit and she wasn't allowed to
24    put in expert witnesses, but they failed to note that
25    that had been reheard en banc and she won when it was
```

1    reheard en banc and the winning of Ms. Garber is 607

2    F.2d 92.  I don't think that was intentional on the

3    Government's part, but it emphasizes our point that

4    experts should be allowed and how difficult -- because

5    it went en banc in the 5th Circuit, how difficult it is

6    for the experts to do that.  I mentioned it now because

7    it appears in the second Government brief.

8            THE COURT:  Very good, thank you.

9            MR. MINNS:  Civil remedies are in evidence

10    because the Government has chosen to make it an

11    indictment.  They've indicted him for interfering with

12    the liens and levies.

13            THE COURT:  But the argument as, I take from

14    it Mr. Chapman, is not that they won't be in evidence,

15    they will, but he's saying you should not be permitted

16    to argue to the jury that that's the Government's

17    remedy rather than criminal charges.

18            MR. MINNS:  Well, it's kind of absurd if I

19    can't comment rational discourse on the evidence that

20    is before the jury.  The evidence before the jury is my

21    client was difficult, loud, obnoxious, threatened to

22    sue people because he didn't want the levies to be

23    enforced and didn't believe they were legally

24    enforceable and he kept finding out he was wrong.  He

25    ends up paying the five percent a month penalty and all

1   of the other stuff over and over and over again.

2   It's part of his delusion and it's part of the

3   evidence for the Government in this case and so the

4   natural response is to be able to say this.  I mean --

5   and the jurors need to know -- the Government's said

6   eloquently that this is not a civil case and the jurors

7   need to know that.  This is the civil process and this

8   is what happens in the civil process.  The Government

9   can elect to make a criminal process, a federal case

10  out of it if they choose and this is the criminal

11  process and it's entirely unrelated.  That's an area

12  where we agree with the Government.

13  But to say there is no civil process when they're

14  charging him -- if this were only a failure to file

15  case, that would be an issue, but they can't put

16  evidence in and say we can't comment rationally on the

17  value of the evidence and where it leads a rational

18  person to go and because of this delusion -- it's more

19  evidence of the delusion.

20  Rational person, even if they believed that they

21  weren't required to file, would start filing when

22  they're paying double taxes.  It's not rational.  I

23  mean a rational person would quit beating their head

24  against the wall.

25  So it's in evidence by the Government.  The

1    Government is saying -- it's kind of in this position

2    too where they don't want lay witnesses to talk about

3    the demeanor of my client when they say he was loud,

4    when they say he was annoying, these things, they don't

5    want him to talk about that because you shouldn't be

6    allowed -- lay witnesses aren't competent and then in

7    the motion we just heard, they said professional

8    witnesses aren't competent and what they're really

9    saying is they don't want this to be a criminal case,

10   they want it to be a civil case.  We're conceding civil

11   violations so we should be able to comment on that, on

12   the reasonableness of that.

13        We discovered -- we discovered through the

14   Government's expert opinion that my client believes

15   that he -- that one day he believes he will be

16   acquitted, the next day he believes he will be

17   convicted.  If he's convicted, he believes he will go

18   to prison and he will be killed in prison.

19        We've developed -- realized that from the

20   examination of the doctor, which is one reason why I

21   wanted to see a sentencing so -- he's so scared

22   sometimes that he's going to end up being killed after

23   his trial that it's hard sometimes even to talk to him

24   and he's just trembling in fear and sometimes he wants

25   to just stop and be killed.

1          So the stress, the stress is his fear factor,

2     which is delusional and I'm hoping that seeing a

3     sentencing may have helped him this morning, but the

4     penalty is very much in his mind.

5          I didn't make this up, it came out of one of the

6     memorandums of interview where one of the Government

7     witnesses said that he's not afraid of going to prison.

8     So now, the Government says they will not ask that

9     person that question, but it is on that memorandum and

10    they may ask him -- he may say he was not asked, I may

11    choose to cross him on it, depending on --

12    cross-examination is not a science, it's an art.  I

13    know there's books now saying it's a science, but I

14    don't agree with that, I don't agree with them and

15    sometimes you don't know what question you're going to

16    ask until you see the witness up there on the stand.

17         Most of the witnesses -- some of the witnesses

18    refuse to talk to us so we won't -- we don't have a

19    preview of anything except the memorandum of interview.

20         As far as the discussion saying how much taxes are

21    due and how much are owed and this and that, if the

22    Government puts an expert on and gives her expert

23    opinion about the amount of taxes that are due and

24    owing, then I expect to be able, as I always have, to

25    cross-examine them on their accuracy.

1      We have offered to stipulate that a tax is due and

2  owing, so the purpose of putting them on the stand is

3  to show prejudice, I guess, but they're allowed to

4  prove their case any way they want.  They are not

5  required to accept a stipulation so I understand that.

6      But if they put them on for that purpose, which is

7  to prove that over $100,000 was due and owing, then I

8  have a right to cross-examine the credentials of that

9  expert and their skill at tallying the figures if I can

10  bring it down or not.  I prefer just to stipulate that

11  there's a tax due and owing, but that's not my right.

12  The Government has a right to put their case on any way

13  they want.

14      As far as the evidence, I mean I'm required --

15  sometimes I don't agree to Rule 16 reciprocity.  In

16  this situation, I probably would have because they have

17  everything anyway, but I don't know, but that was done

18  before I got on the case and so we have -- and I told

19  the Government on a phone call he was going to get a

20  whole barrage of stuff and he said I don't have to send

21  the books, I can just send a cover and I said that's

22  good because we don't have copies of all the books so

23  we would have had to order them so I'm grateful for

24  that concession, but I also told him I don't intend to

25  put all this stuff in.

1          What we do intend, and hope that there's not going

2     to be a whole big Government disagreement over it, I

3     want to show pictures of piles of stuff.  We might

4     bring a few boxes of stuff and then pull out a few

5     things to show that he legitimately relied on things,

6     that he didn't make them up wholesale.

7          For example, there's a movie that he watched and

8     in the movie, there's four IRS agents and CPAs who say

9     you're not required to file tax returns.  I think

10    jurors would tend to think that's BS, we don't believe

11    any ex-Government or Government agents ever said that.

12         So we have proposed to the Government -- see if we

13    can get an agreement from the Government, we gave them

14    the entire two and a half hour film, but we don't

15    propose to show the two and a half hour film, just the

16    five-minute segment that shows these people saying

17    these things and we're not offering it for the truth of

18    the matter asserted.

19         The Court will instruct them that these people are

20    incorrect.  We will agree -- my entire defense is that

21    I disagree with them, but they support the delusion.

22    It may be the only --

23              THE COURT:  It may be the what?

24              MR. MINNS:  It may be the only case that we

25    have -- it is the only case we have if the Court does

1    not allow our doctor to testify.  The only case we have

2    is we relied on these people and to show these people.

