UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

_____

UNITED STATES OF AMERICA,          CRIMINAL ACTION

              Plaintiff          Docket No: 2:14-cr-83-DBH


      -versus-                    **E X C E R P T**


F. WILLIAM MESSIER,

DAVID EVERETT ROBINSON,

         Defendants
_____

Transcript of Proceedings

Pursuant to notice, the above-entitled matter came on for **Trial** held before **THE HONORABLE D. BROCK HORNBY,** United States District Judge, in the United States District Court, Edward T. Gignoux Courthouse, 156 Federal Street, Portland, Maine on the 1st day of April, 2015 at 12:26 p.m. as follows:

Appearances:

For the Government:  James W. Chapman, Jr., Esquire
                     Karen E. Kelly, Esquire
                     Assistant United States Attorneys

For Defendant Messier:  Michael L. Minns, Esquire
                        Ashley Blair Arnett, Esquire
                        William Maselli, Esquire

For Defendant Robinson:  Joel Vincent, Esquire

Dennis R. Ford
Official Court Reporter

(Prepared from manual stenography
and computer aided transcription)

I N D E X

| Witness | Direct | Cross | Redirect | Recross |
|---------|--------|-------|----------|---------|
| William Messier | 3 | | | |

E X H I B I T S

| Number | Description | Page/Admit |
|--------|-------------|------------|
| M-8 | Book Cover | 6/8 |
| M-11 | Photographs | 8/10 |
| M-10 | Movie | 12 |
| M-2 | Letter | 26,76 |
| M-3 | Letter | 30,76 |
| M-4 | Letter | 32,76 |
| | | |
| G-2(D) | Notice of Levy | 21 |
| G-2(A) | Letter | 64 |

**SIDE BAR CONFERENCES**

27, 48, 78, 81

**CHAMBERS CONFERENCES**

—Messier-Direct/Minns—

1          (The following is an excerpt).

2          (Open court.  Defendants present).

3        (Jury entered.  Time noted:  12:26 p.m.)

4          THE COURT:  Please swear the witness.

5          THE CLERK:  Please raise your right hand.  Do

6   you solemnly swear that the testimony you will give in

7   the cause now in hearing will be the truth, the whole

8   truth, and nothing but the truth, so help you God?

9          THE WITNESS:  I do.

10          THE CLERK:  Please sit down.  Pull yourself

11   right up to the microphone and state and spell your

12   name for the record.

13          THE WITNESS:  My name is Bill Messier.

14   B-I-L-L M-E-S-S-I-E-R.

15          THE COURT:  Ladies and gentlemen, you may be

16   wondering why we delayed since Mr. Messier is taking

17   the stand.  We wanted to wait until the parties experts

18   could be in the courtroom to listen to his testimony so

19   that's the reason for the delay.

20      Go ahead, Mr. Minns.

21          MR. MINNS:  Thank you very much.

22                  DIRECT EXAMINATION

23   BY MR. MINNS:

24   Q.   Bill, tell the jurors your name?  Your name?

25   A.   Bill Messier.

Messier-Direct/Minns

1    Q.    And how old are you?

2    A.    I'll be 71 next month.

3    Q.    When did you graduate from high school?

4    A.    1963.

5    Q.    And the gentleman that owns half of one of your

6    houses, Richard, what was his last name?

7    A.    Laborde.

8    Q.    Laborde.  Did you go to high school with him?

9    A.    Yes.  We did graduate in the same class.

10   Q.    And had you ever been on the witness stand

11   before?

12   A.    Never.

13   Q.    Are you nervous?

14   A.    Scared to death.

15            MS. KELLY:  Your Honor, I'm going to object to

16   leading.  I've allowed some, but --

17            THE COURT:  Well, the answer will stand, but

18   watch the leading.

19            MR. MINNS:  Your Honor, at this time I want to

20   put the board up for the jury to see.  I apologize.

21   Hello?

22   BY MR. MINNS:

23   Q.    Before we get into your background, Mr. Messier,

24   I want to establish certain times and dates.

25            MR. MINNS:  Your Honor, we have been trying to

Messier-Direct/Minns

1   work out the logistics of how the jurors can see this

2   and Mr. Messier.  If I could have him stand here when I

3   ask about ten questions from the chart, would that be

4   all right?

5           THE COURT:  Can he not see it from there?

6           MR. MINNS:  I don't know.  Can you see it from

7   here?

8           THE WITNESS:  Yes.  I can't read off

9   everything for certain on it, but I can see it.

10          THE COURT:  Well, I prefer to have him stay in

11  the witness box.  You can move the chart over here, if

12  you'd like.  I don't have to see it.

13          MR. MINNS:  Okay, all right.  I apologize to

14  everyone.  I don't know, can you see this, Mr. Messier?

15          THE WITNESS:  Yes, I can.

16          MR. MINNS:  Your Honor, is it all right if I

17  stand over here?

18          THE COURT:  Yes.

19  BY MR. MINNS:

20  Q.   Mr. Messier, there's a notation up here that says

21  Maine Army National Guard.  Do you recall approximately

22  if or when you were in the Maine Army National Guard?

23  A.   I believe it was probably somewhere after I got

24  out of high school, maybe '63 or '64.

25  Q.   So then actually this probably should be over

───────────Messier-Direct/Minns───────────

1   here?

2   A.    I think so, yes.

3   Q.    And do you recall the visit in 1995 to an Arizona

4   bookstore?

5   A.    Yes, I do.

6   Q.    Do you recall in 1996 watching the Libertarian

7   Convention?

8   A.    Yes, I did.  I actually videotaped it.

9   Q.    Do you recall building your cell towers

10  approximately 1999?

11  A.    Can I clarify that?

12  Q.    Yes.

13  A.    Okay.  In -- I had the business prior to retiring

14  to Arizona.  When I came back to Maine, I built one

15  additional tower.

16  Q.    Okay.  Do you recall buying --

17          MR. MINNS:  If I could return to the table.

18          THE COURT:  Go ahead.

19          MR. MINNS:  And Your Honor, we're not -- we're

20  going to offer only the cover of the Internal Revenue

21  manual.  The entire manual would be confusing, but I

22  wish to show the witness the manual that he's used, but

23  we only want to offer the cover, unless there's an

24  objection.  We offer M-8, the cover of the Internal

25  Revenue Code.

—Messier-Direct/Minns—

 1          MS. KELLY:  No objection if he lays a

 2   foundation, Your Honor.

 3          THE COURT:  Once the foundation is laid, yes.

 4          MR. MINNS:  Yes, I will do that.

 5   BY MR. MINNS:

 6   Q.    Mr. Messier, did you buy what says M-8 on the

 7   cover, did you buy that?

 8   A.    Yes, I did.

 9          MS. KELLY:  Your Honor, I'm going to object to

10   the form of the question.  He's leading the witness.

11          THE COURT:  Overruled as to that question.

12   BY MR. MINNS:

13   Q.    Do you remember when you bought this M-8?

14   A.    Yes, it was right around 2002.

15   Q.    Did you study it?

16   A.    Exclusively almost every day.  I actually took it

17   to bed with me.

18   Q.    And you continue to study it even during the

19   trial?

20   A.    Definitely, yes.

21   Q.    And you've relied on it in your --

22          MS. KELLY:  Your Honor --

23   A.    Yes.

24          MS. KELLY:  I'll object to the leading

25   questions.  It's his witness now.

Messier-Direct/Minns

1    THE COURT:  I didn't hear the question.  It
2  was interrupted midstream.  What was the question?
3    MR. MINNS:  Thank you, Your Honor, and I was
4  not trying to suggest an answer.
5  BY MR. MINNS:
6  Q.    Have you or have you not relied on this for some
7  of the opinions regarding the tax code?
8  A.    I did.  That plus a lot of other material.
9    MR. MINNS:  We offer M-8, Your Honor.
10    THE COURT:  M-8, the cover, is admitted as an
11  exhibit.
12  BY MR. MINNS:
13  Q.    Mr. Messier, on this chart, is this a picture of
14  you at your home?
15  A.    Yes, it is.
16  Q.    And do you remember who took the picture?
17  A.    You did.
18  Q.    Does it -- was it changed before me coming to
19  your house or is this how it's been for the last many
20  years?
21  A.    It's been like that pretty much since I built the
22  house.  I never finished it.
23  Q.    Is the same true, Mr. Messier, of these pictures
24  labeled Exhibit M-11?
25    THE COURT:  You need to -- I'm not sure what

Messier-Direct/Minns

1    that question is.  You said is the same true, but

2    what's the question?

3    BY MR. MINNS:

4    Q.    These are pictures that were taken --

5           MS. KELLY:  I object to the form of the

6    question.

7           THE COURT:  Just ask what they are and when

8    they were taken.

9    BY MR. MINNS:

10   Q.    What are these pictures, first of all?

11   A.    They are pictures of my house and my living room

12   with some tables that I laid out with all the documents

13   over the years that I've been studying of income tax.

14   Q.    Did you purchase all of those documents?

15   A.    Um, some I purchased, a lot of it I relied

16   online, the Internet.  I bought videos, books,

17   combination.

18   Q.    Is this the way they normally sit in your home or

19   did you rearrange them for me?

20   A.    No.  That was the way they sat in my house.

21   Q.    Are these all materials that you've relied on to

22   come to your tax positions?

23   A.    They certainly are.

24           THE COURT:  Counsel, did you ask when these

25   pictures were taken?

Messier-Direct/Minns

 1           MR. MINNS:  The pictures --

 2           THE COURT:  No, ask.

 3           MR. MINNS:  Yes.

 4    BY MR. MINNS:

 5    Q.    When were the pictures taken, Mr. Messier?

 6    A.    I'm going to have to -- they were taken this

 7    early fall, late summer, fall.  This year.

 8           THE COURT:  So you're offering the pictures in

 9    M-11?

10           MR. MINNS:  Yes, Your Honor.

11           THE COURT:  Any objection?

12           MS. KELLY:  We do object because they were

13    obviously taken recently.  They don't reflect how the

14    house was during the prosecution period.

15           THE COURT:  I think he just testified -- you

16    can cross on that.  Overruled, M-11 is admitted.

17           MR. MINNS:  Thank you, Your Honor.

18    BY MR. MINNS:

19    Q.    Mr. Messier, the chart shows the year 2006, you

20    saw a film "Freedom to Fascism" by Aaron Russo; is that

21    correct or not correct?

22    A.    That is absolutely correct.

23    Q.    And when you -- did the film, without discussing

24    the details at this point, did the film have anything

25    to do with income taxes?

Messier-Direct/Minns

1   A.     Oh, mostly all income taxes.

2   Q.     Do they support any of the positions you believed

3   prior to 2006?

4   A.     Yes, they do and they reinforced it.

5   Q.     Have you been relying on this --

6          THE COURT:  You are leading, counsel.

7          MR. MINNS:  I am sorry.

8   BY MR. MINNS:

9   Q.     What effect, if any, in 2006 did the film have on

10  you?

11  A.     A great amount.

12  Q.     Can you tell the jurors what effect that it had

13  on you.

14  A.     Well, as a producer, a producer by the name of

15  Aaron Russo, and he wanted to find out whether --

16         THE COURT:  Excuse me, sir, the question is

17  what effect did it have on you.

18  A.     Oh, a lot, a lot of effect, great effect.

19  BY MR. MINNS:

20  Q.     Did it effect your position and beliefs regarding

21  your status as a citizen on your income taxes?

22  A.     Yes.

23  Q.     And did you rely on it from the moment that you

24  saw it?