3        All of the cases -- the Government cites the

4    Willie case, which was the second case to come out

5    after Cheek.  Cheek says you've got to be able to tell

6    them what you relied on.  The Willie case says the

7    Government can -- the judge needs to be able to make

8    sure what goes into the jury and there was no predicate

9    leg by Willie offering -- making the offer, he didn't

10   make the predicate so there's nothing to rule on in the

11   appellate court.  It was a 2-to-1 decision in the 10th

12   Circuit.

13       At the same time, the Powell case came out and in

14   Powell, the Court unanimously said you've got to be

15   able to show them -- and it was reversed and remanded

16   for a new trial -- you've got to be able to show them

17   what you've relied on.

18       Now, that's the state of the law in really every

19   Circuit.  You've got to be able to show them what you

20   rely on, but the law also doesn't allow us to take

21   500 pounds of paper and dump it in there and it doesn't

22   allow us to offer the theory that -- this is one of the

23   theories -- that Queen Elizabeth right now is in on

24   this plot to do these things to make American slaves.

25       It may not surprise the Court that we won't be

1    supporting that as a legitimate theory of law, but that

2    is actually one of the theories relied on and one of

3    the reasons that this is delusional behavior and I

4    don't think that the groups that they're talking about

5    subscribe to this.  Our client believes that George

6    Washington was a traitor.  I can guarantee you that

7    these right wing groups do not believe that.  They

8    worshipped the Founding Fathers who -- though nothing

9    could have ever been wrong or anything else, so the

10   theories don't fit in with the so-called culture group.

11       What I want -- what we are proposing, and this has

12   never been rejected by any appellate court, is that we

13   take a small sample of the issues, that we offer them

14   for what he relied on, not for proof of the matters

15   asserted therein.  As a matter of fact, more strongly

16   sometimes than with hearsay, you offer it not for the

17   proof of the matter, but then you're hoping that

18   they'll say well, but maybe it does prove the matter.

19       We're going to absolutely stipulate -- I'm going

20   to be arguing that it doesn't prove the proof of the

21   matter.  The Government's whole argument is kind of

22   ignoring our defense, which is not under the insanity

23   defense act, which specifically allows negating mental

24   aspects.

25       I think I may have -- well, let's see.  Oh, this

 1    is something that we mentioned since the Court -- since

 2    this is a local practice, our client is a nonviolent

 3    passivist, turn the other cheek kind of person and the

 4    Government should not be handing in these -- to their

 5    doctor and -- on these motions and stuff of groups that

 6    advocate violence and things like that.

 7         I right now want to -- I think we put this in some

 8    of our responses, but we're very concerned that they're

 9    going to get up and inflame the jurors and try to

10    equate our client with these violent groups or these

11    crazy groups or these racist groups.  Our client has

12    not advocated any of that at any time.  He said that he

13    won't defend himself if someone strikes him because

14    it's required by his religious faith to turn the other

15    cheek, so that's critical.

16         The currency transaction report things are

17    prejudicial too.  We don't -- I don't know what -- my

18    client does not trust banks.  Now, maybe that's a

19    mainstream position after 2008, but he doesn't trust

20    banks and he's one of the tens of thousands or hundreds

21    of thousands or whatever who cashes everything he can

22    and doesn't want to have money transferred in a bank

23    account.

24            THE COURT:  So let me make sure I understand

25    that one.  If the Government is suggesting that shows

1    motivation to avoid taxes, are you saying that's not

2    admissible?  I understand your client may want to

3    explain it and say why he did it, but how is it

4    inadmissible?

5          MR. MINNS:  Well, I don't think it's

6    admissible -- they don't have evidence that he's trying

7    to avoid the currency transaction report.  My

8    understanding is that they want to say that this is --

9    they want this as a 404(b).  I may be incorrect.

10          THE COURT:  We will find out when Mr. Chapman

11    gets back up.

12          MR. MINNS:  Yes, and so there's no -- there's

13    no predicate for that.  He cashes everything so I hope

14    that won't be brought up as an additional crime.  It's

15    not related to filing or not filing income taxes unless

16    he's hiding the money.

17          THE COURT:  Let's pass it until I hear the

18    Government's theory.  Anything else?  All right, thank

19    you, Mr. Minns.

20          MR. MINNS:  Thank you, Your Honor.

21          THE COURT:  Mr. Vincent.

22          MR. VINCENT:  Thank you, Your Honor.  Most of

23    the issues I'm comfortable that they've been touched

24    upon.  I just wanted to go to a couple of three points.

25          One is the term tax protester, which I find to be

1    akin to an ad hominem type argument.  A term that's

2    come into the floor in recent years is the word hater.

3    When the disagree with somebody, you call them a hater.

4    You really can't argue against that because you're not

5    talking about the facts in a particular argument,

6    you're just labeling the individual.

7        To say somebody is a tax protester in the

8    circumstances of this case I think is extremely

9    overbroad.  There are people that don't want to pay

10   their taxes just because they want to hide their money

11   and be cheaters.  There are people who don't want to

12   pay taxes because they believe the Government is

13   spending it on things that are not appropriate.  There

14   are people that don't believe they have a duty to pay

15   tax because the tax code is a procedure that doesn't

16   require them to pay tax.

17       So I think it's inappropriate for the Government

18   to use any term that's so general in nature as to

19   inflame the jury given the standard use of that term.

20       Secondly, I believe that you heard the Government

21   talk about the fact that this case is what -- about

22   what the defendant knew about the tax code.  I don't

23   necessarily disagree with that.  I think not offering

24   for the truth of the matter asserted, but certainly

25   being able to show the jury the materials, for example,

1    that my client did or the books which reference the

2    foundations for some of his beliefs are certainly

3    appropriate to show what his good faith beliefs are

4    about the tax code.

5         And then finally, Judge, my concern is about again

6    going back to the issue about whether this is a civil

7    or criminal case.  I certainly conceded in my memo and

8    we concede now that we should not opine to the jury

9    about what the punishment should be specifically, but I

10   think the jury needs to know that this is a criminal

11   case and that fines and supervised release and jail

12   penalties are all at play as they are in every criminal

13   case, but that this is not a civil case.  And I think

14   to hide the fact that -- of what the criminal case

15   entails as opposed to a civil case might lead to a

16   situation where the jury thinks they're making a

17   decision based on, for example, they have a duty to pay

18   their taxes, therefore they might be -- we all have a

19   duty to pay our taxes.  This is the civil view and that

20   therefore if I find them guilty, they will have to pay

21   those taxes.

22        That's not what this case is about.  This case is

23   about whether their conduct is conduct that would then

24   put them in a situation where they could face those

25   criminal penalties and not civil penalties.

1              THE COURT:  Thank you, Mr. Vincent.  Just one

2    moment, Mr. Chapman.  Mr. Chapman, brief rebuttal.

3              MR. CHAPMAN:  Thank you, Your Honor.  Your

4    Honor, with respect to the issue that Mr. Minns raised

5    about the CTR, we're not putting on evidence to show

6    that Mr. Messier attempted to avoid currency

7    transaction reports.  We are going to put on evidence