25  A.     Yes.

Messier-Direct/Minns

1           MR. MINNS:  Your Honor, we offer the film

2      M-10, but we offer only -- not to be shown until I've

3      finished the line, we offer a brief excerpt of the film

4      for the jurors to see.

5           THE COURT:  Well, when you're ready, you can

6      offer it then.  Finish your line.

7           MR. MINNS:  Thank you, Your Honor.

8      BY MR. MINNS:

9      Q.   And we have up here Freedom Law School.  Did you

10     take the course for Freedom Law School?

11     A.   Yes, I did.

12     Q.   And did you -- was it free?

13     A.   Hell no.

14     Q.   What did you pay?

15     A.   About 9 -- about $9,000.

16     Q.   Did you rely on the information that you studied

17     or not?

18     A.   I relied quite a bit on the information, yes.

19     Q.   Did it have anything to do with filing income tax

20     returns?

21     A.   Yes.

22     Q.   And we will go into 2012 later.  I'm going to --

23          MR. MINNS:  Pardon me, Your Honor, ladies and

24     gentlemen.

25     BY MR. MINNS:

Messier-Direct/Minns

1   Q.    I've again forgotten the last name of the person

2   you went to high school with.

3   A.    Laborde.

4   Q.    Laborde.  Do you still see Mr. Richard Laborde?

5   A.    I've seen him on occasions, yes.

6   Q.    Where is he living now?

7   A.    He still lives in Brunswick, assisted living.

8   Q.    Do you ever -- when you go to visit him, do you

9   ever run into his former fiancé?

10  A.    No.

11  Q.    Do you have trouble sitting up straight, Mr.

12  Messier?

13          MS. KELLY:  Your Honor, I'm going to object to

14  the leading questions.  This is his witness.

15  BY MR. MINNS:

16  Q.    Are you uncomfortable, Mr. Messier?

17  A.    Yes, at times.  Most of the time.

18  Q.    Why?

19  A.    Well, I've never quite recovered from my prostate

20  cancer and it's bothered my insides.

21  Q.    Are you okay?  Can I --

22  A.    Say what?

23  Q.    Can I continue?

24  A.    Yes, continue.

25  Q.    Before -- well, where were you born?

Messier-Direct/Minns

1    A.    In Brunswick.

2    Q.    Okay.  And you had two parents?

3    A.    Yes, I did.

4    Q.    Who became the caretaker for your parents?

5    A.    I was.

6    Q.    I take it your parents are not still living?

7    A.    No.  They both died the same day.

8    Q.    Where were you on the day of your parents death?

9    A.    I was on a ship when I was working for Bath Iron

10   Works.  I went for delivery to Norfolk, Virginia.

11   Q.    If you were their caretaker and you were on the

12   ship, who was taking care of them on the day that they

13   died?

14   A.    No one.

15   Q.    Did you subsequently come home and bury your

16   parents?

17   A.    Yes, I did.

18   Q.    Do you recall the time of your military service?

19   What did you do in the military?

20   A.    I was a radio technician.

21   Q.    Where did you get your training to be a radio

22   technician?

23   A.    I was all self-educated.  Read a lot of books.

24   Q.    Do you have any formal education other than high

25   school?

Messier-Direct/Minns

1    A.     Not really.

2    Q.     Now, prior to this visit to the Arizona

3    bookstore, did you always file tax returns the way

4    everybody else does?

5    A.     Yes, I did.

6    Q.     And why did you do that?

7    A.     Everybody else was doing it, everyone else said

8    you're supposed to do it so I did it.

9    Q.     In 1995 when you went to the bookstore, what did

10   you see in this bookstore?

11   A.     I saw a magazine rack and on that rack was a book

12   that said 90 -- 30 -- 6 -- 33 million people had

13   stopped filing taxes, so I got curious and picked it up

14   and brought it home and started reading it.  I wanted

15   to know why people weren't filing it.  There must have

16   been a reason.

17   Q.     And yet you still filed your '95 tax return?

18   A.     Yes, I did.  I wasn't quite confident yet.

19   Q.     Now, in 1996, what did you see that had an effect

20   on you with taxes regarding the Libertarian Convention?

21   A.     I was sitting home watching C-SPAN television and

22   they were having this 1996 Libertarian Convention and

23   they had two people that sparked my imagination or my

24   interest and one of them was a man by the name of Harry

25   Brown which, by the way, he died, and he had mentioned

Messier-Direct/Minns

1    that if he was elected President, the two things he

2    would do, in the morning he would get rid of the income

3    tax and get rid of the Federal Reserve and then he was

4    going to break for dinner -- for lunch.

5    Q.    Was there anybody else that you heard at the

6    Libertarian Convention regarding taxes?

7    A.    Yes, I did.  Irwin Schiff.

8    Q.    Who is he?

9    A.    He's a person that has studied the income tax.

10   He had a bookstore in Phoenix -- um, Las Vegas and he

11   was on that same show and he wanted to get rid of the

12   income tax because it was illegal and it was

13   fraudulent.

14   Q.    Isn't Mr. Schiff a con artist?

15   A.    Excuse me?

16   Q.    Isn't Mr. Schiff a con artist?

17   A.    I wouldn't say so.

18   Q.    Now, what, if anything, did watching this

19   discussion about taxes on the convention, what effect

20   did it have, if anything, on your belief system

21   regarding filing income tax returns?

22   A.    Well, it woke me up and I thought there must be

23   some truth to this because both these candidates wanted

24   to eliminate the IRS and the Federal Reserve, there

25   must have been something to this and it sparked my

Messier-Direct/Minns

1   imagination and I wanted to investigate it further

2   before I did anything wrong.

3   Q.    But you still filed your -- in 1997, you filed

4   your '96 tax return?

5   A.    Yes, I did.

6   Q.    Why?

7   A.    Because I wasn't quite educated enough or

8   confident believing these people.  I needed to further

9   educate myself.  I don't like doing things just

10  spur-of-the-moment.  I need -- I'm a research person, I

11  love research and stuff.

12  Q.    Had you filed your 1998 tax return?

13  A.    Um, I don't remember if it was 90 -- I think so.

14  Q.    Have you filed your 1999 tax return?

15  A.    No.

16  Q.    After you stopped filing, had you ever filed a

17  federal income tax return?

18  A.    No, I didn't.

19  Q.    Do you file Maine income tax returns?

20  A.    No, I don't.

21  Q.    Okay.  Well, what reason is there for not filing

22  Maine income tax returns?

23  A.    Well, from everything I've read, if you don't --

24  if you do not owe a federal income tax, you don't

25  usually owe a Maine income tax.  They basically

Messier-Direct/Minns

1   piggyback on each other.

2   Q.   Now, in 2006, you saw the Aaron Russo film.  What

3   specifically in that film either made you agree with

4   your position or made you change your mind?

5   A.   That was the documentary where they were trying

6   to figure out if people owed an income tax or not so

7   they did this documentary and they interviewed, I

8   believe, three or four IRS agents and they all

9   testified that they had to leave the IRS because they

10  had discovered that there was no income tax and when

11  they presented that to their employer, they were handed

12  resignation papers.

13        And then there was another woman who was an

14  IRS agent, she was offered a $50,000 reward to find if

15  there was an actual income tax law and she spent months

16  and months and never claimed the $50,000.  She couldn't

17  find it either.

18  Q.   Now, you believed what these people on the film

19  were telling you or not?

20        MS. KELLY:  Objection leading.

21        THE COURT:  It's leading.

22  BY MR. MINNS:

23  Q.   Did you believe what they were telling you?

24  A.   Definitely.  They were professionals, they were

25  -- they were experts.  They worked for the IRS.

Messier-Direct/Minns

1   Q.    Do you still today as you're sitting in the

2   witness stand believe what they were telling you?

3   A.    A hundred percent.

4   Q.    You know that your lawyers completely disagree.

5            MS. KELLY:  Your Honor, I'm going to object.

6            THE COURT:  Sustained.

7            MR. MINNS:  Your Honor, we offer the excerpt

8   five minutes from the movie from Aaron Russo, M-10.

9            THE COURT:  Ladies and gentlemen, I'm going to

10   let you see this excerpt.  The contents of it are

11   false.  The lawyers agree that they are false.  I'm

12   only allowing you to see it as you consider the

13   testimony of Mr. Messier, that he watched it and what

14   he says that he did as a result of it, the excerpt.

15   And that's M-10, for the record.

16            (Video played).

17            MR. MINNS:  It was going back again.

18            THE COURT:  Just to reiterate, ladies and

19   gentlemen, the contents of that are false and are not

20   being offered for the truth.  It's simply in relation

21   to Mr. Messier's testimony about watching it and what

22   he did as a result.

23   BY MR. MINNS:

24   Q.    Mr. Messier, this proceeding, does this convince

25   you that maybe you were wrong?

Messier-Direct/Minns

1          MS. KELLY:  Your Honor, I'm going to object to

2    leading.

3    A.    Quite the opposite.

4          THE COURT:  Overruled.  Did it convince you

5    you were wrong?  Did it convince you you were wrong?

6    A.    No, it convinced me I was right.

7    BY MR. MINNS:

8    Q.    Were there any of these same type of ideas and

9    sentiments taught at the Freedom Law School that you

10   attended?

11   A.    Repeat that again?  I'm a little hard-of-hearing,

12   in case you don't know.

13   Q.    Yes, sir.  Bill, you attended Freedom Law School.

14   Did they supplement this type of information or did

15   they disagree with you?

16   A.    Oh, no, they 100 percent agreed with it.

17   Q.    Were they an accredited law school?

18   A.    I -- I really don't know.  I -- it was just

19   Freedom Law School.  That's all I know.

20   Q.    Well, has that stuff that you learned at Freedom

21   Law School helped you in the legal process at all,

22   learned how to go to court and stuff like that?

23   A.    There was some stuff in it about that.  There was

24   a couple of books that I really didn't get a chance to

25   get into that as far as court procedures.  I was still

1    studying the taxes.

2    Q.    You've heard the testimony of the Internal

3    Revenue Service agent that you sent the questions to.

4    How many times have you asked different IRS agents to

5    show you where the law is?

6    A.    Oh, gosh, I've lost track, many, many times.

7    Quite a few times I've asked and never got any replies

8    to my answers and all I want to do is make sure I

9    follow the law, but they wouldn't show it to me.

10   Q.    Moving for a moment to 2012.  The Paragraph A and

11   the --

12           MR. MINNS:  If I could go to the exhibit.  Is

13   there one in evidence that has Paragraph A?  Pardon me,

14   Your Honor.  I apologize.  This will take a moment.

15         Your Honor, I would like to post Government's

16   Exhibit 2-D and then turn to a specific section on it.

17           THE COURT:  It's been admitted, go ahead.

18   BY MR. MINNS:

19   Q.    Mr. Messier, did you sign this?

20   A.    Yes, I did.

21   Q.    Bill, what does that mean, secured party creditor

22   for F. William Messier?

23   A.    Well, it's kind of a complicated matter, but,

24   it's -- I give credit using my name.  I offer my own

25   credit.

Messier-Direct/Minns

1    Q.    I don't understand.

2    A.    Um --

3    Q.    Speak into the microphone, please.

4    A.    Excuse me?

5    Q.    You have to speak into the microphone.

6    A.    Okay, I'm just thinking.

7    Q.    I know.  I understand.

8    A.    Okay, my signature is worth -- is worth money

9    because of our birth certificate so when I do something

10   like this, I am the secured party and my signature

11   creates money or authority.