8    that he made extensive use of cash throughout the

9    prosecution period in this case.  That he had a bank

10   account for his business -- I can't remember if it was

11   a personal account as well -- but he had a bank

12   account.

13        He used it off and on, but he also cashed a lot of

14   the checks he received from his customers and there

15   will be evidence that he kept a lot of cash in a safe

16   at his home.

17        We're going to show that through testimony of the

18   bank witnesses that explain on the bank statements that

19   he would cash a lot of his checks and that's indicated

20   on the bank statements.  We're going to show that

21   through a summary witness at the end of the case who's

22   going to provide a summary of the amount of cash --

23   amount of checks that he cashed rather than deposited

24   and that's all relevant for intent purposes, Your

25   Honor.

1        There's plenty of case law in the criminal tax

2    cases that extensive use of cash is a factor for the

3    jury to consider with respect to the defendant's

4    willfulness in a tax case.

5        THE COURT:  So let me just make sure I

6    understand.  You're not going to suggest any illegality

7    in his use of cash or any violation of the reporting

8    laws.  You are going to use -- you're going to argue

9    from the use of cash that he was using that as a device

10   to avoid taxes.

11       MR. CHAPMAN:  Yes.  In fact, he was using it

12   more and more after the IRS began levying and started

13   by levying his bank account.

14       THE COURT:  So you're saying it's not a 404(b)

15   issue, it's solely for motivation.

16       MR. CHAPMAN:  Yes.  It goes to his plan, his

17   preparation, his attempts to --

18       THE COURT:  But you're not going to suggest

19   it's illegal, so I don't need to go through a 404

20   analysis.

21       MR. CHAPMAN:  Correct.

22       THE COURT:  Okay, go ahead.

23       MR. CHAPMAN:  And there's also evidence, Your

24   Honor, I think that as late as 2013, he brought in a

25   bag of cash described by one teller as the cash was old

1    and smelly and he purchased a money order in the fall

2    of 2013 in the amount of about 150,000 and I believe

3    there was a CTR filed in that case and there was no

4    attempt by this defendant to avoid that.

5            THE COURT:  Say that again?

6            MR. CHAPMAN:  I believe there was a CTR filed

7    in that case.  There was not no attempt by the

8    defendant to avoid that.

9            THE COURT:  Okay.

10           MR. CHAPMAN:  With respect to the term tax

11   protester, that's used in courts all the time.

12           THE COURT:  You told me you're not going to

13   use it until closing, so I'm going to require that

14   counsel raise that with me again at the end of the case

15   and I'll rule on it then.

16           MR. CHAPMAN:  Very good.  We also have no

17   plans on putting on any evidence, and we have no

18   evidence that the defendant is violent or -- in fact,

19   the Court's already ruled on one issue pretrial on a

20   statement by one witness that she was assaulted by the

21   defendant.

22       We're not going to put on any evidence of any

23   assault by this defendant, we're not going to put any

24   evidence that he's part of the far violent extreme end

25   of the sovereign citizen tax protest movement so that's

1    not --

2           THE COURT:  So there would be no evidence to

3    link him to racist groups or violent groups; is that

4    what you're saying?

5           MR. CHAPMAN:  Right.  But, you know, the term

6    sovereign citizen, you know, it's in the material that

7    he submitted to witnesses or materials that he's

8    offering in evidence that may come in.  We don't --

9           THE COURT:  The term, but not the relationship

10   to these other groups.

11          MR. CHAPMAN:  Correct.

12          THE COURT:  Go ahead.

13          MR. CHAPMAN:  We also, just to reiterate, I

14   mean if Mr. Robinson takes the stand and then brings

15   with him a stack of the books that he wrote, those

16   books are out-of-court statements offered for the truth

17   of the matter asserted.  They are all hearsay.  They

18   are not evidence of things he relied on, this is

19   evidence of things he wrote.  So it's not really -- it

20   doesn't go to his intent, it's just out-of-court

21   statements that are going to mislead the jury.

22        His testimony is what he provides as far as what

23   he believes and what he relied on, not his books.

24          MR. ROBINSON:  Would you repeat that?

25          MR. VINCENT:  He couldn't hear that.

1          MR. CHAPMAN:  I'm sorry.  I was going to say

2     if he wanted to put on evidence of his beliefs, he can

3     testify to what he believed in, but his books are

4     out-of-court statements offered for the truth of the

5     matter asserted by what he believes so they're not

6     admissible under the hearsay rule and I think that's

7     all I have to speak about at this point.

8          I do have two very brief issues to raise with the

9     Court after the Court has --

10          THE COURT:  Before you do that, let me let Mr.

11     Minns address the CTR issue because I wasn't sure where

12     he really stood on that.

13          Do you want to respond to that?

14          MR. MINNS:  Um, he's not arguing -- I think

15     I'm satisfied, Your Honor, based on what you elicited

16     from him.

17          THE COURT:  Very good, thank you.

18          MR. CHAPMAN:  With respect to stipulations,

19     Judge, we don't have any offers of stipulations in

20     writing.  We did discuss them briefly in a couple of

21     conversations and I'm going to revisit that issue with

22     Mr. Minns and Mr. Vincent at some point before trial,

23     so we very well may have stipulations about things such

24     as, you know, the filing deadline dates and the

25     threshold amounts that were requiring one to file in

1    Mr. Messier's particular category, as well as the taxes

2    due and owing on the income that he earned for the

3    years of the failure to file counts.  We very well may

4    have stipulations about that.

5        If not, we'll have a summary witness, whom we are

6    not offering as an expert, but a summary witness and

7    she's an IRS revenue agent and she will testify about

8    calculations that she performed, which are basically

9    math.  And again, I have two minor issues to raise with

10   the Court.

11            THE COURT:  Go ahead, right now.

12            MR. CHAPMAN:  And I raised this with defense

13   counsel prior to beginning the hearing, I have an IRS

14   employee who recently remarried.  Her former name was

15   Joline Hendershot, as this Court has seen her testify

16   before.  She's been authorized by the IRS to continue

17   to use the name Hendershot as her authorized pseudonym.

18       She would rather not provide her legal name in

19   open court because she's been sued twice already by

20   these two defendants and was involved in another

21   contentious case with another former person that she

22   investigated.

23       So with the Court's permission, she would like to

24   use her authorized pseudonym when she takes the stand

25   and say her name is Joline Hendershot.

1              THE COURT:  Which was her real name at one
2    point?
3              MR. CHAPMAN:  Correct.
4              THE COURT:  Is there objection to that?
5              MR. MINNS:  I think it's still her real name
6    and she uses that.  My wife does the same thing so --
7    Ms. Arnett does the same thing.
8              THE COURT:  Right.  So you're content with her
9    going by that name?
10             MR. MINNS:  Absolutely.
11             THE COURT:  Mr. Vincent?
12             MR. VINCENT:  No objection.
13             THE COURT:  Fine, that's agreed to.
14             MR. CHAPMAN:  And the last issue, I know
15   there's a local rule about closing arguments and that
16   the parties are only permitted to have one attorney
17   make the closing without leave of the Court.  I would
18   like to ask for leave of the Court so that I could give
19   the opening portion of the closing argument and then my
20   trial partner, Ms. Kelly, give the rebuttal argument.
21        I don't think there's any --
22             THE COURT:  Any objection?
23             MR. MINNS:  If I might inquire, how long would
24   the Court be giving for closing arguments?
25             THE COURT:  Well, that's something I'll