12   Q.    If you don't owe them money, why do you have to

13   do this?  If you don't owe the Government any money,

14   why do you have to do this?

15   A.    Well, I thought I might be able to settle with

16   the IRS using this HJR 192, which was an account set up

17   for each one of us and I was going to pay them off so

18   they -- you know, I could satisfy them instead of

19   continuously arguing with them or trying to -- you

20   know, with them refusing to give me answers, I thought

21   maybe I could settle using this Treasury account.

22   Q.    Who set the account up?

23   A.    Who set it up?

24   Q.    Yes.  Yes, Bill.

25   A.    Oh, the Government sets it up.

Messier-Direct/Minns

1    Q.    Which Government?

2    A.    United States Government.

3    Q.    Are you a citizen of the United States

4    Government?

5    A.    No, I'm not.

6    Q.    Where are you a citizen?  Where are you a citizen

7    of?

8    A.    I'm a citizen of the United States of America,

9    one of the 50 states of the Union.

10   Q.    Isn't that the same thing as being a citizen of

11   the United States?

12   A.    No, it's not.  The United States is 50 square

13   miles of Washington, DC.  It's not part of the 50

14   states of the Republic, of the Union.

15   Q.    Bill, I'm moving over to a section that I've

16   highlighted that says levy and restraint.  Can you see

17   that?

18   A.    No, I know what it is.  I can read it.

19   Q.    Can you tell the jurors -- did you have a problem

20   with this?

21   A.    Oh, definitely.

22   Q.    Would you tell the jurors what your problem was?

23   A.    Well, my problem was this is the back side of a

24   notice of levy that my customers would get and they

25   start off with Paragraph B and they leave off this

Messier-Direct/Minns

1    Paragraph A.  So I got kind of curious why a document

2    that would allow my customers to give money to the IRS,

3    why did they leave off an important paragraph.

4            So I did some research and I discovered the

5    reason they left it off is because Paragraph A tells

6    you who is liable for the income tax and Paragraph A

7    says Government employees, not us.

8    Q.    Did you try to point that out to the Government

9    officials?

10   A.    Yes, I did.

11   Q.    Did they respond to your letters and notes

12   pointing that out?

13   A.    Totally ignored me.

14   Q.    Did you bring this up to the sheriff when you

15   tried to file criminal charges?

16   A.    I probably did, yes.

17   Q.    If you're right and the Government is wrong, why

18   didn't the sheriff accept your criminal charges?

19   A.    Well, that was a good question.

20           MS. KELLY:  Objection, Your Honor.

21           THE COURT:  Sustained.  No, he doesn't know

22   what's in the sheriff's mind.

23   BY MR. MINNS:

24   Q.    Now, moving back down the timeline, you sold your

25   business to Jeffrey Price, the gentleman that was on

Messier-Direct/Minns

1   the witness stand here?

2   A.   Yes.  I sold it to him and I have a mortgage

3   because he was hard up for cash.

4   Q.   Do you recall the form where you filled out and

5   said your residence was earth?

6   A.   Yes.  Yeah, I mean I think the W-9 you're talking

7   about?

8   Q.   Why would you put that down on a form that your

9   residence is earth?

10  A.   Because I -- it's because that's where my

11  residence is, on earth.  My residence is not the United

12  States because that's ten square miles of Washington,

13  DC, so I couldn't use that so I used earth, which is

14  nothing wrong with that.  That's where I'm a resident

15  of, of earth.

16  Q.   Well, that would apply to everybody in this

17  courthouse; would it not?

18  A.   Definitely.

19  Q.   Everybody in the state of Maine?

20  A.   Everybody, as long as you didn't live in

21  Washington, DC, the federal zone, yes, it would apply

22  to everyone.

23  Q.   People in China, would it not apply to them?

24  A.   Well, they're foreigners.

25  Q.   Are you a foreigner?

Messier-Direct/Minns

1    A.    Of?  I'm a foreigner of the United States, but

2    not the United States of America.

3              MR. MINNS:  Your Honor, if I could approach

4    Mr. Messier with Exhibits M-2, M-3 and M-4 to ask for

5    identification.

6              THE COURT:  Fine.  I assume you've shown them

7    to opposing counsel.

8              MR. MINNS:  Yes, they have copies.

9              THE COURT:  Go ahead.

10   BY MR. MINNS:

11   Q.    What is M-2?

12   A.    M-2 is a document where a fellow by the name of

13   Dennis Hertel, and he wrote a letter to the Congress of

14   the United States, House of Representatives,

15   questioning the missing paragraph on the notice of

16   levy.

17   Q.    How did you get this?

18   A.    I got this off my research off the Internet.  I

19   didn't do it myself because someone had already done

20   it.  I didn't want to redo it over again.

21   Q.    Did you rely on that for any of your opinions on

22   the income tax code?

23             MS. KELLY:  Objection, Your Honor.

24             THE COURT:  Overruled.  You can answer.

25   A.    Well, it was from a member of Congress, I assume

──────── Messier-Direct/Minns ────────

1    you believe that fellow.

2    BY MR. MINNS:

3    Q.    Well, my question is did you rely on it?

4    A.    Oh, yes.

5    Q.    Can you tell the jurors what M --

6          MR. MINNS:  Well, Your Honor, we offer M-2.

7    It's a letter that Mr. Messier relied on.

8          MS. KELLY:  Your Honor, may I approach?

9          THE COURT:  Yes.

10         (Sidebar conference)

11         MS. KELLY:  Your Honor, he's gotten in his

12   testimony that he relies on this and he explained it to

13   the extent he's able to, but I don't think this is

14   document to be admitted to the jury to review as an

15   exhibit.

16         In addition to that, this refers to 668-W, which

17   is not relevant in this case.  This is pertaining to

18   W-2 wage earners, which he is not.  This is from 1985,

19   this letter.  I think it's misleading, confusing,

20   prejudicial and I think under 403, I think he testified

21   he relied on it and to the extent defense counsel asked

22   him what it is, it's come in that way.

23         MR. MINNS:  One of the forms that the

24   Government has put into evidence is IRS Form 668 and

25   it's dealing with the levy and dealing with levy counts

Messier-Direct/Minns

1  and --

2          THE COURT:  Notice of levy on wages?

3          MS. KELLY:  On wages.  I'm not familiar with

4   that form.  Can you direct me to the exhibit, please?

5          MR. MINNS:  Am I wrong about that?

6          THE COURT:  Let me interject.  I'm going to do

7   what I've done in other cases and the objection is

8   sustained.  I will let him read portions of it to the

9   extent that it affected him, but I'm not going to admit

10  the document.  So you can ask him to read portions and

11  you can cross-examine him.

12          MR. MINNS:  May I, Your Honor?  May I publish

13  it while he's reading it so they will know that this is

14  the real piece of paper that says Congress of the

15  United States on it?

16          THE COURT:  I don't think that's necessary,

17  no.  I don't even know if it's real.

18          MR. MINNS:  I don't know either.

19          THE COURT:  So I'm not going to put it in

20  front of the jury.  He can read from it.

21          MR. VINCENT:  Judge, if I could, perhaps I

22  just didn't hear when he got this document.

23          THE COURT:  I didn't either.  That's a good

24  question.  We need to know that.

25          MR. MINNS:  All right.

Messier-Direct/Minns

1          THE COURT:  Thank you, Mr. Vincent.

2          (Open court)

3          THE COURT:  Go ahead, Mr. Minns.

4          MR. MINNS:  I'm plugging myself in, Your

5    Honor.  I think.

6          THE COURT:  We can hear you.

7          MR. MINNS:  Thank you, Your Honor.

8    BY MR. MINNS:

9    Q.    Mr. Messier, when did you first see Exhibit M-2?

10   A.    It would have been after I got -- moved back from

11   Arizona to Maine.

12   Q.    Can you give a decade, what decade?  The year or

13   the 1995 or 2005 or --

14   A.    Oh, it would have been maybe around the year

15   2000, 1999, 2000.

16   Q.    Okay.  And can you read the portions -- first of

17   all, who is the author of the letter?

18   A.    The author is -- you mean --

19   Q.    The person signing the letter?

20   A.    Oh, Dennis M. Hertel.  He's a member of Congress.

21   Q.    And what, if anything, from this document did you

22   rely on?

23   A.    The whole document.  I relied on the whole

24   document.

25   Q.    Would you read the portions that you relied on?

——Messier-Direct/Minns——

1    A.    Okay.  The portions I relied on had to do with

2    this Act 6 -- the notice of levy, the back side, the

3    6331 which is the note -- the levy and distraint and

4    6331(a) which, by the way, we agree it's missing off

5    the original notice of levy, 6331(a).  The IRS entitled

6    authority of the secretary and the levy may be upon the

7    accrued salaries or wages of officers, employees

8    elected officials of the United States, meaning the

9    District of Columbia, or any other agency instrumental

10   -- okay, now let me finish reading this.  By serving

11   notice of levy on the employee of such officer,

12   employee or elected official does not provide authority

13   to levy wages of private citizens in the private

14   sector, which I consider myself that.

15           So it says the omission of the section from

16   the IRS Form 668-W, which is the notice of levy, may be

17   misleading to some employees as you have suggested.

18           MR. MINNS:  May I approach the witness to look

19   at the next -- he's holding 3-M exhibit up.

20           THE COURT:  Yes.

21           MR. MINNS:  Okay.  Which one did you just talk

22   about?

23           THE WITNESS:  This one.

24   BY MR. MINNS:

25   Q.    Okay, and now M-3.

—Messier-Direct/Minns—

1          MR. MINNS:  Your Honor, I'll return to the

2     stand.  I'm just going to ask him --

3          THE COURT:  Yes.

4     BY MR. MINNS:

5     Q.    Is there a signature at the back of M-3?

6     A.    Yes, there is.

7     Q.    And who is the person that signed M-3?

8     A.    Dan Burton, a member of Congress.

9     Q.    What is the date of the letter?

10    A.    1997, December 11th.

11    Q.    Who is it addressed to?

12    A.    Dear Mr.

13    Q.    There's no name on it?

14    A.    Um, no name.

15    Q.    How did you receive this letter?

16    A.    This I received -- I know I received it off the

17    Internet.  It might have been some of the educational

18    materials I had sent for, but I think this came from

19    the Internet.

20    Q.    Do you remember when you received it?

21    A.    More than likely early 2000.

22    Q.    Did you rely on that through your beliefs on the

23    tax system?

24    A.    Yes.

25         MR. MINNS:  Your Honor, we offer M-3.

1          THE COURT:  Same ruling as before.  You can

2   ask him to read portions, but I'm not admitting the

3   document.

4          MR. MINNS:  Thank you, Your Honor.

5   BY MR. MINNS:

6   Q.    Would you read the parts of this that you relied

7   on.

8   A.    Yes.  It says, you are correct in your assertion

9   that the word liable or the terminology liable for

10  income taxes is not included in any sections of the

11  Internal Revenue Code.

12  Q.    Mr. Messier, can you look at M-4, please.  What's

13  the date of M-4?

14  A.    2007.

15  Q.    Do you know when you received M-4?

16  A.    Probably right around that date or shortly after.

17  Q.    Who signed it?

18  A.    It looks like Tom Feeney, which is another member

19  of Congress of the 24th District in Florida.

20  Q.    Who is it addressed to?

21  A.    Dear Mr., but there's a name above that John, so

22  it could be that person who it was addressed to.

23  Q.    Dear John?

24  A.    Yes.

25  Q.    Is there a part of this letter that you relied on

Messier-Direct/Minns

1   after 2007?