```
 1   discuss with you at the charge conference.  There's a
 2   local rule that limits your time in openings, it
 3   doesn't address closings, so after I hear the testimony
 4   and see the exhibits and see you at a final charge
 5   conference, that's when I'll address with you how long
 6   the closings would be.
 7              MR. MINNS:  If we -- we have no objection if
 8   we're allowed to do the same thing too.  I've done that
 9   in many --
10              THE COURT:  You don't get a rebuttal.
11              MR. MINNS:  No, but I have been allowed by
12   many judges to divide the time.
13              THE COURT:  I see.
14              MR. MINNS:  So I don't have an objection if
15   we're allowed to do the same thing.  I know there's
16   only one lawyer on the other defendant so he may have
17   an objection, but I don't if we're allowed the same
18   thing.
19              THE COURT:  I understand that.  Mr. Vincent,
20   do you take a position on this?
21              MR. VINCENT:  I have no objection to that,
22   Judge.  Obviously, I wouldn't be pleased if there were
23   actually two closing arguments, but I think -- and I'm
24   sure it's going to be legitimate rebuttal material.
25              THE COURT:  Do you have any objection to Mr.
```

1   Minns splitting his time?

2        MR. CHAPMAN:  With Ms. Arnett?

3        MR. MINNS:  I haven't decided.  I do it

4   frequently, but I'll decide when we get to the closing.

5        MR. CHAPMAN:  No.

6        THE COURT:  Well, let me just say this in

7   principle.  I'm not opposed to it.  I will address it

8   with you again in the final charge conference as things

9   are moving forward, but I don't have any objection in

10  principle to it being done.

11       MR. CHAPMAN:  And I was alerted of a third

12  issue that I want to bring to the Court's attention.

13  We have our case agent, Martino Coviello, who would

14  like to sit at counsel table with us during the trial.

15  He's listed as a potential witness.  And we also have a

16  summary witness, Nancy McDonald, an IRS revenue agent,

17  who would also like to be present in the courtroom

18  during the testimony.

19       THE COURT:  And not at counsel's table?

20       MR. CHAPMAN:  Correct.

21       THE COURT:  Any objection to that?

22       MR. MINNS:  I believe they are entitled to

23  have one at counsel table to assist them in

24  preparation, but not two.  That would --

25       THE COURT:  I think what Mr. Chapman is saying

1    they would like Mr. -- it is Mister or Miss?

2             MR. CHAPMAN:  Mister.

3             THE COURT:  Mr. Coviello to be at counsel

4    table as the case agent, but he would like their

5    summary agent to be in the back of the courtroom

6    listening to the testimony so that she can then testify

7    as a summary witness, not as a case agent.

8         Do you object to either of those?  Did I capture

9    that correctly?

10            MR. CHAPMAN:  Yes, Your Honor.

11            MR. MINNS:  If the witness at the table then

12   takes the stand, you're getting two witnesses around

13   the sequestration and I would object to that.  If the

14   witness at the table is not a witness, if he's helping

15   them with the case, I believe they are entitled to

16   that.

17            THE COURT:  Mr. Vincent, what's your position?

18            MR. VINCENT:  I wouldn't object, Judge.  My

19   experience however has been that the Government has

20   somewhat of an advantage when they have multiple people

21   at the table, basically finding exhibits for them, et

22   cetera.  I obviously wouldn't have that luxury in my

23   situation, but I've also found that the Government is

24   very cordial in providing, for example, their exhibit

25   book ahead of time and that generally alleviates that

1    problem.  So for that reason, assuming that process

2    will be played out as in the past, I would have no

3    objection.

4         MR. MINNS:  If I could?  Thank you, Your

5    Honor.  My co-counsel reminded me, we had asked for the

6    report of the agent.  It's nothing but numbers, and if

7    we can get the numbers in advance, we may be able to

8    stipulate to the report, but if it's nothing but

9    numbers, we have no objection to the summary witness

10   receiving the numbers that are put into evidence.

11   There's no reason -- if they're not going to testify as

12   an expert witness, there's no reason for them being in

13   the courtroom.

14        Oh, we have the numbers now?  Oh, I apologize.

15   They have turned over the numbers to us and we could go

16   over it with them.  If we don't disagree, we may be

17   able to stipulate to the exhibit.

18        THE COURT:  All right.  Is Agent Coviello

19   likely to testify?  You said may or may not.

20        MR. CHAPMAN:  He's more than likely not going

21   to testify, but there's a chance he might because he

22   was present for a lot of witness interviews.

23        THE COURT:  Well, I'm certainly going to allow

24   the agent to be at counsel table for the reasons that

25   even defense counsel have admitted, that's standard.

1      If he's going to take the stand, then we will need to

2      raise it and I'll hear you at sidebar whether there is

3      any objection because of what's developed in the

4      courtroom.

5           And I'm not going to rule on the second question

6      until you all figure out whether you all can stipulate

7      on the numbers.  Is she going to testify to more than

8      numbers?

9           MR. CHAPMAN:  Well, Your Honor, some of the

10     numbers are going to be coming in not just through

11     documents, but through witnesses testifying that we

12     paid certain amounts that are not reflected in our

13     records, but we paid certain amounts each month as a

14     regular pay --

15          THE COURT:  Be more precise.  You're not

16     calling her as an expert?

17          MR. CHAPMAN:  No.

18          THE COURT:  Is she going to, in her summary,

19     summarize anything other than mathematical

20     computations?

21          MR. CHAPMAN:  She's going to summarize income

22     received by the defendant based on the records and the

23     testimony.  She's going to schedule the bank accounts

24     to show how much was deposited or cashed.  She's going

25     to produce some of those in graph form to show how much

1   income the defendant received above the threshold

2   amount at the time he filed and I think that's about

3   it.

4          THE COURT:  I will allow it.  If there's a