2   A.     Yes, I did.

3   Q.     What part is that?

4   A.     It all has to do with missing Paragraph A in the

5   6231 and at the bottom, the answer from this member of

6   Congress and says, this particular provision does not

7   appear to extend to the private sector employees.  If a

8   form was given to an employee that omitted section A,

9   this form could be considered misleading, and that's

10  from a member of Congress.

11  Q.     You've heard the discussion about your --

12  levying -- a notice of levy; is there a difference

13  between a levy and a notice of levy?

14  A.     100 percent there is.

15  Q.     What's the difference?

16  A.     A notice is basically a warning or stating that

17  at some point later on there could be an actual levy.

18  Q.     So is it possible that there could be legitimate

19  levies against you for the income taxes that you did

20  not pay?

21  A.     Not until they show me the law.

22  Q.     Now, you sent letters -- there's been testimony,

23  you heard the testimony about you sending letters to

24  your own clients.

25  A.     Yes, I did.

Messier-Direct/Minns

1    Q.    You threatened to sue your own clients?

2    A.    I did.

3    Q.    Did you draft the lawsuit?

4    A.    Um, no, I didn't.

5    Q.    Did you learn how to draft a lawsuit in Freedom

6    Law School?

7    A.    There was a little bit in there, but I didn't

8    rely very much on that part.

9    Q.    You -- did you -- did you give permission for Mr.

10   Robinson to file a lawsuit on your behalf against your

11   own clients?

12   A.    More or less, yes.

13   Q.    Did some of the clients quit doing business with

14   you?

15   A.    I lost a number of them, yes.

16   Q.    You can understand why they wouldn't want to do

17   business with you if you sue them; can you?

18   A.    Without them knowing what I had learned, they

19   would be nervous about staying -- having staying with

20   me as a customer.

21   Q.    What if one of them sued you; would you want to

22   do business with them?

23   A.    If it was an honest suit and made any sense, I

24   probably would.

25   Q.    Did you understand everything in the lawsuit you

Messier-Direct/Minns

1    filed?

2    A.    Um, mostly I would say.

3    Q.    Well, do you remember the CPA from the radio

4    company that testified during the trial?

5    A.    Yes.

6    Q.    They did everything you asked them to do; didn't

7    they?

8    A.    I know and I should apologize for that.  I didn't

9    really intend to harm her, but not having any of my

10   customers return any information that I had given them

11   about them questioning the IRS and this notice of

12   levies because they weren't signed by a judge or

13   anything and people just, you know, turning over my

14   money to the IRS without any questions, without them

15   questioning the IRS or anything, and sending all these

16   letters to my customers and everybody ignoring it,

17   naturally I got frustrated to the point that yeah, I

18   sued them.

19   Q.    The CPA from the radio company testified that you

20   told her that birth certificates could be sold on the

21   stock market; did you tell her something like that?

22   A.    I've mentioned about the birth certificate to a

23   lot of people.

24   Q.    What does that have to do with taxes?

25   A.    Um, um, I'm not quite sure what you want for an

Messier-Direct/Minns

1    answer.

2    Q.    Just what -- does the birth certificate have

3    anything to do with taxes?

4    A.    Not really, no.  Well, it's collateral for the

5    debt that the United States owes, but it wouldn't -- it

6    wouldn't have anything, I believe, to do with taxes.

7    Q.    So your birth certificate is collateral for

8    United States debt, but has nothing to do with taxes?

9    A.    Correct.

10   Q.    Does it have anything to do with the money orders

11   that Mr. Robinson sent out?

12   A.    It's kind of connected.

13   Q.    Explain.

14   A.    Okay, what I read and discovered, 1933, the

15   United States filed for bankruptcy and they took the

16   gold and silver standards away from us so we had no way

17   to pay our bills because they said it -- they had --

18   they own the money, they would pay our bills for us.

19   They would be responsible.

20         So the Government needed collateral so they

21   used the birth certificate and turned us into slaves

22   and we were responsible for the debt to the United

23   States, so that's why they used the birth certificate.

24         So what we try to do was -- because HJR 192

25   says the Government is responsible, they, the

Messier-Direct/Minns

1    Government, had opened up a Treasury account in each

2    one of our names.  Everybody has it.  So what we were

3    doing or we were investigating and researching, that if

4    the Congress created HJR 192 giving us a way to pay our

5    bills because we didn't have any real money, we just

6    had Federal Reserve Notes, that we could use the

7    Treasury account that the Government set up for us and

8    we could offset the bills that we owed because the

9    Government agreed to pay them.

10   Q.    How could this possibly have anything to do with

11   the Queen of England?

12   A.    Well, um, rephrase that one more time?

13   Q.    Yes.  You've claimed that this has something to

14   do, the tax system in the United States, with the Queen

15   of England and my question is how did the Queen of

16   England have anything to do with America's income

17   taxes?

18   A.    Well, this is a long history lesson.  I spent

19   many, many years learning it so it's hard to explain it

20   in a little snippet.  We owed a debt to the Queen and

21   the United States had to pay that debt.  So the Queen

22   is basically the richest woman on the planet and

23   because the United States owed a debt to them, that

24   this is where -- this is where -- basically where our

25   tax money goes.  Am I saying that right?

Messier-Direct/Minns

1    Q.    Did you say our tax money goes to the Queen of

2    England?

3    A.    Yes, it does.

4    Q.    How can you be sure about that?

5    A.    Just from places and things I've read like

6    anybody else would.  You read this stuff and you digest

7    it and, you know, go to other sources just to make sure

8    that you can confirm this.

9    Q.    And how does -- you said this had something to do

10   with the Vatican; how does this have anything to do

11   with the Vatican?

12   A.    Actually, the Pope -- it's a long story, but the

13   Queen in England also owed a debt to the Vatican so

14   this is where the money tree goes.  You know, it goes

15   from -- your income tax goes to the Federal Reserve

16   Banks, which goes to the international monetary system,

17   which goes to the Queen which goes to the Pope.  It's

18   very interesting.

19   Q.    And has anybody ever told you that that sounds

20   ridiculous?

21   A.    No.

22   Q.    Now, you lost both lawsuits; did you not?

23   A.    Yes, I did.

24   Q.    You never even appeared in a courtroom, correct?

25   A.    Correct.

Messier-Direct/Minns

Q.     Why?

A.     Well, not being an attorney, I didn't know the
procedures you had to use to get this into court
because basically I was trying to get some answers to
-- you know, some questions answered so we tried it in
court, but not being an attorney and not knowing exact
court procedure, they actually dismissed it and they
never answered any of our questions at all, just
dismissed the case.

Q.     So did the training that you got from Freedom Law
School do you any good when you tried to file lawsuits?

A.     A little bit.  They took and sent letters to the
Congressmen -- let me think.  You have to bear with me
because there's a lot going on up here.  Can you come
back to that because it would take me a second to
refresh my mind on that one.

Q.     Let me ask another question.  On the money order,
at the bottom it says, void where prohibited by law;
why does it say that, if you know?

A.     I don't really know.

Q.     You have claimed that George Washington has
something to do with current taxes; can you explain
that?

A.     Well, in my learning, basically what George
Washington had to do with this is that we used to have

Messier-Direct/Minns

1    a common law and when George Washington got to be

2    President, they changed common law to military law,

3    admiralty law, military law and this is why if you look

4    at the flag, I see that yellow fringe on it which means

5    it's military, from what I understood and what I've

6    read.  So we went from the common law to a military or

7    admiralty law.

8    Q.    What does George Washington have to do with

9    income taxes?

10   A.    Nothing, nothing that I know of.  Well, vaguely

11   -- no, I can't really.  It's too foggy in my mind to

12   come up with that thought.

13   Q.    You don't remember what brought this up or

14   anything?

15   A.    Um, what brought it up was I was wondering why we

16   had -- we had gone from a common law to military law

17   and everybody had talked about this fringe on these

18   flags and I got interested and did some research and

19   that's what I discovered, that George Washington had

20   converted common law to military law, so I assume I'm

21   in a military court right now.

22   Q.    Is that good?  Is that all right?  George

23   Washington is the Father of Our Country, certainly he

24   did his good, right?

25   A.    Yes.  I'm wondering if I'm being prosecuted in a

Messier-Direct/Minns

1    military court and I'm not in the military.

2    Q.    You used to be though.

3    A.    I used to be.

4    Q.    You heard Ms. Hendershot testify that she was

5    upset about being sued; did you hear that?

6    A.    Yes, I did.

7    Q.    Don't you feel bad about suing her for doing her

8    job?

9    A.    I feel bad suing anyone, but all I wanted was

10   questions answered.  I didn't force anybody, I didn't

11   threaten anybody at the time, I just kept sending and

12   sending letters just wanting to get my answers.

13           I wanted to know if I was going to break the

14   law or if I wasn't going to break the law.  I wanted to

15   follow the law and make sure I did everything right.

16   So this is why I sent all these letters and, like I

17   said earlier, I got frustrated, nobody's answered me.

18   I got frustrated and the only way I'm going to get

19   answers, I'll have to sue them.

20   Q.    Did you get any answers when you filed your suit?

21   A.    No, I didn't.

22   Q.    Was the two suits that you filed a waste of time?

23   A.    No because I was pursuing what I wanted to find

24   out, where the law is that I owed an income tax, so no,

25   I wasn't.

Messier-Direct/Minns

1   Q.    But it didn't do you any good, so weren't they a

2   waste of time?

3   A.    I don't consider it a waste of time.

4   Q.    You haven't even read the two lawsuits.

5         MS. KELLY:  Objection, Your Honor.

6         THE COURT:  You're leading, counsel.

7   BY MR. MINNS:

8   Q.    You earlier testified, and I ask you again, did

9   you read the lawsuits before they were filed

10  word-for-word?

11  A.    I might have glanced over them vaguely, but I

12  don't remember what actually was in it.  Basically what

13  was in it, we were asking the same questions we were

14  basically doing with the IRS.

15  Q.    Do you recall your daughter's testimony?

16  A.    Yes, I did.

17  Q.    She said she lived with you when she was 18 for

18  three months?

19  A.    Yes.

20  Q.    How long did she live with you when she was 18?

21  A.    Well, she lived with my wife and her son for

22  about three months, but she stayed in Brunswick and

23  found a boyfriend, moved in with him for probably a

24  couple years or so.

25  Q.    And you stayed on a friendly basis during that

1   time?

2   A.    Well, she had a life of her own and she was

3   pretty much interested in doing what she wanted.  She

4   really wasn't too much interested in me at the time.

5   Q.    Does it upset you that she was helping the

6   Internal Revenue Service?

7   A.    Oh, it was devastating.

8            MS. KELLY:  Objection, leading.

9            THE COURT:  Overruled.  The answer will stand.

10  BY MR. MINNS:

11  Q.    Do you still love your daughter?

12  A.    Of course I do.

13  Q.    Can you understand why the IRS agents believe you

14  owe a tax that they keep collecting tax money from you?

15           MS. KELLY:  Objection to the form of that

16  question, Your Honor.

17           THE COURT:  Sustained, it's compound.

18  BY MR. MINNS:

19  Q.    You understand that there's evidence that the IRS

20  has collected from you over $170,000?

21  A.    Yes.

22  Q.    You understand that they believe they're supposed

23  to do that?

24  A.    That's what they believe, not what I believe.

25  Q.    But can you accept the fact that they're doing

──────── Messier-Direct/Minns ────────

1    what they believe is right?