5   problem that the defense thinks there's some prejudice

6   there, you can raise it with me again, but based on

7   what I've heard now, I'll allow her to sit in the back

8   of the courtroom to listen.

9       Okay, let me rule on all but the Voss motions.

10   I'll take a recess before I rule on that.  Let me go

11   through the more recent matters that we've been talking

12   about.

13       First of all, as counsel who have practiced in

14   this court know, my preliminary jury instructions at

15   the beginning and my final jury instructions at the end

16   make it abundantly clear that this is a criminal case,

17   not a civil case and I will also instruct the jury that

18   they are not to consider penalties because that is a

19   matter that is reserved to the judge; that the only

20   question for them is whether the respective defendants

21   are guilty or not guilty, whether the Government has

22   met its burden of proof.

23       So I don't want to hear in openings or closings or

24   in questioning any discussion about the criminal

25   penalties for the reasons that that's how I will be

1    instructing the jury.

2          With respect to the civil remedies issues as

3    you've raised it, it's my understanding that evidence

4    will come in about certain civil remedies that the IRS

5    has used, and so obviously if it's in evidence, there

6    is room for some comment about it.  However, I will not

7    permit in either opening or closing the argument that

8    the Government should be pursuing civil remedies rather

9    than the criminal sanction.

10          That is how I will be instructing the jury.  The

11    only question for them is whether, given the charges

12    that have been returned by the Grand Jury, whether the

13    Government can prove its case on those issues.

14          The arguments here did not address it, but it's in

15    the briefs and so I will mention it.  The law in this

16    Circuit is very clear about jury nullification.  None

17    of the counsel, none of the lawyers are permitted to

18    suggest to the jury in any way, and nor am I permitted

19    to suggest it -- it is true that the jury has that

20    power -- but it's nothing that any of us are allowed to

21    suggest to them that they exercise or to remind them of

22    that power.

23          The statement out of court, alleged statement that

24    Mr. Messier said about not being afraid to go to

25    prison, I have to confess I'm not fully understanding

1    how that's relevant or not relevant so my ruling is

2    going to be this.  Before anybody attempts to elicit

3    that, ask for a bench conference, come forward and

4    explain it to me and then in that context, I can

5    determine whether something should be allowed or not.

6        At the present time my inclination is -- and this

7    is subject to revisiting at trial -- my inclination is

8    that questions of the IRS agents regarding confusion

9    about the tax code is not relevant given the nature of

10   this case and given the nature of the defenses that

11   have been raised, but as I say, that's subject to

12   revisiting at trial as the evidence comes in.

13       So far as defense exhibits are concerned and the

14   various publications that they may have relied upon or

15   media, visual media, I'm inclined to follow the

16   procedure that I did in the Anthony case that the 1st

17   Circuit seemed to approve, which is I will certainly

18   allow the defendants if they take the stand to refer to

19   the things that they saw or read and how they relied

20   upon them, but I would not expect them -- I would not

21   expect to actually admit those documents into evidence

22   for the jury.  Instead, the jury can see them in the

23   courtroom.

24       I may allow selective reading aloud from them by

25   the defendant if he takes the stand and chooses to say

1    I relied on this or I used it, but I will be telling

2    the jury that I am the sole decider of what the law is

3    and that's why I will not expect to allow those to go

4    to the jury.

5         With respect to Mr. Robinson and his books, I

6    think Mr. Chapman is correct that he can't use those to

7    show reliance since they are his product.

8    Nevertheless, I'm not going to prohibit Mr. Vincent

9    from having them present to show that Mr. Robinson is

10   committed to this or that this is the point of view

11   that he takes by describing what he's written about,

12   what have you.  Obviously, it's not a reliance issue,

13   but it can show the focus of his activities.

14        I've already said on the tax protester issue, Mr.

15   Chapman's agreed that term will not be used during the

16   trial until we get to closing so I want you to address

17   that with me at the final charge conference and I'll

18   determine then whether it's appropriate or

19   inappropriate in the closing argument.

20        If you can stipulate on the tax due and owing, I

21   think that would be helpful, helpful to the jury,

22   helpful to the Court.  It's already been agreed there

23   won't be reference to connections to violent groups or

24   to racist groups and the currency transaction report

25   issue has been resolved.

1     I think the only other issue that I saw your

2  briefs kind of circle around is the dilemma that <u>Cheek</u>

3  causes for courts and lawyers that have to apply it.

4  It's logic on the one hand in terms of what goes to

5  scienter, and on the other hand, it's statements that

6  views about constitutionality of course don't meet that

7  standard, and I know that that issue is floating

8  around.  I guess we will just have to address it as we

9  go forward because I may well need to instruct the jury

10 about that.

11     You may have shifting interests in terms of

12 whether that comes in or not and I just want to be sure

13 you're alert to it, as I am, that we have that sort of

14 two-sided part of <u>Cheek</u> that we, because the Supreme

15 Court said it, have to apply it as best we can in terms

16 of how the case comes in.

17     So aside from the ruling on the motion concerning

18 Dr. Voss, I think -- have I missed any others; any for

19 the Government?

20          MR. CHAPMAN:  Not that I can think of at this

21 point, Judge.

22          THE COURT:  Any for either defendants?

23          MR. MINNS:  Yes, Your Honor.  If I could, when

24 the Court says that we can show what he relied on, I

25 think that does not -- it doesn't deal with my request