2    A.    No.   They're not doing what's right.

3    Q.    If you could go back 20 years and not have ever

4    seen the book in the Arizona bookstore, would you do

5    that?

6              MS. KELLY:   Objection, Your Honor.

7              THE COURT:   Sustained.

8    BY MR. MINNS:

9    Q.    Have you ever deliberately tried to violate any

10   law?

11   A.    Never in my life.

12   Q.    Would you ever deliberately violate a law?

13             MS. KELLY:   Objection.

14             THE COURT:   Overruled.   You can answer.

15   A.    I would never break any laws.   I never have in my

16   life.   I don't -- I don't do now and I never plan on

17   it.

18   Q.    Would you tell a mistruth under oath to avoid

19   going to prison?

20             MS. KELLY:   Objection, Your Honor.

21             THE COURT:   Overruled.

22   A.    Would you repeat the question again?

23   Q.    Yes.   Would you lie under oath if it would keep

24   you out of prison?

25   A.    Of course not.   I don't believe in lying.

—Messier-Direct/Minns—

1    Q.    How do you plead to the charges of intentionally

2    violating the law requiring you to file tax returns?

3    The charge, the actual charge --

4                MR. MINNS:  Do we have our chart?

5                THE COURT:  Counsel, I'm not sure I understand

6    the question.

7                MR. MINNS:  I know.

8                THE COURT:  He pleaded not guilty to all

9    charges.

10                MR. MINNS:  Yes, Your Honor.

11                THE COURT:  And that is the status of the

12    case.  He has pleaded not guilty.

13                MR. MINNS:  Yes, Your Honor.  I'm --

14                THE COURT:  That's why we're here.

15                MR. MINNS:  Yes, it is, but I would like the

16    jurors to hear it from his mouth, if possible.

17                MS. KELLY:  I would object.

18                THE COURT:  Ladies and gentlemen, I would

19    instruct you the defendant has pleaded guilty -- has

20    pleaded not guilty to all charges, both defendants have

21    pleaded not guilty and that's why we're having the

22    trial and you'll make that determination as to whether

23    either of them is not guilty or guilty.  Go ahead.

24    BY MR. MINNS:

25    Q.    You understand and you heard testimony that there

Messier-Direct/Minns

```
 1    was $170,000 in your safe at one time when your

 2    daughter was living with you?

 3    A.    Yes, there was.

 4    Q.    Is that money still in your safe?

 5    A.    It's all gone.

 6    Q.    Now, what were your plans for it when your

 7    daughter was living with you?

 8    A.    I never got to see my daughter grow up so I had

 9    -- I wanted her to know that she had a father who still

10    loved her, so I was going -- I was going to give her

11    everything.  I'm sorry.  So that was going to be hers

12    and the house and she was going to get everything

13    because I still loved her and I wanted to make up for

14    all these last -- these lost years and I didn't have

15    anything else to live for anyway.  I wasn't married, I

16    was living alone.

17    Q.    Is the money still there?

18    A.    It's all gone.

19    Q.    Where did it go?

20    A.    Well, I used it to pay my bills, I paid my

21    property taxes with it.  I didn't have any health

22    insurance.  I paid $45,000 that was out of my pocket

23    for the prostate operation and follow-ups.  I used it

24    to pay -- I bought one vehicle, a 1999 -- it's 16 years

25    old.  I bought -- I used that, I bought -- I used it to
```

Messier-Direct/Minns

1    buy the airplane, basically, and I don't have a

2    retirement accounts so that's going to be part of my

3    retirement.

4    Q.    Who's paying your legal fees?

5    A.    You are.  I mean oh, I am paying it.  I wish you

6    were.  I'm paying the legal fees.

7    Q.    You sent a very large amount of money for legal

8    fees, fees for the psychiatrist, for your defense?

9    A.    Yes.

10   Q.    You flew down into Texas --

11             THE COURT:  You're leading.

12             MR. MINNS:  I apologize.

13   BY MR. MINNS:

14   Q.    Did you have to fly anywhere commercially to meet

15   with me?

16   A.    Yes, I did.  I flew to Texas.

17   Q.    Can you remember how many IRS agents you have met

18   with and spoken with over the years?

19   A.    Only two that I know of.

20   Q.    How many have you written to?

21   A.    Excuse me?

22   Q.    How many have you written to?

23   A.    Oh, let's see, Patrick Frie, Jolene.  Four, maybe

24   five.

25   Q.    Have you ever invoked your right to remain silent

Messier-Direct/Minns

1   on what you believe?

2   A.    No, I haven't.

3   Q.    Do you think that's wise?

4   A.    I'm not afraid to tell the truth.

5   Q.    Bill, you understand now that the Government will

6   be able to ask you questions.

7   A.    Yes.

8           MR. MINNS:  Your Honor, I pass the witness.

9           THE COURT:  Thank you.  Let me ask Mr. Vincent

10   first if he has any questions.

11          MR. VINCENT:  May we approach, Judge?

12          THE COURT:  Yes.

13          (Sidebar conference)

14          MR. VINCENT:  Judge, I'm just mindful of the

15   time and the fact that we have the doctors here.  I

16   don't know if it would be appropriate to take them out

17   of order.

18       I'm not -- I would expect that would use a great

19   deal of the time that's left on my cross so --

20          MR. MASELLI:  Is the next -- is the Government

21   next?

22          THE COURT:  Well, I will hear from them.

23   There's obviously no correct answer to that, but

24   generally, you two -- the two defendants have been

25   acting in tandem and so I thought initially it was

1      appropriate to have both examinations and then the

2      cross, but you can persuade me she should --

3            MR. VINCENT:  I haven't been acting in tandem,

4      Judge.  It's just -- it just so happens I haven't had

5      any disputes with --

6            THE COURT:  I didn't mean that in any kind of

7      evaluative way; simply meant that you're both

8      defendants and you haven't had, for the most part,

9      inconsistent defenses.  You may have some at this

10     point, I understand.

11           MR. MINNS:  I think I forgot for a second

12     about Mr. Robinson and the expert of the Government and

13     I apologize --

14           MR. VINCENT:  That's okay.

15           THE COURT:  Well, there's two questions here.

16     Who should go next, but also what do we do with the

17     experts.  What's the Government's position in terms of

18     the experts?

19           MS. KELLY:  Your Honor, I would submit that

20     it's appropriate for Mr. Vincent to do the

21     cross-examination at this point.  That's how we've been

22     running the trial the entire three days.  There's no

23     reason to take them out of order.

24           THE COURT:  But the consequence would be that

25     the experts might have to come back in the morning.

1              MS. KELLY:  That's fine.  They're prepared.

2    They're going to be here tomorrow and they're going to

3    get to testify.  They're being paid.

4              THE COURT:  Okay, let's go.

5              MR. VINCENT:  That's fine.

6              MR. MINNS:  That's our choice.

7              THE COURT:  Okay, thank you.

8              MS. KELLY:  Thank you.

9              (Open court).

10             THE COURT:  Mr. Vincent, you may proceed

11   whenever you are ready.

12             MR. VINCENT:  Thank you, Your Honor.

13                       CROSS-EXAMINATION

14   BY MR. VINCENT:

15   Q.    Is it okay if I call you Bill?

16   A.    Everyone does.

17   Q.    Thank you.  You've had an opportunity to review

18   the indictment against you, correct?

19   A.    Yes.

20   Q.    And you've reviewed Count 2, that's the

21   conspiracy charge?

22   A.    Yes.

23   Q.    And that conspiracy charge alleges that both you

24   and Mr. Robinson conspired against -- to defraud the

25   Government?

Messier-Cross/Vincent

1    A.    That's what the allegations are, yes.

2    Q.    What kind of agreement did you have with Bill

3    about the tax problems, if any?

4    A.    Agreement with Bill?

5    Q.    Yes.

6            THE COURT:  You don't mean Bill.

7    BY MR. VINCENT:

8    Q.    Oh, excuse me, with David.  Forgive me, I

9    misspoke.

10   A.    Repeat the question?

11   Q.    What agreement, if any, did you have with David

12   concerning your tax problems?

13   A.    We were just close friends.

14   Q.    But I'm asking you, did you have any agreement

15   concerning working on your tax problems?

16   A.    Yes.

17   Q.    Did you and David agree on every issue when it

18   came to your beliefs about taxes or his beliefs?

19   A.    Repeat that one more time?

20   Q.    Did you and David agree on everything when it

21   came to your beliefs and his beliefs on taxes and other

22   issues?

23   A.    On the taxes?  Yes.

24   Q.    And did you have an agreement with David to

25   defraud the United States?

Messier-Cross/Vincent

1    A.    No.  He never had any intentions of defrauding

2    anyone.  Neither did I.

3    Q.    Did you and he agree to use deceit, craft or

4    trickery or dishonesty in your dealings with --

5    A.    No.

6    Q.    -- let me finish the question.  In dealing with

7    your questions concerning your liability for taxes?

8    A.    We never agreed to be dishonest about anything or

9    defraud anyone.

10   Q.    Now, your working with David on the tax issues,

11   what did that involve?

12   A.    Um --

13   Q.    What were the issues you were -- the two of you

14   were working on?

15   A.    The issues was trying to get the IRS to answer

16   questions.

17   Q.    This was questions about -- I believe you

18   testified about your obligation to pay or file taxes?

19   A.    Correct.

20   Q.    And also your concerns about the conformity of

21   the levies with the law?

22   A.    Correct.

23   Q.    And what expertise about levies did Mr. Robinson

24   bring to the discussion?

25   A.    He basically just brought up the idea that there

Messier-Cross/Vincent

1   was a difference between a notice of levy and a levy,

2   but I brought up the missing Paragraph A.

3   Q.    And you had been aware of these issues long

4   before you met Mr. Robinson; isn't that correct?

5   A.    Yes, correct.

6   Q.    And when did you two meet?

7   A.    It was probably three, maybe four years ago.

8   Q.    Well, can you be more specific?  This is 2015,

9   beginning of 2015.

10  A.    Let's see, you have to bear with me.  Since I

11  retired, I threw my calenders away and threw my watches

12  away, so dates are just memories for me and it's hard

13  for me to place them in order.  So this is 2015; 2013?

14  Q.    Well, the allegations are that you conspired with

15  Mr. Robinson beginning in February of 2012.  This was

16  2014?

17  A.    I was probably wrong in my guess.  Okay, it was

18  2012.

19  Q.    How long had you known him prior to your issues

20  with the Internal Revenue Service?

21  A.    Maybe another six, six, seven months.

22  Q.    So would it be fair to say that your beliefs

23  about the Internal Revenue Service and the levy system

24  and -- you were subject to a levy prior to 2012,

25  correct?

Messier-Cross/Vincent

1   A.    Never.

2   Q.    But your beliefs about the tax system and the tax

3   code had been evolving since 1999?

4   A.    Yes.

5   Q.    And did you have discussions with David about

6   your education and learning about the tax code?

7   A.    Yes.

8   Q.    And did he talk to you about his education and

9   learning about the tax code?

10  A.    Yes.

11  Q.    Who was the teacher and who was the student, if

12  that is applicable?

13  A.    It was a 50/50 thing.  We shared a lot of

14  information back and forth.

15  Q.    It would be fair to say you both had shared

16  beliefs?

17  A.    Yes.

18  Q.    And that you shared those with each other?

19  A.    Yes.

20  Q.    When was your prostate surgery, Bill?

21  A.    You're going to have to do the math for me.  It

22  was about six years ago.  2009, 8.