```
1    that out of hundreds of hours of tapes, movies, all

2    sorts of things, we wanted to show five minutes because

3    we want the jurors to see exactly what he saw.

4              THE COURT:  This is the movie?

5              MR. MINNS:  Yes, Your Honor.

6              THE COURT:  I thought you were going to

7    discuss that with counsel.  I don't even know what that

8    is.

9              MR. MINNS:  Well, it's one of the movies we

10   sent, but I will discuss that with him, but I --

11             THE COURT:  Let's do this.  Discuss it first

12   and then if you don't reach agreement, then you need to

13   send to me, through the clerk's office, whatever the

14   segment is that you want to show so that I can see it

15   and if there's any written argument you want to go with

16   it or the Government wants to resist, I'll do it that

17   way, but I can't deal with that in the abstract.  I

18   have to see what it is and how it's said in context.

19             MR. MINNS:  Okay.  I'm glad that the Court

20   focused on this other issue because the Government put

21   this in their charge -- proposed charge to the jury,

22   the constitutionality issue, and then there's a

23   statement by my client that he hangs out with

24   constitutionalists, whatever that means, and but none

25   of his --
```

1          THE COURT:  I thought that might be American

2    Constitutional Society, but apparently not.  Go ahead.

3          MR. MINNS:  Oh, I don't know.

4          THE COURT:  There's a legal organization, as

5    you probably know, called that, but go ahead.  By legal

6    organization, there's an organization -- there's a

7    Federalists on the one side that tends to take a strict

8    construction and the American Constitutional Society on

9    the other side that tends to be a more liberal

10    construction.  I'm sorry, I was just introducing some

11    humor.  Go ahead.

12          MR. MINNS:  No, I knew about the Federal

13    Society, I didn't know about the other society so it's

14    humorous, but it's also interesting to me personally.

15          But the Government has indicated -- I mean we're

16    not going to solicit anything about beliefs on whether

17    or not these are constitutional because that's not the

18    basis of any of the reasons -- he takes the tax code

19    with him to bed every night literally, and that's where

20    he's drawing his conclusions from, not from the United

21    States Constitution.

22          So the Government has suggested that they -- we

23    can't bring it out.  We agree, we don't want it brought

24    out, but then they are suggesting they may be able to

25    bring it out on cross-examination and I'm concerned

1    about that because I don't want a charge at the end of

2    the trial that says you can't rely on the constitution

3    because that will let the jury -- jurors think that

4    that's part of what he's relying on.

5         Unless it comes in to the evidence, we don't want

6    it to come into evidence, the Government should not be

7    allowed to raise it.  I think the Court is sensitive to

8    that, but that's --

9              THE COURT:  Well, I'm sensitive to it, but I

10   don't know that I can prevent the Government from

11   raising it.  If he said that to other people

12   out-of-court, then that's going to be a statement

13   against -- that's going to be an 801 statement that can

14   be admitted, right?

15             MR. MINNS:  I'm -- maybe he has, maybe he

16   hasn't.

17             THE COURT:  I don't know.

18             MR. MINNS:  I don't know either.  I'm unaware

19   that he said that that's the reason for his tax

20   beliefs.  I don't believe he's ever said that.  If he

21   has, I would appreciate from the Government the

22   statements about that so we can deal with it before the

23   Court.

24             THE COURT:  All right.  Well, I would invite

25   you to talk together about that fact.  I'm going to

1    take a recess now.  You can talk now or later and I can

2    address it at the opening of trial or whatever.

3         My only point is if there's admissible evidence

4    that constitutionality or unconstitutionality is the

5    basis of his beliefs, I would expect to have to give a

6    Cheek type instruction to the jury.  If there's no such

7    evidence, I will have to be persuaded by the lawyers

8    why I need to give such a charge.  Maybe there's an

9    argument that the jury would think they should consider

10   that and I don't know.

11        But certainly if there is evidence, I'll need to

12   get the charge.  If there's not evidence, then there's

13   more of a struggle to determine whether there's any

14   need to make such charge.

15             MR. MINNS:  Thank you.

16             THE COURT:  Okay?  Mr. Vincent?

17             MR. VINCENT:  Just one point that was in my

18   brief, Judge, we didn't talk about and that's the fact

19   that my client is charged with a conspiracy count.

20   There's going to be a lot of statements, I suspect,

21   that will be admitted from Mr. Messier that were not in

22   furtherance of the conspiracy or during the pendency of

23   that conspiracy.

24        I think we just need to be mindful, I'm going to

25   be requesting instructions to the jury during the