23  Q.    2008, 2009, somewhere in there?

24  A.    Yes.

25  Q.    And you had been reconciled with your daughter,

Messier-Cross/Vincent

1     if that's the right word, you had re-contact --

2     re-established a relationship, perhaps would be a

3     better word, with your daughter well prior to your

4     prostate surgery?

5     A.     Probably a couple three years, couple of years.

6     Q.     Do you agree with her testimony that her husband

7     did not want to leave Wisconsin because he wanted to

8     finish his military pension obligation and it was about

9     five years before arrangements were made to come to

10    Maine?

11    A.     That's correct.

12    Q.     So for a period of time, it could be as much as

13    five years, you had a cordial and loving relationship

14    with your daughter?

15    A.     Oh, definitely.

16    Q.     And you were sometimes extravagant with her, with

17    providing her with money?

18    A.     Oh, we were -- she is my one and only daughter.

19    Yeah, I used to send her 3, $4,000 every month.

20    Q.     And you did that as -- I believe your testimony

21    was you did that to kind of make up for the fact that

22    you were not in her life earlier?

23    A.     Correct, correct.

24    Q.     Now, at some point you had your surgery and your

25    daughter was and her husband -- by the way, do they

Messier-Cross/Vincent

1    have any children?

2    A.    No.  She wasn't able to have any.

3    Q.    So it's just -- the family was basically you and

4    your daughter?

5    A.    Yeah and her husband.

6    Q.    And her husband.  Do you have any other extended

7    family?

8    A.    I don't think so.

9    Q.    Fair to say you're alone except for your daughter

10   and her husband?

11   A.    Yes.

12   Q.    So at some point you're in the hospital.  You

13   heard your daughter's testimony about the fact that you

14   weren't asking her to come and stay here in Maine and

15   take care of you after you got released from the

16   hospital, correct?

17   A.    I heard that part, yes.

18   Q.    Well, is that accurate?

19   A.    No, it's not.

20   Q.    Was the expectation that your surgery would go a

21   lot smoother than it did?

22   A.    Yes.

23   Q.    And I take it it didn't based on --

24   A.    It didn't.

25   Q.    Based on that, did you fear for your longevity?

Messier-Cross/Vincent

1          MS. KELLY:  Objection to the form, Your Honor.

2          THE COURT:  Overruled.  You can answer.

3    A.    You want to know about my longevity?

4    BY MR. VINCENT:

5    Q.    Well, let me rephrase the question because it

6    wasn't artful, I apologize.  Based on the events in the

7    hospital, did you fear that you were going to die?

8    A.    Oh, yes.

9    Q.    And did you attempt to get ahold of your

10   daughter?

11   A.    The doctor made one call to my daughter that the

12   operation had been complete, but they didn't tell her

13   that there was complications.

14   Q.    Did you try to get messages to her some other

15   way?

16   A.    Um, Dick, Richard Laborde lived in the house at

17   the time next door --

18   Q.    Well, this is a yes or no question.  Did you try

19   to get ahold of her in other ways?

20   A.    Yes.

21   Q.    And did you get information that led you to

22   believe that somebody had tried to contact or had --

23   sent her messages on your behalf?

24   A.    Yes.

25   Q.    And you still didn't hear from her?

Messier-Cross/Vincent

1    A.    Still didn't hear from her.

2    Q.    Okay.  Now, did that cause you some upset?

3    A.    Oh, definitely.

4    Q.    And she's testified that the relationship then

5    deteriorated rapidly?

6    A.    Yes, it did.

7    Q.    Explain what your view of the relationship's

8    demise was about.

9    A.    Okay.  Um, when I went to visit my daughter the

10   first time in Wisconsin, she told me that she liked

11   giving to people and paying back people.  That was her

12   personality.

13         MS. KELLY:  Your Honor, I'm going to object to

14   hearsay and ask to speak at sidebar.

15         MR. VINCENT:  It goes to his state of mind,

16   Judge.  I'm asking what information he got.

17         THE COURT:  Well, that's not responsive.  You

18   asked him his view of the relationship's demise was

19   about.  We're getting back to the beginning here.  The

20   question is why did the relationship break down.

21         THE WITNESS:  That's what I'm trying to

22   explain, Your Honor.

23   A.    When -- before I got to the hospital and my

24   daughter was visiting with me at the time, she wanted

25   to know if they moved up the hill in the new house I

```
1   built for them, if they would have to be -- she wanted
2   to know if they would have to be -- they would have to
3   be my slave, you know, to be a slave to me and that
4   didn't set very well.
5   BY MR. VINCENT:
6   Q.    What did you think she meant by saying being a
7   slave to you?
8   A.    I don't know.  I really don't, I don't know why
9   she came up with that.  She just said are we going to
10  have to be your slave and the only thing they would
11  have to do is help me cut some wood.  And the other
12  thing that happened --
13            MS. KELLY:  Your Honor, I don't think there's
14  a question pending.
15            MR. VINCENT:  Well, I think he's responding to
16  my question, Judge, about why --
17            THE COURT:  Are you still on that same
18  nature --
19            MR. VINCENT -- the relationship -- yes, I am.
20            THE COURT:  Go ahead.
21  A.    So the other thing she wanted to know is how much
22  I would give her -- in writing how much cash I would
23  give her.  So I gave her the house, you know, I give
24  her cash and she wanted to know if she had to be my
25  slave and then I went to the hospital for prostate and,
```

1   you know, she never came, never visited.

2          Six days later I came home and I had to call

3   her and she blamed it up on the doctors for not calling

4   the extra days I was in the hospital, so she really

5   didn't care about me so I had to call her.

6   BY MR. VINCENT:

7   Q.    Was that the beginning of the difficulty with

8   your relationship then with your daughter?

9   A.    The six days I was in the hospital, all this

10  stuff is coming together in my mind about being a slave

11  and having to give her so much money in cash in writing

12  and her not visiting me.  That's when I realized all

13  she cared about was the money.

14  Q.    I'm sorry you can't cover your mouth.  I can't

15  hear you.

16  A.    All she cared about to me, in my opinion, was

17  that all she cared about was the house, the money and

18  all my resource.  She really -- she really wasn't the

19  daughter I expected.  She had changed.

20  Q.    Did you have an opportunity to talk to her about

21  your feelings?

22  A.    No.  When they moved, when they left, she severed

23  everything.  I didn't know where she moved to, she

24  wouldn't tell me where she moved to.  I had no phone

25  number, nothing whatsoever.

Messier-Cross/Vincent

```
 1   Q.    Well, when you got out of the hospital, did you
 2   communicate to her your feelings and what you were
 3   thinking about her and the relationship?
 4   A.    Yes, I did.
 5   Q.    And what was her response to that?
 6   A.    She says I'll change, meaning that when I brought
 7   up the insult about her having to be my slave and then,
 8   you know, wanting so much money every month in writing,
 9   then -- and I told her, I said I don't think this is
10   going to work out.  Even my attorney -- I had a real
11   estate attorney that met her on several occasions and
12   he had suggested -- of course, love is blind.
13              THE COURT:  I think we're beyond the question
14   here.  The question is what was her response.
15   BY MR. VINCENT:
16   Q.    So you never had an opportunity to repair the
17   relationship after you got out of the hospital?
18   A.    No.
19   Q.    Now, you've heard some testimony about you trying
20   to establish or establishing a trust for your assets.
21   A.    Yes.
22   Q.    What was the reason for you establishing this
23   trust for your assets?
24   A.    Well, I had no will, I had no family, I had
25   nobody to leave my estate to and because my daughter
```

Messier-Cross/Vincent

1    didn't really care about her father, so I left it in

2    the Maine Republic Free State.

3    Q.    That was what you were doing?

4    A.    That was what I was doing, yes.  I was doing it

5    so my daughter couldn't get her hands on it.

6    Q.    Now, this Maine Republic Free State, did you have

7    -- who is the Maine Republic Free State?

8    A.    Dave Robinson.

9    Q.    Were you leaving your assets to David?

10   A.    Well, it was the Maine Republic Free State trust.

11   Yes, I left it --

12   Q.    But you didn't want to turn control of your

13   assets over to anybody; did you?

14         I said you didn't want to turn the control of

15   your assets over to anybody; did you?

16   A.    The trust I was sure would have taken care of it

17   after I was gone.

18   Q.    But that never got followed through on; did it?

19   A.    No, it didn't.

20   Q.    You never re-registered your plane title to

21   anybody?

22   A.    No, it's still --

23   Q.    Nor your vehicles?

24   A.    Nope, it's all mine.

25   Q.    Nor your property?

Messier-Cross/Vincent

1    A.    It's still all mine, in my name, yes.

2    Q.    Never had any of your payments for your tower

3    ever sent to anybody other than you?

4    A.    No, just me.

5    Q.    And have you ever made a claim in your dealings

6    with the Internal Revenue Service that you didn't own

7    these assets and that they were in trust to somebody

8    else?

9    A.    No, never.

10   Q.    Now, you started getting correspondence from the

11   IRS concerning back taxes or they claimed that you owed

12   back taxes, correct?

13   A.    Yes.

14   Q.    And we've heard about -- well, when was -- what

15   was the first thing that alerted you to the fact that

16   the Government thought you owed back taxes and wanted

17   to talk to you?  Was it the letter on the 17th of

18   February?

19   A.    If that's the time that the notice of levies

20   started coming, yeah, that would be the time that I

21   really started getting concerns.

22   Q.    Well, the notice of levies started coming -- you

23   found out about that from your customers initially,

24   correct?

25   A.    Yes.  One of the letters, my customers sent me a

Messier-Cross/Vincent

1    copy of it.  They got a notice of levy.

2    Q.    Then you got a letter from Agent Frie?

3              MS. KELLY:  Your Honor, I'm going to object to

4    the leading.

5              THE COURT:  Overruled.

6    BY MR. VINCENT:

7    Q.    You got a letter from Agent Frie?

8    A.    I'm not sure.  I assume that they sent one.  I

9    probably got it, but I can't remember.

10   Q.    Let me show you what's been marked as

11   Government's Exhibit 2-A.  This is the letter dated

12   11/1/2011.  Do you remember receiving that letter?

13   A.    Vaguely.

14   Q.    This is back before you knew David or did you

15   know David at this point?

16   A.    Um --

17   Q.    I believe you said you knew him about nine months

18   before you started getting letters so you knew him at

19   this point, correct?

20   A.    I did not, I don't believe, because that was

21   dated 2011.

22   Q.    This is November 1st of 2011.

23   A.    Right.  So I think I would have gotten that

24   before I knew David.

25   Q.    Did you ever talk to David about this letter?

Messier-Cross/Vincent

1    A.    Possible, but I don't remember.

2    Q.    Do you recall sending a letter to the IRS with a

3    conditional acceptance?

4    A.    Um, yes, but I believe I had help with it.

5    Q.    And was that an attempt to tap this account you

6    think was established with your birth certificate?

7              MS. KELLY:  Objection to the leading.

8              THE COURT:  He's allowed to lead, counsel.

9    BY MR. VINCENT:

10   Q.    Do you understand my question?

11   A.    No.  Would you repeat it again, please?

12   Q.    When you sent the response back with the

13   conditional acceptance that's -- and you saw the seal

14   that was stamped on the outside of the levy --

15   A.    Yes.

16   Q.    -- was that attempt for you to offer $250,000 in

17   settlement to the IRS tapping this account that's

18   established for you at birth?

19   A.    Yes.

20   Q.    And did you get a response to that?

21   A.    No, they ignored that.

22   Q.    Did you get a letter back with information from

23   the IRS directing you to parts of the code and telling

24   you that your arguments were frivolous?