```
 1    course of the trial that those are not to be considered
 2    as to Mr. Robinson.
 3             THE COURT:  That's a good point.  I will
 4    certainly at the preliminary charge make clear to the
 5    jury that they have to consider each defendant
 6    separately and each charge separately and I know your
 7    client is only on Count 2, I think, is the number of
 8    the count?
 9             MR. VINCENT:  Yes.
10             THE COURT:  And certainly I would expect you
11    as defense counsel to make that clear in your opening,
12    your closing and if there are times during the trial
13    when you think I need to give a limiting charge or
14    cautionary charge, you should certainly feel free to
15    request it.
16             MR. VINCENT:  Thank you, Your Honor.
17             THE COURT:  All right.  Let's take a 15-minute
18    recess and then I'll return to rule on the Voss
19    question.
20             (Recess called)
21             THE COURT:  Thank you for your arguments.
22    They are helpful.  As I said at the outset, I had read
23    -- there's a delay.  I guess they are afraid I'll say
24    something.  There's a pause in there to correct any
25    misstatements I've made.
```

1        I have read all of your written materials and a

2    lot of cases and so I'm going to make my ruling now.

3    It is going to be a tentative ruling because it's the

4    nature of a ruling such as this that depends upon how a

5    case develops.

6        I am going to, as I said, tentatively allow Dr.

7    Voss to testify.  I do not believe that the Insanity

8    Defense Reform Act precludes his testimony.  I believe

9    that the case law is clear that it is not where there

10    is a specific scienter element that the defense

11    maintains the Government is not able to prove beyond a

12    reasonable doubt, and that is certainly part of the

13    Cheek Supreme Court analysis in terms of the scienter

14    requirement.

15        The 1st Circuit, I believe, has spoken to that.

16    The Schneider case, I believe, makes it clear that

17    there are circumstances where it can be admitted.  In

18    that case, of course, the 1st Circuit sustained the

19    trial judge who excluded it as unduly confusing to the

20    jury.

21        I am acutely aware, as I think all the lawyers

22    are, at least now if not before, about Rule 704(b) and

23    Rule 803(4) and also Rule 703.  Let me just explain

24    what I mean by that.  704(b) says -- and I read it

25    aloud before, but I want to read it again so the

1    defendants can hear it -- in a criminal case, an expert

2    witness must not state an opinion about whether the

3    defendant did or did not have a mental state or

4    condition that constitutes an element of the crime

5    charged or of the defense.  Those matters are for the

6    trier of fact alone.  So I will have that very much in

7    mind for the testimony of both experts.

8         Rule 703 says, that an expert can base an opinion

9    on facts or data that they've been aware of or

10   personally observed and if they would -- if experts in

11   that field would reasonably rely on them, they need not

12   be admissible themselves for the opinion to be

13   admitted, but if the facts or data would otherwise be

14   inadmissible, the proponent of the opinion may disclose

15   them to the jury only if their probative value in

16   helping the jury evaluate the opinion substantially

17   outweighs their prejudicial effect.  So I note that's

18   the limitation on the proponent, not a limitation on

19   the party objecting and cross-examining.

20        803(4) is the medical diagnosis exception to the

21   hearsay rule and says that a statement that is made for

22   and is reasonably pertinent to medical diagnosis or

23   treatment and describes medical history, past or

24   present symptoms or sensations, their inception, or

25   their general cause, that's not excluded by the hearsay

rule and during the course of the development of that

rule, it's clear that has gone beyond just treating

physicians for diagnosing and treatment and goes indeed

to other experts who are called.

I remain very concerned, as I said to counsel

during the argument, about the literal effect of 803(4)

in this case if, in fact, either or both of the

defendants choose not to testify and that's their

constitutional right not to testify. But I am

concerned about the apparent consequence that if 803(4)

applies literally, the jury gets to hear evidence about

their respective states of mind, or at least of Mr.

Messier's state of mind, where there's no one -- they

are not hearing Mr. Messier testify as to what he

believes, subject to cross-examination, and so I have

asked counsel to consider that further.

And I think I'm going to set a deadline before

we're done for any further argument you have to me on

that score in terms of what I will tell the jury if Mr.

Messier chooses not to testify and Dr. Voss does

testify basing his opinion on things said by Mr.

Messier to Dr. Voss.

And I'm still a little puzzled on that whole score

because I also hear defense counsel expressing

reservations about calling their clients, and I

1    understand that perfectly, but then also saying that

2    you want to introduce evidence about things that they

3    relied upon, and I guess I'm not sure how you can bring

4    into evidence the so-called movie or other sources that

5    your client relied upon unless your client takes the

6    stand and says I've read these, I've watched this and

7    relied upon it.  So maybe we're talking about a moot

8    issue, I don't know, but those are the sort of things

9    that will only settle out at trial.

10        So two things I need further briefing from you on;

11   one, the conspiracy argument that I never considered

12   before, and I don't know that Mr. Messier's counsel

13   needs to address this.  This is more, I think, between

14   Mr. Vincent and the Government, but you understand the