25   A.    Well, I believe that everything you get from the

Messier-Cross/Vincent

1      IRS to me is frivolous.

2      Q.    My question is do you remember getting that

3      letter with the pamphlets from the IRS?

4      A.    I think I -- I think I saw it, yes.

5      Q.    Did you share that with David Robinson?

6      A.    Probably.

7      Q.    Do you have a recollection of whether you did or

8      not?

9      A.    No, I don't.

10     Q.    So your attempt to use your account was not

11     successful?

12     A.    Not success -- well, no.  Not my account.

13     Q.    At some point did David Robinson suggest to you

14     that he would pay your debt?

15     A.    Yes, he did.

16     Q.    Using his secret account?

17     A.    I don't believe it's secret, but yes, he was

18     going to use his account to help me, yes.

19     Q.    Well, it would be fair to say it was your belief

20     that not too many of us know about this account?

21     A.    Not unless you study.

22     Q.    So when I call it a secret account, you don't

23     think it's a secret account because you know about it?

24     A.    If anybody were to check it out, they'd find out

25     it wasn't secret.  You just need to go research and

Messier-Cross/Vincent

1    find that it's there.

2    Q.    So another letter was sent this time attempting

3    to use Mr. Robinson's account to pay off your tax debt?

4    A.    Correct.

5    Q.    Did you get any response from that that you know

6    of?

7    A.    All we know is that they accepted -- they

8    accepted the money order and never refuted it and never

9    sent anything back.

10   Q.    But they continued to collect the levies,

11   however, on the 172,000 from your customers; didn't

12   they?

13   A.    Yes, they did.

14   Q.    Well, wouldn't that be a pretty obvious indicator

15   that they were not accepting the $172,000 money order

16   from Mr. Robinson?

17   A.    I can't really testify to that.  They may have

18   accepted it and double-dipped the money to get it from

19   me and the secret account.

20   Q.    Didn't you both, in fact, send another piece of

21   correspondence that had more information about this

22   account because you didn't think they understood what

23   the stamp and the check meant?

24        MS. KELLY:  Your Honor --

25   A.    I don't know about that.

Messier-Cross/Vincent

1          MS. KELLY:   -- I would object to the question.

2          THE COURT:   Sustained.   I don't understand it.

3          MS. KELLY:   It's not why they did what they

4     did.

5          THE COURT:   Sustained.

6          MR. VINCENT:   I'm asking what he thought the

7     IRS -- IRS charged him.

8          THE COURT:   That's a very compound question.

9     Rephrase it.

10    BY MR. VINCENT:

11    Q.   Didn't you send an additional letter to the IRS

12    with more information about this secret or this birth

13    certificate account at birth account?

14    A.   I'm not sure.

15    Q.   Not sure.   When -- did you send information to

16    your customers about the fact that a money order

17    drafted on this birth certificate account had been sent

18    to the Government; did you send that to your customers?

19    A.   Yes, yeah.

20    Q.   Did you attempt to explain to the customers what

21    that meant?

22    A.   Yes.

23    Q.   And you were getting no information back from the

24    IRS that --

25    A.   No.

Messier-Cross/Vincent

1    Q.    -- disregarding all of this as frivolous?

2    A.    Yes.

3    Q.    So at some point, you and Mr. Robinson discussed

4    the issue of filing a lawsuit against the Government?

5    A.    Yes.

6    Q.    And do you recall who the parties to that lawsuit

7    was?

8    A.    I think it was all of my customers, some IRS

9    agents.  Basically we sued everyone.  Susan Collins.

10   Q.    Susan Collins?

11   A.    I believe she was on the lawsuit, yes.

12   Q.    Did you sue the head of the IRS?

13   A.    No, she's a Congresswoman.

14   Q.    No.  Did you also sue the head of the IRS or

15   don't you --

16   A.    Yes, I think so.  I'm not sure.  Like I said, we

17   sued everyone.

18   Q.    Would it be fair to say it was your intent to get

19   all the parties in court so that you could get this all

20   sorted out and convince them that your position about

21   the tax laws was accurate?

22   A.    Yes.

23         MS. KELLY:  Objection as to the form of his

24   intent, Your Honor.  He should ask --

25         THE COURT:  Overruled.

Messier-Cross/Vincent

1           MR. VINCENT:  You can answer.

2           THE COURT:  The answer stands.  The answer is

3      yes.  It stands.

4      BY MR. VINCENT:

5      Q.    Now, that suit subsequently was dismissed?

6      A.    Yes.

7      Q.    And do you know why it was dismissed?

8      A.    Like I said, not being an attorney, we

9      evidently -- we weren't doing the correct procedures to

10     get this into court so we could get these people to

11     answer our questions.

12     Q.    Well, this suit was filed in Sagadahoc County

13     Superior Court in the state of Maine?

14     A.    Yes.

15     Q.    Were you aware that that's not the proper venue

16     for somebody who lives in Cumberland County?  You live

17     in Brunswick, right, which is in Cumberland County?

18     A.    Can I explain a little bit why that court is

19     there?  Brunswick used to have their own court on

20     Federal Street and a number of years ago, the Town of

21     Brunswick and the Town of West Bath agreed to build a

22     building and they both share the same court.

23          THE COURT:  Counsel, I'm not sure what the

24     question is.

25          MR. VINCENT:  Well, neither am I, Judge.

```
 1              THE COURT:  Let's put a new question.
 2              MR. VINCENT:  Okay.  I'll pose a new question.
 3    BY MR. VINCENT:
 4    Q.    I believe I was asking you about whether you were
 5    aware that Sagadahoc County was not the proper venue to
 6    file the suit.
 7    A.    Exactly, and Brunswick shares --
 8    Q.    But you live in Cumberland County.  And your -- I
 9    believe what you're saying is there's a dual court --
10    A.    Yes.
11    Q.    -- now that houses both Sagadahoc and Cumberland
12    Counties?
13    A.    Yes.
14    Q.    And is that a Superior Court or District Court?
15    A.    Um, I think it's just District Court.
16    Q.    And the suit was filed in Superior Court; was it
17    not?
18    A.    Um --
19    Q.    Or do you know?
20    A.    I don't.
21    Q.    Would it be fair to say that Mr. Robinson
22    prepared and filed the lawsuit with your
23    acquiescence --
24    A.    Yes.
25    Q.    -- or your agreement?
```

Messier-Cross/Vincent

1    A.    Yes.

2    Q.    And when that lawsuit was subsequently dismissed,

3    you said -- you thought it was dismissed because you

4    didn't do things properly?

5    A.    Correct.

6    Q.    Did the court address the merits of your

7    argument?

8    A.    No.

9    Q.    Did you want the court to address the merits of

10    your argument?

11    A.    Oh, definitely.  That was the whole point.

12    Q.    And the decision was made to file another suit?

13    A.    Yes.

14    Q.    And when that suit was filed, again did Mr.

15    Robinson draft that up?

16    A.    Yes.

17    Q.    And did you participate in that?

18    A.    Somewhat.

19    Q.    He did most of the typing?

20    A.    Yes.

21    Q.    And did you sue the same number of defendants in

22    that case?

23    A.    I believe so.  I'm not sure.

24    Q.    You're not sure.

25    A.    No.

Messier-Cross/Vincent

```
1    Q.    Would it be fair to say that once you turned to

2    the courts for some assistance in getting your

3    questions answered, you stopped sending inquiries to

4    the IRS about tax issues?

5    A.    Yes.

6    Q.    And would it be fair to say you stopped sending

7    information to your clients suggesting they try to get

8    answers to these tax issues?

9    A.    I believe we stopped, yes.  Can I add to that?

10             THE COURT:  Wait for a question, sir.

11   BY MR. VINCENT:

12   Q.    I apologize for skipping around, Bill, but I just

13   want to go back to some of your answers when Mr. Minns

14   was asking you questions.

15             You talked about seeing the video that was

16   produced by Aaron Russo.

17   A.    Several times.

18   Q.    Who is Aaron Russo?

19   A.    He is a Hollywood movie producer.

20   Q.    And at the time you saw this video, were you

21   aware of who he was?

22   A.    I had heard the name.

23   Q.    Did you do anything to discover more about him

24   after you saw this video?

25   A.    Oh, yes.
```

Messier-Cross/Vincent

1    Q.    And what did you find out?

2    A.    Well, I found out the man was honest and he

3    wanted to get to the truth like the rest of us American

4    people and he made this documentary.

5              MS. KELLY:  Objection, Your Honor.  This is

6    all hearsay.

7              THE COURT:  It's not being offered for the

8    truth, ladies and gentlemen.  It's just what Mr.

9    Messier believes.  That's what it's being offered for.

10             MR. VINCENT:  Thank you, Your Honor.

11   A.    And he took it all over the country, the United

12   States and all the movie theatres and offered it for

13   free.

14   BY MR. VINCENT:

15   Q.    Did you ever find out what movies or any of the

16   movies that Aaron Russo had done in the past?

17   A.    Yes.  I think -- oh, gosh, he made two other

18   movies.  One of them had to do about the rose and I

19   can't remember off the top of my head --

20   Q.    About the what?

21   A.    The rose.  I can't remember the name of it.  I

22   mean I could find it, but he did make two other movies

23   prior to this documentary so he was a movie producer.

24   Q.    Did he make an Eddie Murphy movie maybe?

25   A.    Yes, that's it.  Eddie Murphy, okay.  Yes,

1    something about the rose.

2    Q.    I guess it would be fair to say he wasn't -- he

3    was a mainline producer, he wasn't just some shmoe?

4    A.    No, he wasn't a shmoe by any means.

5          THE COURT:   Again, this is only being offered

6    for what Mr. Messier believes.

7    BY MR. VINCENT:

8    Q.    And did that reinforce your opinion of this

9    documentary that he produced that he went around the

10   country showing?

11   A.    Absolutely, absolutely.   I would have went to one

12   of them if I had the means to get there.

13   Q.    Now, you testified that you took a Freedom Law

14   School course.

15   A.    Yes, I did.

16   Q.    That was an online course?

17   A.    Yes.  It was a home study course.

18   Q.    I'm sorry, home study course.   And it cost

19   $9,000?

20   A.    I gave them 97 -- probably $9,700.   It was over

21   9000.

22   Q.    And how long was this course -- how long did it

23   take?

24   A.    I never quite finished it because I was studying

25   so many things at the time.   This was just in addition

1    to what I had already studied to reinforce everything

2    else that I was --

3    Q.    How much of the course do you think you did?

4    A.    Oh, probably a tenth of it.

5    Q.    And what effect did that have on your beliefs?

6    A.    It convinced me with all the other beliefs I had,

7    these just kept adding up and convincing me more and

8    more to my beliefs.

9    Q.    Now, you've testified to Exhibits M-2, M-3 and

10   M-4.  These were letters that were purported to be from

11   members of Congress?

12   A.    Yes.  I still have them.

13   Q.    Yes, and you got those off the Internet?

14   A.    Yes.  They might have been -- there might have

15   been a copy of this in that Freedom Law School material

16   I received.

17   Q.    And those exhibits, are the names basically

18   blacked-out or whited-out so that there's no names on

19   the letters who they are from?

20   A.    Oh, no, they are right in black and white bold

21   print who they're from.

22   Q.    I'm not talking about at the bottom of the

23   letter, I'm talking about the top of the letter.