15   argument as to whether for some reason the jury finds

16   that Mr. Messier is not guilty because of the delusion,

17   he doesn't have the right required mens rea and the

18   defendant Robinson nevertheless be found guilty.

19   That's the question I would like some assistance on.

20        And I think we all know the cases around here.  We

21   know there can't be a conspiracy, for example, with an

22   undercover agent if you've got two guilty parties in

23   that sense.  On the other hand, a particular

24   co-conspirator in some cases, the Government may not

25   satisfy its burden of proof as to one but as to another

 1     and there may still be guilt and we need to address

 2     that in this context.

 3         And then the second question is the one we've just

 4     been talking about concerning whether -- if Dr. Voss is

 5     -- does testify and Mr. Messier does not, what, if

 6     anything, I say to the jury about the statements that

 7     Dr. Voss reports.

 8         I think I would be content to have those written

 9     memoranda, if there are any, two business days before

10     trial; is that agreeable to counsel?

11             MR. MINNS:  What day is that?

12             THE COURT:  Melody, what day does the trial

13     start?

14             THE CLERK:  Trial starts on Monday, March 30th

15     so two days before would be Thursday, March 26th.

16             THE COURT:  So let's say by 5:00 p.m., close

17     of business on Thursday?

18             MR. MINNS:  Yes, Your Honor.

19             THE COURT:  Does that work for you, Mr.

20     Chapman?

21             MR. CHAPMAN:  Yes, Your Honor.

22             THE COURT:  Mr. Vincent?

23             MR. VINCENT:  It does, Your Honor.

24             THE COURT:  All right.  What have I missed?

25             MR. CHAPMAN:  Your Honor --

1    THE COURT:  Just a second.  I'm approving that

2 you be allowed to eat.  The court security officer just

3 needed my blessing on that so they will allow you to

4 bring in your banana or whatever for the recess.

5    MS. KELLY:  So Your Honor, in light of your

6 ruling, does that mean that you will not be having a

7 *Daubert* hearing --

8    THE COURT:  I do not see the need for a

9 *Daubert* hearing.  I think that's ripe for

10 cross-examination, it's ripe for opposing testimony.  I

11 understand all the arguments that you've made and, you

12 know, maybe you'll bring in that article under the

13 learned treatise exception, I don't know.  I think

14 those are all ripe for the jury to consider.

15   The one question I am -- still have in the back of

16 my mind is whether I need to voir dire Dr. Voss, not at

17 a *Daubert* hearing, but voir dire in terms of the dates,

18 in terms of the bases or in terms of what the

19 limitations of his testimony are under the rules that

20 I've just described.

21   But no, I conclude that I have enough information

22 for the *Daubert* ruling, there's enough to go to the

23 jury on that question, but as we get to the trial, you

24 can persuade me, either party -- I expect it to be

25 you -- you can try to persuade me that I should voir

1    dire Dr. Voss before he takes the stand.

2        Any other questions from the Government?

3            MR. CHAPMAN:  No.

4            THE COURT:  Any questions from you, Mr. Minns?

5            MR. MINNS:  No.  We're going to transcribe

6    this and give this to the doctor and we're going to

7    have one more meeting so I'm going to ask him to

8    address those questions.

9            THE COURT:  Fine.

10           MR. CHAPMAN:  If he's going to have another

11   meeting with Mr. Messier, we would like to have a copy

12   of any additional report he produces.

13           THE COURT:  I'm sure you'll work that out.

14           MR. MINNS:  Of course, yes.

15           THE COURT:  Mr. Vincent, anything else from

16   you?

17           MR. VINCENT:  No, Your Honor, thank you.

18           THE COURT:  Thank you all very much.  We will

19   stand in recess and I probably won't see you again

20   until the trial day.

21       You're all familiar now with the schedule that we

22   maintain and just to remind you, local counsel know

23   this, we run these abbreviated trial days, we find they

24   are very effective, but one of the consequences is that

25   I expect you to raise legal issues at the close of the

1    trial day, not to interrupt the trial during the day,

2    just so that the jury's attention can be focused on the

3    testimony and exhibits.  And so when you've got issues

4    coming up, the time to alert me about that is the day

5    before because we've got time in the afternoon to

6    address some of them and go forward.  All right?

7                MR. MINNS:  At the close of trial the day

8    before, Your Honor?

9                THE COURT:  Yes.  In other words, the trial

10   day is 8:30 to 2:30 and at 2:30, we can take up any

11   evidentiary issues that you see emerging the next day

12   and take care of them then so that I don't want to see

13   you at 8:30 in the morning when the jury is waiting in

14   the jury room and we're suddenly struggling for

15   45 minutes while they are wondering what's going on or

16   that we have to take a prolonged recess during the

17   trial and send them back to the jury room.  That's why

18   we have the schedule this way so we can take those

19   issues up at the close of the trial day.  Got it?

20               MR. MINNS:  Yes.

21               THE COURT:  All right.  Thank you all very

22   much.  Have a pleasant afternoon.

23               (End of proceeding)

24

25

1          **C E R T I F I C A T I O N**

2    I, Dennis Ford, Official Court Reporter for the United

3    States District Court, District of Maine, certify that

4    the foregoing is a correct transcript from the record

5    of proceedings in the above-entitled matter.

6    Dated:  ^ Replace Date

7              /s/ Dennis Ford

8              Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25