24   A.    It's not blacked-out.  It just says Mr.  It was

25   just in --

Messier-Cross/Vincent

1  Q.   But it doesn't tell you who that's addressed to?

2  A.   That's correct.

3  Q.   One of the letters, Exhibit M-3, would you look

4  at that for me for a second.  Up on the top right-hand

5  corner, it says Exhibit 4.

6  A.   Yes.

7  Q.   Did that mean -- did you not notice that before?

8  A.   No, I didn't.

9  Q.   I believe you testified that one of the

10  expenditures of the cash that you had accumulated was

11  paying for your medical treatment of $145,000?

12  A.   The operation was 40, 45 or 47,000.  I normally

13  paid for all my medical treatments because I didn't

14  have any insurance.

15  Q.   Well, that was going to be my next question.  So

16  you had no insurance?

17  A.   No insurance.

18  Q.   So you live alone up on the hill, correct?

19  A.   Correct.  I used to have a German Shepard that

20  lived with me.

21  Q.   Is he gone?  Sorry for your loss.  How old was he

22  when he went?

23  A.   Well, he was probably about seven years old, but

24  he got attacked by coyotes or not coyotes, but -- yeah,

25  coyotes.  They tore him all up.  I had to -- $1,500 for

Messier-Cross/Vincent

1    veterinarian fees to help save him, but then six months

2    later, I had to have him put away.

3    Q.    So now that he's gone, you live alone?

4    A.    Yes.

5    Q.    And are you greedy, Mr. Messier?

6    A.    Oh, definitely not.  I don't buy anything for

7    myself.  I don't spend any money on myself.  I live as

8    cheap as I can.  I'd rather give money away and help

9    other people.

10   Q.    We have, in fact, heard about how you've given

11   money away.

12   A.    Excuse me?

13   Q.    I say we've heard about you giving money away.

14         THE COURT:  Don't testify, Mr. Vincent.  Just

15   ask your question.

16         MR. VINCENT:  Thank you.  No further questions

17   at this time, Your Honor.

18         THE COURT:  Thank you, Mr. Vincent.  Let me

19   see counsel at sidebar.

20         (Sidebar conference)

21         THE COURT:  I think it doesn't make sense to

22   start cross-examination at this point, but I just

23   wanted to find out from you what the schedule is, what

24   I should tell the jury.

25         So we'll have cross from Mr. Messier first thing

1    in the morning and then your calling Dr. Voss, I

2    assume.

3              MR. MINNS:  Yes, Your Honor.

4              THE COURT:  He will be examined and cross and

5    then you'll be resting after that?

6              MR. MINNS:  Yes, Your Honor.

7              THE COURT:  And Mr. Vincent, you haven't

8    decided yet what you're going to do, but if you're

9    going to have any witness, it would be only your

10   client; is that correct?

11             MR. VINCENT:  We will be ready to go, Judge.

12             THE COURT:  All right.  And then the

13   Government's rebuttal would be the doctor and --

14             MS. KELLY:  Potentially two other witnesses,

15   Your Honor, short witnesses.  It depends on how they go

16   forward.

17             THE COURT:  What I'm trying to figure out is

18   whether we need to have a charge conference this

19   afternoon.  There's still a little bit up in the air as

20   to what's coming in tomorrow, whether we should wait

21   until tomorrow.  In other words, it sounds to me like

22   probably we will use a good part of the trial day on

23   testimony, and then have the charge conference and

24   charge the jury Friday morning; does that makes sense?

25             MS. KELLY:  Yes, Your Honor.

```
 1            MR. VINCENT:  Yes.  That would be wonderful.
 2            THE COURT:  Very well.
 3            MR. MINNS:  Your Honor, we've been working on
 4     them.  We will try to file something on the willful
 5     blindness charge and we have not put together a charge
 6     for fear of defense.
 7            THE COURT:  I noticed that.
 8            MR. MINNS:  Yes.  I'd like to schedule, but
 9     I'm overwhelmed -- the law is overwhelming.  It would
10     make a difference.
11            THE COURT:  The proposed charge are supposed
12     to be in advance of trial, but I'll consider them as
13     they come in.
14            MS. KELLY:  Your Honor, I anticipate using the
15     term tax protester in my cross-examination.
16            THE COURT:  On Mr. Messier?
17            MS. KELLY:  Of my cross-examination of Mr.
18     Messier, yes.
19            THE COURT:  Let me let the jury go and then we
20     can address that.
21            MS. KELLY:  Thank you, sir.
22            (Open court)
23            THE COURT:  You're going to think I'm too
24     easy.  I'm going to let you go five minutes early again
25     today.
```

1          The lawyers believe that we will finish the

2     testimony tomorrow and then I will be charging you on

3     the law Friday morning and we will do the closing

4     arguments and you'll go back and deliberate on Friday,

5     so that's what we think the schedule will be.

6          So remember, keep your minds open, we are still in

7     the middle of the case.  Don't reach any conclusions.

8     Don't talk about the case.  Don't let anybody talk to

9     you about it.  No newspaper coverage of it, no TV

10    coverage of it, no social media, nothing about it.

11    Just other things, enjoy the day.  The jury is excused

12    and we will see you tomorrow morning at 8:30.

13         (Jury excused.  Time noted:  2:25 p.m.)

14         THE COURT:  Be seated.  Maybe we should

15    address this at sidebar, counsel.  Let me allow Mr.

16    Messier, you can go back to counsel table, and we will

17    just say to the experts in the room, we're going to

18    finish the testimony of Mr. Messier tomorrow morning at

19    8:30.  We're not going to take any more testimony this

20    afternoon, but I'll hear counsel at sidebar.

21         (Sidebar conference)

22         THE COURT:  All right, so tell me now why you

23    want to use the term and I'll hear if there is any

24    objection.

25         MS. KELLY:  I anticipate it coming up

1    tomorrow, Your Honor, because a number of the people --

2    for example, Irwin Schiff, a tax protester is in the

3    literature and the case law uses that term.  I am not

4    going to call Mr. Messier a tax protester.  We've

5    already had some kind of exchange on that.

6         That's not what I anticipate, but the term is

7    going to come up in cross-examination materials based

8    on the Freedom Law School that he discussed, the We the

9    People, the video that they played, Irwin Schiff will

10   be mentioned.  Those are all renowned tax protester

11   positions.

12             THE COURT:  Is there objection?

13             MR. MINNS:  Um, I did not -- there's been so

14   much evidence and I probably looked through 20 percent

15   of it, so if the term tax protester is used in some

16   sort of appropriate way and the Government can point it

17   out to the Court, that might be an argument.

18   Otherwise, it is an inflammatory term, has no reason at

19   all.

20        I concur, Irwin Schiff was a convicted criminal.

21   He's also a tax protester, he's also a con artist, but

22   calling the people that he relied on tax protesters

23   serves no evidentiary value whatsoever.

24        The only purpose for the term -- the same purpose

25   is to try to drag up other things that are unpleasant

1    and it's a very unpleasant word.  It's a term that

2    tends to indicate people not interested in following

3    the law and that's the purpose of using the term.

4        If there's evidence in here which Bill Messier

5    tried to violate the law, that's fair game, but a

6    derogatory term is not fair game unless it's in the

7    evidence.

8            THE COURT:  Mr. Vincent?

9            MR. VINCENT:  Well, I agree, Judge.  I think

10   that's a loaded term.  The defense is not predicated on

11   the fact that, as far as my client is concerned, that

12   he has some aversion to paying legitimate taxes and

13   that tax protester term is so broad and has such

14   connotations to it, I think it's unduly prejudicial.

15           THE COURT:  I take it what you've said is

16   you're going to use it in the context of whether Mr.

17   Messier knew those people to be labeled as tax

18   protesters?

19           MS. KELLY:  Yes.  It would go to willful

20   blindness and his research --

21           THE COURT:  You're not going to suggest he's a

22   tax protester.

23           MS. KELLY:  I'm not going to make any comment.

24           THE COURT:  And you're not going to call other

25   people tax protesters, except whether he endorsed it or

1    acknowledges this because you can't testify.

2            MS. KELLY:  Yes.  That they're perhaps labeled

3    tax --

4            THE COURT:  And what he's seen.

5            MS. KELLY:  Yes --

6            THE COURT:  The objection is overruled.  I

7    will allow it -- allow the Government to inquire

8    whether Mr. Messier knows these people to be

9    categorized as tax protesters, but not to be attributed

10   to Mr. Messier himself in terms of his conduct or Mr.

11   Robinson.

12           MS. KELLY:  Yes.

13           THE COURT:  And just a final close, In New

14   England, tax protester is not such a bad word.  We had

15   the Boston Tea Party.

16           MS. KELLY:  Your Honor, I have one additional

17   request for guidance on this.  Mr. Messier testified at

18   least three times from the witness stand he has no

19   family.  He does have two daughters with his first wife

20   and a stepson with his second wife.  I would like to

21   cross-examine him about that.  He's been very sad and

22   bereaved he has no family, but indeed, he does have a

23   biological child and a stepchild.

24           MR. MINNS:  First of all, stepchild from a

25   divorce, that's a gray area.  It would be highly

1    unfortunate to bring that up.  Secondly, he disagrees

2    with the paternity of the other child.  To bring that

3    up creates a paternity issue at trial, which we should

4    not have to deal with.

5         I do think he said that he has no family.  He has

6    a brother living here.  I think that's fair for them to

7    bring up.  It acknowledges that he's his brother, but

8    to turn this into a paternity case or to turn it into

9    being a bad stepparent from a divorced ex-spouse who

10   has committed suicide 20 years ago, I think that's a

11   huge --

12            THE COURT:  Well, here's my ruling.  There's

13   no question defense counsel have elicited sympathy in

14   terms of the dog, the daughter, everybody else.  The

15   Government can cross-examine, but the Government should

16   understand the risks that's been pointed out by defense

17   counsel, that it may provoke further redirect, elicit

18   other kinds of sympathy.

19        So that's a tactical decision, but I can't

20   restrict the cross just because it may be difficult,

21   but you should take that into account whether you

22   really want to do that cross in light of the

23   explanations that may come back in response.  All

24   right?

25            MS. KELLY:  Thank you, Your Honor.

1              MR. MINNS:  Thank you, Your Honor.

2              (Open court)

3              THE COURT:  All right, counsel, then to

4    reiterate, we will recess this afternoon.  We will

5    continue with Mr. Messier's testimony tomorrow morning

6    and the doctors can be present to hear that and you

7    should set aside time tomorrow afternoon for the charge

8    conference.

9         We will finish the evidence tomorrow, have the

10   charge conference and then charge the jury and do

11   closing arguments first thing Friday morning.  Any

12   other matters that I need to take up before we adjourn

13   for the day; any for the Government?

14             MR. CHAPMAN:  No, Your Honor.

15             THE COURT:  Defendant Messier?

16             MR. MINNS:  No, Your Honor.

17             THE COURT:  And from defendant Robinson?

18             MR. VINCENT:  No, Your Honor.

19             THE COURT:  All right, have a pleasant

20   afternoon, everybody.  We will stand in recess.

21             (Proceeding adjourned to Thursday, April 2,

22   2015, at 8:30 a.m.)

23             (End of day).

24             (End of excerpt).

25

```
 1              C E R T I F I C A T I O N

 2    I, Dennis Ford, Official Court Reporter for the United

 3    States District Court, District of Maine, certify that

 4    the foregoing is a correct transcript from the record

 5    of proceedings in the above-entitled matter.

 6    Dated:  May 14, 2015

 7               /s/ Dennis Ford

 8               Official Court Reporter

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```