UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

_____

UNITED STATES OF AMERICA,              CRIMINAL ACTION

            Plaintiff              Docket No: 2:14-cr-83-DBH


        -versus-                    **E X C E R P T**


F. WILLIAM MESSIER,

DAVID EVERETT ROBINSON,

        Defendants
_____

Transcript of Proceedings

Pursuant to notice, the above-entitled matter came on
for **Trial** held before **THE HONORABLE D. BROCK HORNBY,**
United States District Judge, in the United States
District Court, Edward T. Gignoux Courthouse, 156
Federal Street, Portland, Maine on the 2nd day of
April, 2015 at 8:30 a.m. as follows:


Appearances:

For the Government:  James W. Chapman, Jr., Esquire
                     Karen E. Kelly, Esquire
                     Assistant United States Attorneys

For Defendant Messier:  Michael L. Minns, Esquire
                        Ashley Blair Arnett, Esquire
                        William Maselli, Esquire

For Defendant Robinson:  Joel Vincent, Esquire


Dennis R. Ford
Official Court Reporter

(Prepared from manual stenography
and computer aided transcription)

```
 1                        I N D E X

 2    Witness              Direct  Cross  Redirect  Recross

 3    William Messier              90    168       174

 4                     E X H I B I T S

 5    Govt's               Description          Page/Admit

 6    63                   Press Release        110

 7    61                   e-mail               118

 8    62                   e-mail               118

 9    65                   Screenshot           126

10    27-B(2)              Document             136

11    67                   Application          145/147

12    68                   Documents            151

13    69                   Document             156,170

14    24-G                 Document             162

15    Deft's

16    M-3                  Letter               158

17    SIDE BAR CONFERENCES

18    110, 129, 133

19    CHAMBERS CONFERENCES

20

21

22

23

24

25
```

Messier-Cross/Kelly

1          (The following is an excerpt.)

2              (Open court.  Defendants present.)

3              THE COURT:  Good morning everybody.  Ready for

4    the jury?  The jury may be brought in.

5          (Jury entered.  Time noted:  8:30 a.m.)

6              THE COURT:  Good morning.  Welcome back.

7              THE JURY PANEL:  Good morning.

8              THE COURT:  Mr. Messier, you're still under

9    oath.  Ms. Kelly, you may cross-examine.

10             MS. KELLY:  Thank you, Your Honor.

11                     CROSS-EXAMINATION

12   BY MS. KELLY:

13   Q.    Good morning, Mr. Messier.

14   A.    Good morning.

15   Q.    How are you feeling today?

16   A.    Uh, stressed.

17   Q.    Stressed.  Okay, we'll take this easy.

18   A.    Excuse me?

19   Q.    We'll take this easy then.

20   A.    Thank you.

21   Q.    So Mr. Messier, you agree that you're a smart

22   guy?

23   A.    Uh, in my field of expertise, electronics,

24   whatnot, study a lot of tax stuff, so yeah, I believe

25   pretty intelligent, I would say.

Messier-Cross/Kelly

1   Q.    Yeah.  You agree that you like to read?

2   A.    Oh, definitely.

3   Q.    Like to read books?

4   A.    Electronics, I read books -- I've read thousands

5   of books in my field of electronics, constantly read

6   books.

7   Q.    And you like to read the newspaper?

8   A.    Not too much newspapers.  I never believe --

9   Q.    You never --

10  A.    You never believe what you see in the newspapers.

11  Q.    Do you like to read magazines?  Magazines, sir,

12  do you like to read magazines?

13  A.    Um, electronic magazines.

14  Q.    Yesterday you said that you're a research person?

15  A.    I like research.  I like the finances.

16  Q.    You love researching.  You love researching,

17  right?

18  A.    Yes.

19  Q.    So your primary sources are books?

20  A.    Books, Internet, talking with other people.

21  Q.    Okay.  So the Internet is something you like to

22  research on, the Internet?

23  A.    Yeah.

24  Q.    And you do a lot of research on the Internet?

25  A.    Yes.

Messier-Cross/Kelly

1    Q.    And you do a lot of research with books?

2    A.    Yes.

3    Q.    And you look to talk to people, talk with people?

4    A.    Yes.

5    Q.    About what you've learned in your research?

6    A.    I like to talk to people in different fields.

7    Q.    And learn new things?

8    A.    And learn new things.

9    Q.    So is it fair to say that you're intellectually

10   curious?

11   A.    Yes.

12   Q.    And you like to be informed; is that fair?

13   A.    Yes.

14   Q.    You like to exhaust a topic and know everything

15   about a topic; isn't that true?

16   A.    I try.

17   Q.    And you agree with me that sometimes you can

18   spend hours on the Internet researching things?

19   A.    Oh, yes.

20   Q.    Right.  You click on one link and you click on

21   another and you click on another and you look up and

22   it's four hours later.

23   A.    Yes.

24   Q.    Is that fair to say?

25   A.    Yes.

Messier-Cross/Kelly

1    Q.     Yes.  Do you have Internet at your home, sir?

2    A.     Yes.

3    Q.     On your computer at home?

4    A.     Yes.

5    Q.     You're familiar with the Google, the Google

6    search engine?

7    A.     Oh, yes.  Basic, yeah.

8    Q.     Oh, yes.  I guess everybody is now, right?  Have

9    you heard of or do you use Wikipedia?

10   A.     Yes, but I don't -- I don't necessarily trust it.

11   Q.     So you view it with some skepticism?

12   A.     Yes.  I'm definitely skeptical about that.

13   Q.     Why is that?  Why are you skeptical about the

14   Wikipedia?

15   A.     Well, through some of my education and learning

16   that Wikipedia is kind of biased, so I don't usually

17   use that as 100 percent.

18   Q.     Um-hmm.  So it's not 100 percent trustworthy?

19   A.     I don't believe it's totally trustworthy.  I mean

20   I read it with a grain of salt.

21   Q.     All right.  So you use your common sense when you

22   read it?

23   A.     Common sense, correct.

24   Q.     A grain of salt.

25   A.     Yes.

Messier-Cross/Kelly

1    Q.    So you filter through your common sense the stuff

2    you find on the Internet; is that fair to say?

3    A.    What was the first word?

4    Q.    You filter through your common sense the stuff

5    you find on the Internet; is that fair to say?

6    A.    I missed the first word.

7    Q.    You filter, filter --

8    A.    Oh, yes, filter.  Yes, filter, yes.

9    Q.    I'm sorry.  Am I talking too fast for you?

10   A.    No, it's not fast.  I'm slightly hard-of-hearing.

11   Q.    Okay.  I'm try to speak up and keep my voice up

12   and I'll move my mic up.  How is that, is that better?

13   A.    Fine.

14   Q.    Okay.  Mr. Messier, you would agree that you've

15   been a very successful businessman in your career?

16   A.    Yes, ma'am, definitely.

17   Q.    Yes.  You're excellent at electronics, aren't

18   you?

19   A.    Eat, breathe and sleep it.

20   Q.    And you're excellent at radio communications?

21   A.    Oh, yes.  I started my own business from scratch.

22   Q.    And you're self-taught on that; aren't you?

23   A.    Definitely.  Read a lot of electronic books and

24   educated myself.  The reason I did that --

25   Q.    Well, let me ask you this, you're also a ham

Messier-Cross/Kelly

1    radio operator?

2    A.    I have a ham operator license.  I got that back

3    when I was in 7th grade because I found it fascinating

4    to be able to talk to people all over the world.  With

5    my own skills, I built my own equipment from scratch

6    and I got quite excited about being able to talk to

7    people all over the planet.

8    Q.    Sure.  I mean it was pre-Internet so you can

9    communicate with everyone, right?

10   A.    Well, that was prior to the Internet.  They

11   didn't have that back in my amateur radio days.  We

12   actually just -- we made our own wireless Internet back

13   in them days before they even had the regular Internet

14   we have today.

15   Q.    And in the ham radio community, you've got lots

16   of friends and acquaintances?

17   A.    All over the world.

18   Q.    All over the world.  It's fair to say, sir, you'd

19   agree that you've made an excellent living from your

20   career?

21   A.    It was hard at times when I first started my

22   business.  I had problems trying to have beans and

23   franks the first -- eat them together.  I had to eat

24   beans one night and franks the next night because I'd

25   never run a business before.  I was starting from

1    scratch and I had beans one night, franks the next.  I

2    couldn't afford them both together.

3    Q.    And you basically built Active Communications

4    from the ground up; isn't that true?

5    A.    Yes, I did.

6    Q.    And it was such a successful business that you

7    were able to sell it and retire by age 48; isn't that

8    true?

9    A.    That's correct.  My -- but I wanted to retire at

10   50 because I worked at Bath Iron Works and I'd seen

11   people retire at 65 and within a couple of three years

12   they pass on, so --

13   Q.    Yeah.

14   A.    -- I didn't want that to happen to me.

15   Q.    Right.  So you beat your goal?

16   A.    I beat my goal.

17   Q.    That's how successful you were?

18   A.    Excuse me?

19   Q.    That's how successful you were?

20   A.    Exactly.

21   Q.    You must be very proud?

22   A.    I am.  Yeah, I did that because, see --

23         THE COURT:  Wait for a question, sir.

24   A.    Okay.

25   Q.    Now, after you sold Active Communications, you

Messier-Cross/Kelly

```
 1    were able to retire for a bunch of years and not work;

 2    isn't that true?

 3    A.    That's correct.

 4    Q.    And that was out in Arizona?

 5    A.    Yes.

 6    Q.    But you also own 17, 18 acres in Brunswick?

 7    A.    Yeah, plus or minus.

 8    Q.    On the hill?

 9    A.    On the hill.

10    Q.    Bill's Hill, right?

11    A.    Yes.

12    Q.    And that property has two houses on it?

13    A.    Yes.

14    Q.    Right, at least two houses.

15    A.    Yeah, only two.

16    Q.    And has the valuable cell towers on it?

17    A.    Excuse me?

18    Q.    The valuable cell towers?

19    A.    The value of the --

20    Q.    Valuable?  You have some valuable cell towers?

21    A.    Yeah, to the community because police wouldn't be

22    able to communicate, ambulance wouldn't be able to

23    communicate, fire departments, cell phones, yeah.  If

24    that site was not there, we would be in a world of

25    trouble.
```

Messier-Cross/Kelly

1    Q.    Right.  Well, it's valuable to the community,

2    right?

3    A.    Oh, definitely.

4    Q.    And it's valuable to you, right?

5    A.    Yes.

6    Q.    Right?  I mean you make a very good living off

7    those cell towers on your hill?

8    A.    I did.

9    Q.    Well, you'd agree you made close to $100,000 in

10   lease payments on those cell towers each year?

11   A.    Yes.

12   Q.    You'd agree that's a fair living; wouldn't you?

13   A.    Yes.

14   Q.    Especially for retirement?

15   A.    Well, yes.

16   Q.    Right?

17   A.    But I gave most of it away because --

18         THE COURT:  You've answered the question.

19   A.    Okay.

20   Q.    Now, you built your own house; isn't that true?

21   A.    I did part of it.  I did the plumbing and

22   electrical, but I'm definitely not a carpenter so I had

23   other people to do it, finish -- well, to help build

24   it.  It never got finished.

25   Q.    That's the main house on the property?

Messier-Cross/Kelly

1    A.    Yes.

2    Q.    That's three stories?

3    A.    That has two stories.

4    Q.    Two stories.  And that house is self-sufficient,

5    you're self-sufficient in that house?

6    A.    Oh, yeah.  I have my own cell power, wind power.

7    Q.    Solar, wind power?

8    A.    Yes, I like to be independent.

9    Q.    You use wood to heat the house in the winter?

10   A.    Yes.

11   Q.    And you have a generator in case there's no wind

12   or sun or whatever else you might need, right?

13   A.    Yes.

14   Q.    You built the electrical system in that house?

15   A.    Yes.

16   Q.    Fair to say -- it's fair to say you're proud of

17   your good work?

18   A.    Oh, yes.

19   Q.    Now, Mr. Messier, you'd agree that there was a

20   time when you did follow the tax laws?

21   A.    Yes.

22   Q.    You filed income tax returns?

23   A.    Yes.

24   Q.    You filed extensions to file income tax returns?

25   A.    Extensions?

Messier-Cross/Kelly

1  Q.    To get additional time to file returns?

2  A.    I can't remember.  I don't believe so, but I

3  can't remember.  I don't think so.

4  Q.    In 1992 and 1993, you filed extensions to file

5  tax returns?

6  A.    I really can't remember back that far if I did or

7  not.  I know I did pay the taxes.

8  Q.    You know you did pay the taxes?

9  A.    Yes.

10  Q.    Okay.  You filed in '93, you filed a tax return?

11  A.    '93?  Yes.

12  Q.    '94 you filed a tax return?

13  A.    Yeah, right up till I left Ariz -- to come back

14  to Maine from Arizona.

15  Q.    '95, you filed a tax return?

16  A.    Yes.

17  Q.    '96, you filed a tax return?

18  A.    '96?  I think, I think that's the time I came

19  back to Maine, '96.  No, wait a minute, I came back in

20  1998, 1999 so I paid taxes prior to that.

21  Q.    So you agree you did -- there was a time when you

22  agreed with the tax laws, right?

23  A.    Definitely, oh, yes, 100 percent.  I liked paying

24  taxes.

25  Q.    I'm sorry, I didn't catch that?

Messier-Cross/Kelly

1    A.    Only the ones that I owe.

2    Q.    I didn't catch that, did you say you like paying

3    taxes?

4    A.    Yes.  As long as they are legitimate and I get a

5    service out of it.

6    Q.    Right, all right.  So let's just talk for a

7    minute, let me just switch gears.  So you agree with me

8    that it's not upsetting to talk about your disagreement

9    with the tax laws, right?

10   A.    I agree with the tax laws --

11   Q.    No, no, no, what I said is -- we're having a hard

12   time here.  You agree, sir, that it's not upsetting to

13   talk about your disagreement with the tax laws?  It

14   doesn't upset you to talk about your disagreement with

15   the tax laws?

16   A.    It doesn't upset me, that was the question?

17   Q.    Yes, sir.

18   A.    No, it doesn't upset me.

19   Q.    It's fair to say you enjoy sharing your

20   information with others?

21   A.    Um, it's interesting.

22   Q.    You enjoy sharing that information?

23   A.    To people that would be interested like I was.

24   Q.    Um-hmm.  You enjoy teaching other people?

25   A.    I like educating people if they're curious

Messier-Cross/Kelly

1    enough, they want to listen and --

2    Q.    And you enjoy your time researching the tax laws?

3    A.    Yes.

4    Q.    And you enjoy sharing your research, the results

5    of your research?

6    A.    Yes.  I think it's interesting to be able to

7    share new thoughts and new ideas that possibly some

8    person might not know.

9    Q.    Is it fair to say, sir, that you enjoy a good

10   debate, a lively disagreement?

11   A.    With reference to what?

12   Q.    Just your personality, what you like to do?

13   A.    I would say so, yes.

14   Q.    And you agree, sir, that before you stopped

15   filing income tax returns, you told this jury yesterday

16   that you carefully considered your actions; isn't that

17   true?

18   A.    I carefully what?

19   Q.    You carefully considered your actions?

20   A.    Considered my actions?  Yes.

21   Q.    You didn't act on impulse; did you?

22   A.    Oh, definitely not.  All research, studying, I

23   wanted to make sure I didn't do anything wrong that was

24   going to get me in trouble.

25   Q.    This wasn't some kind of knee-jerk decision; was

1   it?

2   A.    Oh, definitely not.  No, I was just curious.  I

3   mean I really got curious and interested in this whole

4   thing.

5   Q.    You're a very methodical man?

6   A.    Yes.

7   Q.    You like to think things through?

8   A.    Definitely.

9   Q.    And you made a very deliberate decision to not

10  follow the tax law; isn't that true?

11  A.    That's not correct.

12  Q.    It wasn't a deliberate decision?  It happened by

13  accident?

14  A.    Repeat the question again?

15  Q.    You made a very deliberate decision that you were

16  no longer going to file tax returns and follow the tax

17  law?

18  A.    No.  I was going to follow the tax laws if they

19  could show me that the law was that I was required to

20  pay a tax.

21  Q.    Huh.  Now, you told the jury that -- I think you

22  said more than 33 million people don't file tax

23  returns?

24  A.    It's actually more than that now.  There was --

25  the first book I read was 33 million.  Now, I believe

Messier-Cross/Kelly

1    it's up to 65 million.

2    Q.    So would you agree with me, sir, that

3    statistically, it's highly unlikely with numbers like

4    that that you would get caught for tax crimes?

5    A.    Well, you can't say that I was -- that I wanted

6    to get caught.  I was just trying to obey the laws and

7    study -- you know, to learn, you know, what my

8    requirements why.

9    Q.    You'd agree with me though mathematically, if 66

10   million people aren't filing their income tax returns,

11   the probability of you getting caught and prosecuted is

12   very, very small; isn't that true?

13   A.    Well, the percentage of people are small, but

14   that depends on, you know, people studying.  People who

15   are distracted by television these days.

16   Q.    Um-hmm.

17   A.    They are off-guard about studying what I do.

18   Q.    You agree that you purchased a lot of your tax

19   information on the Internet?

20   A.    I did what?

21   Q.    You agree, sir, that you purchased a lot of the

22   tax information on the Internet?

23   A.    Yes.

24   Q.    And some of this stuff you got on the Internet

25   was free?

Messier-Cross/Kelly

1   A.    Oh, some of it was free; some I paid for.

2   Q.    You've done both, you've paid for some and --

3   A.    Yes.

4   Q.    -- and got the rest for free.

5   A.    Yes.

6   Q.    Okay.  Now, sir, yesterday you testified that you

7   watched the 1996 Libertarian Convention on C-SPAN; do

8   you remember that?

9   A.    Yes, I did.

10  Q.    And you testified that both Harry Brown and Irwin

11  Schiff spoke?

12  A.    Yes, among others.

13  Q.    Do you remember that testimony yesterday?

14  A.    Yes.

15  Q.    And you said that Harry Brown said that if I was

16  elected president, the first thing I'd do is get rid of

17  the income tax --

18  A.    That's correct.

19  Q.    Do you remember that?

20  A.    And break for lunch.  He would do it that quick.

21  Q.    And then break for lunch.  So, sir, you'd agree

22  with me that Harry Brown believed the income tax laws

23  existed and was correct, right?

24        He wanted to get rid of it, right?

25  A.    Oh, yes.  Yes, he did.

Messier-Cross/Kelly

1  Q.   So he acknowledged that the income tax existed,

2  he just -- right?

3  A.   He just said -- the only part I saw was he wanted

4  to eliminate the income tax.

5  Q.   He wanted to get rid of the income tax; didn't

6  he?

7  A.   Yes.

8  Q.   That's the only part you watched?

9  A.   Um, basically, yeah.  It was just those two

10 speakers wanted to eliminate the income tax.

11 Q.   Um-hmm.  Do you remember yesterday you said you

12 watched the whole thing on C-SPAN?

13 A.   Yeah, but the rest of it, I didn't care about the

14 other -- the other speakers.  These two here were the

15 ones that sparked my interests.

16 Q.   Those were the only two you cared about?

17 A.   I cared about the whole Libertarian movement,

18 yes.

19 Q.   Now, you'll agree that Harry Brown wasn't running

20 for President of the United States to abolish income

21 tax just for people in Washington, DC; was he?

22 A.   He -- repeat the question again?

23 Q.   You'll agree that Harry Brown wasn't running for

24 President of the United States just to abolish income

25 tax people -- for only those people in DC and the

1   federal territories like Guam, right?

2   A.    Oh, I imagine he was running the Libertarian

3   reason because he knew there was a problem with our

4   government the way it was.

5   Q.    And he wanted to be president of the whole United

6   States; is that fair to say?

7   A.    Sure.

8   Q.    Now, sir, you stated that you were a member of We

9   the People?

10  A.    Who do you mean We the People?  There is a lot of

11  organizations called We the People.

12  Q.    Well, We the People of Bob Schultz, the founder?

13  A.    I know that person.

14  Q.    Oh, you've met Bob Schultz?

15  A.    Yes.

16  Q.    So the We the People organization that's also an

17  antitax organization?

18  A.    They are not antitax.  What they're trying to do

19  is get the truth about the income tax and who's liable

20  for the income tax.

21  Q.    Okay.  And you follow We the People pretty

22  closely; don't you?

23  A.    Amongst others.

24  Q.    So you follow them on the Internet?

25  A.    Yes.

Messier-Cross/Kelly

1   Q.    And been to their meetings in-person?

2   A.    I met Bob Schultz in-person.

3   Q.    Did you meet Bob Schultz in New York?

4   A.    Yes.

5   Q.    Did you go down to Washington, DC in 2002?

6   A.    I didn't get a chance.

7   Q.    Fair to say you researched We the People on the

8   Internet?

9   A.    Amongst others.

10  Q.    We the People is just one of the many

11  organizations that you affiliate yourself with, right?

12  A.    There are a lot of people out there trying to

13  discover the truth.

14  Q.    Or trying not to pay taxes, right?

15  A.    Oh, no, definitely not trying to pay taxes.

16  They're looking for the truth and this is what we've

17  been looking for, all these organizations.  We're

18  trying to find the truth, you know, that they want to

19  know if there's a law you have to pay income taxes and

20  that's what all these people are about.

21  Q.    Sir, did you look at the Wikipedia page for We

22  the People when you researched it?

23  A.    No, I didn't.

24  Q.    You didn't?

25  A.    No.

Messier-Cross/Kelly

1    Q.    Are you familiar with We the People being

2    characterized as a tax protester group?

3    A.    I have heard about it.

4    Q.    You've seen that on the Internet; isn't that

5    true?

6    A.    Yes, but I wouldn't say tax protester.  Nobody

7    protests about taxes as long as they're legal.

8    Q.    Well, would you call them government protesters?

9    What would you call them?

10   A.    They're not government protesters.  They are just

11   people trying to get to the truth and the bottom of

12   this matter.

13   Q.    You know that there's people who are part of We

14   the People who went to jail for refusing to file income

15   tax returns, right?

16   A.    Who went to jail?

17   Q.    Lots of people from We the People organization?

18   A.    I'm not aware of that.

19   Q.    So you've never heard of, for example, Richard

20   Simkanin from Houston, Texas, a member of We the

21   People?

22   A.    No.

23   Q.    You never heard of Richard Simkanin?

24   A.    I don't believe so.

25   Q.    Okay.  Sir, you like to read press releases and

1    keep press releases in your tax materials; isn't that

2    true?

3    A.    Read press releases?

4    Q.    Press releases and newspaper articles?

5    A.    I'm not impressed too much with press releases.

6    Q.    Okay.

7    A.    Oh, depending what they are.

8    Q.    Depending on what they are?

9    A.    Yes.

10   Q.    I'm going to show you a document that's marked

11   0001326 Messier.

12            MS. KELLY:  May I approach, Your Honor?

13            THE COURT:  Yes.

14            MS. KELLY:  And 000322.

15            MR. VINCENT:  Excuse me, Judge, have these

16   been marked as exhibits?

17            MS. KELLY:  I'll do that.

18            THE COURT:  Did you say you're going to?  Oh,

19   yes.

20            MS. KELLY:  I'm going to mark this 63,

21   Government's Exhibit 63.

22            MR. VINCENT:  Judge, may we approach?

23            THE COURT:  Yes.

24            (Sidebar conference)

25            THE COURT:  Go ahead.

Messier-Cross/Kelly

1          MR. VINCENT:  I just don't want to step on

2     anybody toes, Judge, but I would like to see the

3     exhibits if they're new before they go to the witness

4     because I don't know what he's going to talk about.  I

5     haven't --

6          THE COURT:  I agree.

7          MR. VINCENT:  It hasn't been identified.

8          THE COURT:  You should show it to opposing

9     counsel.

10         MS. KELLY:  These are from the defendants

11    exhibits, Your Honor.  I was given the Bates Number.

12    I'm sorry, you don't have the defense exhibits?

13         MR. VINCENT:  I can't go into a file and find

14    something by a Bates Number.  I've got 2500 pages of

15    stuff, so --

16         THE COURT:  Just show it to him.

17         MR. MINNS:  And, Your Honor, I didn't get up

18    and object, but I do if it continues to ask did you

19    knows somebody went to jail?  No.  You didn't know that

20    the same person from Houston, Texas went to jail?  No.

21         I do object if she's going to ask everybody who

22    ever went to jail for tax crime that he doesn't know.

23    I think that's irrelevant and prejudicial and

24    argumentative.

25         THE COURT:  Well, we've passed that now, I

1    take it.

2              MR. MINNS:  Yes, Your Honor.

3              THE COURT:  With regard to your client, so go

4    ahead.

5              (Open court)

6              (Discussion off the record between counsel)

7    BY MS. KELLY:

8    Q.    Now, sir, this document came from the files that

9    were provided to the Government from your attorneys,

10   from your files?

11   A.    Okay, yes.

12   Q.    Do you recognize this press release, sir?

13   A.    Yes.

14   Q.    From your tax files?

15   A.    Um, I know about the case, yes.

16   Q.    And so you agree that at times you would, in

17   fact, print out press releases of We the People people

18   and their tax trials?

19   A.    Yeah, but this has nothing to do with We the

20   People.

21   Q.    Okay.  You're familiar with Richard Simkanin?

22   A.    Excuse me?

23   Q.    You're familiar with the conviction of Richard

24   Simkanin?

25   A.    Yes.

Messier-Cross/Kelly

 1    Q.    And that he -- that he refused to file tax

 2    returns because he said that tax returns were

 3    voluntary?

 4    A.    I didn't follow that case thoroughly.  I just --

 5    I just happened to run across it and I just read about

 6    it and basically set it aside.

 7    Q.    So you came across the case?

 8    A.    Yes.

 9    Q.    And he was charged with not filing income tax

10    returns, correct?

11    A.    Yes.

12    Q.    Do you remember that?

13    A.    Yes.

14    Q.    And he said that the law didn't require him to

15    have to file income tax returns, correct?

16    A.    Correct.

17    Q.    And he was convicted of failing to file tax

18    returns, correct?

19    A.    Um --

20    Q.    Among other things.

21            MR. VINCENT:  That's been asked and answered,

22    Judge.

23            THE COURT:  Overruled.

24    A.    Well, my understanding he got convicted because

25    he failed to take -- withhold taxes from employees,

Messier-Cross/Kelly

1     so --

2     BY MS. KELLY:

3     Q.     Okay.   Take a look at the second page.

4            MS. KELLY:  May I approach, Your Honor?

5            THE COURT:  Yes.

6     Q.     Does that refresh your recollection, sir?

7     A.     Not really.

8            THE COURT:  Stay close to the microphone.

9     A.     Not really.

10    Q.     Upon reading that, that he was found guilty of

11    four misdemeanor counts of not filing federal income

12    tax returns?

13    A.     I didn't hear you.

14    Q.     You agree it says, he was found guilty of four

15    misdemeanor counts of not filing federal income tax

16    returns?

17    A.     No.  I kind of left it at that point until I did

18    some other research because I wasn't totally familiar

19    with his case.  I just read about it and it kind of

20    sparked something in my mind and I decided to do some

21    more research.

22    Q.     Well, tell us about the additional research you

23    did on Richard Simkanin.

24    A.     Well, when it said failure to file, then I

25    started studying why would somebody fail to file.  I

Messier-Cross/Kelly

1    mean that was back in my missing Paragraph A, why

2    anybody is required to file and --

3    Q.    Well, wait a minute here.  Missing Paragraph A

4    has to do with levies, right?

5           That's a totally different argument than

6    whether or not you have to file income tax returns.

7    A.    It says those who are required to pay income

8    taxes.

9    Q.    Well, missing Paragraph A in that argument

10   pertains to the levy and notice of levy; wouldn't you

11   agree, sir?

12   A.    But the Paragraph A is the whole thing about

13   who's required to file an income tax.

14   Q.    Well, that's all involving the levy, which didn't

15   occur until 2012; isn't that true, sir?

16   A.    It's part of it.  That's why they -- why the

17   missing paragraph is left out because that tells you

18   who is required to file and pay an income tax.

19   Q.    Okay, but in 2004, when Richard Simkanin was

20   prosecuted and convicted for failing to file income tax

21   returns, you hadn't heard from the IRS or ever seen a

22   notice of levy; isn't that true, sir?

23   A.    I believe so.

24   Q.    Okay.  So it's your testimony today that although

25   you knew that Mr. Simkanin was prosecuted and convicted

Messier-Cross/Kelly

1    for failing to file income tax returns, you continued

2    to follow the We the People and refused to file income

3    tax returns yourself, right?

4    A.    I didn't -- yes, yes.  I followed more of these

5    people.

6    Q.    We the People.  Sir, you said you're familiar

7    with Bob Schultz?

8    A.    Yes.

9    Q.    Is he a friend of yours?

10   A.    Um, yes, I'd say so.  I followed him on a lot of

11   items, lot of things so we'd become friends.

12   Q.    So in the course of your daily research, sir,

13   you're aware of the August 9th, 2000, opinion from

14   Senior Judge Thomas McAvoy that prohibited We the

15   People and Bob Schultz from promoting what --

16          MR. MINNS:  Excuse me, Your Honor --

17   Q.    -- the judge called a tax fraud scheme?

18          MR. MINNS:  Excuse me, Your Honor, she's

19   testifying.  If she has something she wants to see if

20   he can identify, she could show it to him and see if he

21   can identify it.  She's already testifying to what has

22   happened.

23          THE COURT:  He has to be aware of these

24   things.  If he says he's not, I'll instruct the jury to

25   disregard what she said, but the question is are you

Messier-Cross/Kelly

1   aware of it.  Are you aware of it, sir?

2           THE WITNESS:  Um, repeat it again, please?

3   BY MS. KELLY:

4   Q.    Are you aware that a U.S. District -- a Senior

5   U.S. District Court Judge in New York prohibited Bob

6   Schultz from promoting what Judge McAvoy called a tax

7   fraud scheme in a court order?

8   A.    I don't recall that, no.

9           THE COURT:  Well, the jury will disregard what

10  the lawyer characterized as an alleged scheme.

11  Q.    So in your research for We the People, your

12  organization --

13  A.    No, you need to refine who we're talking -- We

14  the People.

15  Q.    Bob Schultz, his organization.

16  A.    Okay, Bob Schultz.

17  Q.    We've already clarified that.

18  A.    Okay.

19  Q.    In your research about your friend Bob Schultz,

20  you never came across an opinion prohibiting him from

21  selling a tax fraud scheme?

22  A.    No, I don't.

23  Q.    So did you research on the Internet?

24  A.    You mean about that --

25  Q.    About your friend Bob Schultz.

Messier-Cross/Kelly

1   A.    No, I don't believe so.

2   Q.    You receive regular e-mail updates from We the

3   People?

4   A.    Not really, not a lot.

5   Q.    You receive updates, e-mail updates from We the

6   People; isn't that true?

7   A.    I'm not on his e-mail list.

8   Q.    Okay.  And it's your testimony that although you

9   do enjoy research, you were completely unaware that

10  your friend Bob Schultz was scolded by a federal judge?

11          MR. MINNS:  Asked and answered.

12          THE COURT:  Sustained, sustained.

13          (Discussion off the record between counsel.)

14          Cover your microphone.

15          MS. KELLY:  Your Honor, may I approach?

16          THE COURT:  Yes.

17  BY MS. KELLY:

18  Q.    Sir, I'm going to show you what's been marked as

19  Government's Exhibit 61 and 62.

20          (Discussion off the record between counsel)

21      Sir, does that refresh your recollection?

22  A.    Yes.  I'm just trying to find the date of this

23  document.

24  Q.    Well, does it help you if I let you know that

25  that came out of your discovery -- from your tax

Messier-Cross/Kelly

1   records that you provided to us?

2   A.     From what?

3   Q.     That it's from your tax records that you provided

4   to us?

5   A.     I mean I remember this.  I'm just trying to place

6   the date --

7   Q.     Okay.

8   A.     -- when this -- when this came about.

9   Q.     But so you agree that you did receive regular

10  e-mails from We the People?

11  A.     I was not on their e-mail list.  This is stuff I

12  discovered on my own.

13  Q.     On your research?

14  A.     On my research.

15  Q.     So what would be the research term that you would

16  use to find the We the People information?

17  A.     I don't understand what you mean.

18  Q.     Well, just tell the jury when you're on the

19  Internet, how would you find We the People?

20  A.     How would I define We the People?

21  Q.     How would you find it in Google?  Would you look

22  up Bob Schultz, the founder?

23  A.     Um, I believe back -- oh God, let me think.  Yes,

24  through my research on the Internet, I discovered these

25  different organizations and this one here happened to

Messier-Cross/Kelly

1    come up and I started researching that one.

2    Q.    Okay.  But you were more than just aware of that

3    organization because you've said you're friends with

4    Bob Schultz?

5    A.    Well, that's why I'm trying to find the date.  I

6    mean this is starting to get fresh in my mind, so.

7    Q.    All right, well, we will just move on.

8              In your research on We the People as you just

9    said, did you come across a 2005 opinion in the United

10   States District Court in the District of Columbia

11   involving We the People and Bob Schultz?

12   A.    No.

13   Q.    Didn't come up in your research?

14   A.    Didn't come up, no.  I was just being interested

15   in these organizations.

16   Q.    Let me ask you this.  Sometimes in your research

17   you looked at cases from courts; isn't that true?

18   A.    A couple of them.  Not many, but a few.

19   Q.    So -- um-hmm.  But this one about your friend Bob

20   Schultz you didn't look at?

21             MR. MINNS:  Excuse me, first, the question

22   assumes that there is a case; secondly, it assumes he

23   knows there's a case.  He's already said he was unaware

24   of it, so counsel's really saying --

25             THE COURT:  Sustained, sustained.  Rephrase.

Messier-Cross/Kelly

BY MS. KELLY:

Q.    Now, sir, you testified that in 2006 you watched the video "Freedom to Fascism"; is that correct?

A.    Several times.

Q.    Several times?

A.    Several times.

Q.    You liked it very much?

A.    I loved it.

Q.    You loved it.  And you said it was something that you relied on for your tax beliefs, correct?

A.    One of them.

Q.    Now, that's a two-hour movie, right?  That was a two-hour movie?

A.    Oh, yes.

Q.    The snippet that you played yesterday was just a clip that was compiled by you and your attorneys, right?

A.    Yes.

Q.    There were a lot of topics in that movie; isn't that true?

A.    Yes.

Q.    And that was a movie about conspiracy theories; isn't that true?

A.    I wouldn't say conspiracy.

Q.    Well, let's talk about the topics.  It was

Messier-Cross/Kelly

1    about -- you agree that that movie talked about

2    national ID cards, right?

3    A.    Yes.   The Government wanted to implant chips in

4    everybody.

5    Q.    Right.   The Real ID Act, right?

6    A.    Yes.

7    Q.    Talked about RFID tags?

8    A.    Yes.

9    Q.    Right?

10   A.    Those are the chips.

11   Q.    Talked about a theory involving a diabolic

12   electronic voting machine, right?

13   A.    Yeah, that they could be rigged.

14   Q.    Talked about globalization of the economy, right?

15   A.    Um, I'm not really well-versed in that part of

16   it.

17   Q.    Talked about big brother, right?   Big brother?

18   A.    Big -- whoever that was, yes.

19   Q.    Talked about TAZER weapon abuse, right?

20   A.    What abuse?

21   Q.    TAZER weapon abuse?

22   A.    I don't remember if that was in the video.   It

23   might have been.

24   Q.    Talked about use of terrorism by the Government

25   to diminish citizen's rights, right?

Messier-Cross/Kelly

1    A.    I don't remember exactly the way you put that.

2    That was in that video.

3    Q.    Well, it talked about Government sponsored

4    terrorism, a theory about that?

5    A.    Repeat that again?

6    Q.    Talked about Government sponsored terrorism, a

7    theory about the Government doing terrorism to make

8    people vulnerable?

9    A.    Well, I don't know if I'd quite put it that way.

10   I mean I --

11   Q.    Something about that?

12   A.    About the one world order, maybe.

13   Q.    Okay, the one world order.  And one of the

14   reasons you said you believed in the movie is because

15   there were purported IRS agents speaking in it?

16   A.    Yes.

17   Q.    And that was a snippet that you showed; isn't

18   that true?

19   A.    Yes.

20   Q.    Irwin Schiff appeared in that video?

21   A.    Yes.

22   Q.    Isn't that true?

23   A.    Yes.

24   Q.    And Irwin Schiff is one of your gurus, someone

25   you followed?

Messier-Cross/Kelly

1   A.   Yes.

2   Q.   Right?

3   A.   Yes.

4   Q.   And in that video, they talked about his tax

5   disagreements, correct?

6   A.   Yes.

7   Q.   Right?  And in that video, they specifically said

8   that Irwin Schiff went to jail for 13 years in his

9   final prosecution for tax crimes; isn't that true?

10  A.   It wasn't for tax crimes.

11  Q.   It wasn't for tax crimes?  Do you dispute that

12  tax evasion is a tax crime, sir?

13  A.   Excuse me?

14  Q.   Do you dispute that tax evasion, violation of 26

15  USC 7201 is a tax crime?

16  A.   When he discovered there wasn't a --

17  Q.   That's not the question, sir.

18  A.   Repeat it one more time.

19  Q.   You would agree with me, sir, that tax evasion is

20  a tax crime, correct?

21  A.   Tax evasion is a tax crime, yes.  Tax evasion.

22  Q.   And filing false income tax returns is a tax

23  crime, correct?

24  A.   Yes.

25  Q.   And helping others file false income tax returns

Messier-Cross/Kelly

1   is a tax crime, correct?

2   A.    If the other people go along with it.

3   Q.    So you would agree then, sir, that Irwin Schiff

4   went to jail for tax crimes, correct?

5   A.    I really honestly don't think that way.

6   Q.    You will agree that in the documentary that you

7   loved --

8   A.    Excuse me?

9   Q.    You will agree in the documentary that you loved,

10  it stated that Irwin Schiff went to jail for tax

11  crimes, correct?

12  A.    He went to jail --

13         THE COURT:  The question is did it say that.

14  A.    Excuse me?

15         THE COURT:  The question is did the video say

16  that.

17  A.    No, I don't believe the video said that.  At

18  least I can't remember it did.

19  BY MS. KELLY:

20  Q.    Sir, that's the part you don't remember?

21  A.    I would have to see --

22         MR. MINNS:  Objection, Your Honor.  That's

23  argumentative.  He said he doesn't remember.

24         THE COURT:  Sustained.

25         MR. MINNS:  Thank you.

Messier-Cross/Kelly

BY MS. KELLY:

Q.    How many times did you watch that video?

A.    Several times, but, you know, it's some of those parts I just don't recollect.  I mean I watch a lot of videos, YouTube videos, all kinds of videos.  It's hard to remember everything right to the detail and I really can't remember that topic.

        If I saw it again, I could say I remember it, but right now I can't remember it.  I mean I know I saw the video, but somehow it just doesn't seem to ring a bell.

        (Discussion off the record between counsel)

        MS. KELLY:  Your Honor, may I approach?

        THE COURT:  Yes.

BY MS. KELLY:

Q.    Sir, I'm showing you what's been marked as Government's Exhibit 65, which is a two page screen shot from the documentary that you played yesterday as your exhibit.

        Does that refresh your recollection from the documentary, sir?

A.    This part here, but not the second page.

Q.    So this part here, can you read the part that does refresh your recollection?

A.    Oh, yes.  Irwin Schiff found guilty and sentenced

Messier-Cross/Kelly

1    to 13 years in prison.

2    Q.    Do you remember now that Mr. Schiff went to jail

3    for his tax crimes?

4    A.    I don't believe they were tax crimes.

5    Q.    Okay.  So we disagree about whether tax evasion,

6    filing false income tax returns are tax crimes?

7              THE COURT:  Asked and answered, counsel.

8    BY MS. KELLY:

9    Q.    Now, sir, you read a lot of Irwin Schiff's

10   material?

11   A.    Quite a bit.

12   Q.    He wrote books; isn't that true?

13   A.    He wrote books.

14   Q.    You had his books?

15   A.    I purchased his book, yes.

16   Q.    You researched him extensively?

17   A.    I read his books.  It stimulated my mind.  I

18   wanted to learn, you know, more about this tax system

19   and he seemed a pretty credible person.

20   Q.    Would you say -- he seemed a fairly credible

21   person, sir, were you aware he had been convicted of

22   tax crimes three different times?

23   A.    At the time I -- no.

24   Q.    Well, sir, are you aware his first conviction was

25   in 1981 for tax crimes?

Messier-Cross/Kelly

1   A.    No, I don't remember.

2   Q.    You're not testifying that you were studying

3   Irwin Schiff before 1981; are you?

4   A.    I started studying him around 2002.  Right around

5   that area.

6   Q.    So by 2002, he had been convicted of tax crimes

7   two separate times because he was also convicted, sir,

8   in 1985, were you aware of that?

9   A.    No, I wasn't.

10  Q.    So in your research on Irwin Schiff, you were

11  unaware that he had been convicted of tax crimes?

12          THE COURT:  Asked and answered, counsel.

13  A.    No, I wasn't.  I was just reading --

14          THE COURT:  Mr. Messier, the question was

15  answered.

16          THE WITNESS:  Oh, I'm sorry.

17  BY MS. KELLY:

18  Q.    Sir, you have his book "The Federal Mafia"?

19  A.    Yes, I do.

20  Q.    This is the book he wrote from prison?

21  A.    Yes.  Well, I don't know if he wrote it in

22  prison.  No because -- no, he had a bookstore in Las

23  Vegas, so I think this is prior to anything that

24  happened to him legally, but --

25  Q.    Okay.  You agree that you read this book?

1    A.    Yes.

2    Q.    You agreed you found it helpful?

3    A.    Found it helpful?  I found it quite interesting.

4    Q.    Um-hmm.

5            MS. KELLY:  Your Honor, may I approach?

6            THE COURT:  Yes.

7            MR. VINCENT:  Judge, can we approach sidebar

8    for a minute?

9            THE COURT:  Yes.

10           (Sidebar conference)

11           MR. VINCENT:  My concern, Judge, is that this

12   is a book that perhaps came from Mr. Messier and I

13   didn't --

14           MR. MINNS:  It didn't.

15           MR. VINCENT:  I beg your pardon?

16           MR. MINNS:  It didn't come from Mr. Messier.

17           MR. VINCENT:  It didn't come from Mr. Messier.

18           MR. MINNS:  Learned after.

19           MR. VINCENT:  Okay.  And it's tabbed -- I

20   guess it's tabbed by the Government and my fear is that

21   the jury would think that this is his book and he's

22   tabbed it and it has something to do with him.

23       So if she's showing him a tabbed book, I don't

24   want them to think he tabbed it because there's

25   particular pages out of this 300 page tome that he's

aware of.

          MS. KELLY:  I'll make sure that when -- I'll
say this is my copy and these are my tabs, not your
copy and not your tabs.

          THE COURT:  Fine.

          MR. MINNS:  And, Your Honor, I have a concern,
and I haven't read everything we submitted to the
Government, but under Rule 16, we submitted everything
that had anything to do with this and it sounds like --
if this book that counsel has now is a different
version or if it's a different edition, I don't know
the answer there, but --

          THE COURT:  He says he's read it.  I'll let
the questioning go on and on redirect, you can see if
it's a different edition, but I'll allow the questions.

          MR. MINNS:  Okay.

          (Open court)

BY MS. KELLY:

Q.    Sir, just so we're clear, this is my book,
correct?

A.    Okay, yes.

Q.    And these are my tabs, not yours, correct?

A.    Okay.  If you say so.

Q.    And it's your testimony that you followed Irwin
Schiff, correct?

Messier-Cross/Kelly

1    A.    Amongst others, yes.

2    Q.    And one of the things that Irwin Schiff talks

3    about, you'll agree, is how to act willfully so that

4    you can prove -- so you can disprove willfulness if

5    you're prosecuted for tax crimes, right?

6    A.    Um, I didn't pay too much attention to that part

7    of it.

8    Q.    You ignored that part of the book?

9    A.    Yes.

10   Q.    So when it says how to disprove willfulness in

11   this book --

12   A.    I didn't really read that part of it, I don't

13   believe.  I was interested in how to -- zero income

14   tax.

15   Q.    So you just ignored it?

16   A.    I believe so.  I might have read over it, skipped

17   over it, but I didn't -- I didn't read the book every

18   word-for-word.  I went through most -- three-quarters,

19   most of the book.

20   Q.    So the part that tells you how to get away with

21   this scheme you didn't read?

22              MR. MINNS:  Pardon me --

23   A.    No.

24              MR. MINNS:  Your Honor, counsel is testifying

25   what is in the book and the book is not in evidence and

1    the witness has not seen what she's pointing to, so if

2    it says what she says, either the witness should see it

3    or it should be entered into evidence so the jury can

4    see it.

5               THE COURT:  Do you want to show it to him?

6               MS. KELLY:  I'm happy to --

7               THE COURT:  He testified he's read it, so you

8    can show it to him and he can agree or disagree whether

9    he read that part.

10   BY MS. KELLY:

11   Q.   I'm going to direct your attention to Page 173.

12   It's on a page that the headings are "Protect Yourself

13   and Fight Back if You Haven't Filed" and I'm just going

14   to take my tab off, but I'm going to direct your

15   attention to the sentence that starts with the object

16   of non-filers.  Can you read that to the jury, please.

17              MR. MINNS:  Excuse me, Your Honor, it's not

18   been offered into evidence.  She's asking to read

19   something that's not in evidence.  If she's offering

20   it --

21              THE COURT:  Counsel, consistent with my

22   earlier ruling, he's allowed to read from things, just

23   as I allowed the video excerpt.  I'm not admitting it

24   into evidence, but he's allowed to read from it and you

25   can redirect on it as well.

1        MR. MINNS:  May I add, Your Honor, if he

2   relied on it.  If he did not rely on this, then --

3        THE COURT:  She can ask if he's read it, if he

4   recalls it.

5        MR. MINNS:  But he can read it silently and

6   then she can ask if he's read it versus -- he's not to

7   read it out loud if he has not --

8        THE COURT:  Read it silently first, yes.

9        MR. MINNS:  Thank you, Your Honor.

10  BY MS. KELLY:

11  Q.    Do you remember reading that, sir?

12  A.    No.

13  Q.    You'll agree that that would have provided tips

14  on --

15        MR. MINNS:  Excuse me, that's argumentative,

16  asking if he agrees with something he didn't remember

17  reading.

18        THE COURT:  Let me see you at sidebar.

19        MS. KELLY:  I'm sorry, I didn't hear you.

20        THE COURT:  See you at sidebar.

21        (Sidebar conference).

22        THE COURT:  It's okay, we've got no sound now.

23  You're all going to have to agree or decide where

24  you're going on this strategically.  I've ruled

25  previously, and it's upheld, as you know, in the

Messier-Cross/Kelly

1    Anthony case, that a defendant who is challenging

2    income tax laws can read excerpts without the entire

3    volume being admitted into evidence because of the Rule

4    403 ruling.

5        Now, if the Government wants to put in some

6    excerpts on that basis, you run the risk of the defense

7    wanting to put in some more excerpts on that basis.  So

8    I think you both have to decide where we're headed here

9    and I'll make my rulings accordingly, but you ought to

10   be aware, certainly excerpts can come in, but as they

11   do, there may be other consequences in terms of

12   redirect, recross, what have you.

13       MR. MINNS:  And Your Honor, I believe -- and

14   my understanding is exactly what the Court has just

15   ruled, but I believe the predicate for that is he's

16   relied on it, so I believe --

17       THE COURT:  Well, that's the predicate for the

18   defense getting it in, but certainly the Government can

19   put in have you read it and ignored it because there is

20   a willful blindness issue.

21       MR. VINCENT:  My understanding, Judge, is he

22   said he didn't recall reading it.

23       THE COURT:  He first testified that he read it

24   all.  He's now not recalling certain parts of it and

25   that's a matter for argument to the jury as to what

Messier-Cross/Kelly

1    that signifies, but he did testify he read it in the

2    first place.  Now, he doesn't remember parts of it.

3         So you have to decide strategically what you're

4    going to do because there will be consequences.

5              MS. KELLY:  Thank you, Your Honor.

6              (Open court)

7    BY MS. KELLY:

8    Q.    Sir, are there other parts in this book that you

9    didn't read, that you skipped?

10   A.    Other parts that I did skip?

11   Q.    Yes.  Other parts of the book that you did skip.

12   A.    More than likely, yes.

13   Q.    So you don't remember now?

14   A.    No, because that was back in 2002 or so, so I

15   can't remember exactly.

16   Q.    And you read this book in 2002?

17   A.    Excuse me?

18   Q.    You read this book in 2002?

19   A.    I would say 2002.

20   Q.    Sir, you heard the testimony from Ms. Reno

21   yesterday from the Midcoast Federal Credit Union?

22   A.    Yes.

23   Q.    She said that you said you don't pay taxes

24   because you don't take anything from the Government,

25   correct?

Messier-Cross/Kelly

```
 1              THE COURT:  Is it correct that she said that
 2   or is it correct --
 3   BY MS. KELLY:
 4   Q.    Is it correct -- you heard her say that; didn't
 5   you, sir?
 6   A.    Um, repeat that one more time?
 7   Q.    You heard Ms. Reno say that you told her you
 8   don't pay taxes because if you don't take anything from
 9   the Government, you don't have to pay into it.  That's
10   what she said.
11   A.    I don't believe I said that exactly.
12   Q.    Okay, but you heard her testify to that in the
13   courtroom?
14   A.    I heard her testify to that.
15   Q.    Under oath?
16   A.    I don't believe it was all correct.
17   Q.    Okay.  I want to show you what's already been put
18   into evidence as Government's Exhibit 27-B(2).
19              THE COURT:  You can look to your right, Mr.
20   Messier.  It's right there.
21              THE WITNESS:  Sometimes it's easier for me to
22   see this.
23              THE COURT:  All right, either way.
24              THE WITNESS:  That's even worse.
25   BY MS. KELLY:
```

Messier-Cross/Kelly

1   Q.    Sir, do you recognize the document?

2   A.    Yes, yes.

3   Q.    Can you read for the jury what it says in the

4   bold print, starts with I do not consent?

5   A.    Oh, okay.  Yes.  I do not consent to participate

6   in any federal or state programs, taxes, offsets,

7   benefits or taking amounts from my remuneration from

8   said government items.  Okay.

9   Q.    So you'll agree that Social Security is a federal

10   program?

11   A.    I didn't realize at the time.  I thought it was

12   basically a savings account for my retirement.

13   Q.    And you've been taking Social Security since

14   2010; isn't that true?

15   A.    Yeah because I figured it's my money that they

16   were giving back to me.

17   Q.    And in 2010, you took more than $7,000 in Social

18   Security?

19   A.    I don't remember the exact amount.

20   Q.    2011, more than 13,000 in Social Security?

21   A.    I don't remember the exact amount.

22   Q.    2012, more than 14,000 in Social Security?

23   A.    I don't remember those exact numbers.

24   Q.    For a total of more than $35,000 in Social

25   Security?

Messier-Cross/Kelly

1    A.    I won't argue with you, but I don't know the

2    exact amount.

3    Q.    And that's something they didn't just mail to

4    you, sir, you had to apply for it; isn't that true?

5    A.    Yeah because I figured it was a benefit that they

6    were going to return the money that I gave to them

7    because I thought it was a retirement thing, that they

8    were going to take --

9    Q.    A federal retirement, right?

10   A.    Well, I wouldn't say federal retirement.  I

11   thought it was just they're thinking that they can do a

12   better retirement than me doing -- keeping my own

13   money, that they would keep it and give it back to me

14   when I retired.

15   Q.    And what about the Army Reserve, sir?

16   A.    Army Reserve?

17   Q.    You didn't pay a dime to that education; did you?

18   A.    Excuse me?

19   Q.    You didn't pay for your education with the Army

20   Reserve, correct?

21   A.    Um, no.

22   Q.    Right?  You do know who pays for the Federal

23   Reserve, for the Army Reserve?

24   A.    Did I get paid?

25   Q.    Do you know who pays --

Messier-Cross/Kelly

1   A.     Who paid?

2   Q.     -- for the Army Reserve?

3   A.     Not really.  I was kind of young at the time.  I

4   wasn't paying attention to stuff like that.

5   Q.     That's how you started your career as an

6   electrician; isn't that true?

7   A.     I started back when I was in 7th grade.  Actually

8   prior to that.

9   Q.     And then in the Army Reserve, you perfected your

10  skills, correct?

11  A.     It was a continuation of it, yes.

12  Q.     And that's the federal Army Reserve, correct?

13  A.     Really, I didn't know.  I just -- you either get

14  drafted or you had to enlist and I just enlisted and I

15  had no idea what I was doing.  I just knew I had to

16  enlist and I took up electronics and that was it.

17  Q.     Let me ask it this way, was it the United States

18  Army Reserve?

19  A.     Honestly, I don't remember that.  I didn't even

20  realize that part.  I wasn't interested in the

21  government back then, just my career.

22  Q.     How about BIW, Bath Iron Works, that's a federal

23  contractor; isn't it?

24  A.     No, I assumed it was a private contractor.

25  Q.     Well, they make giant federal ships, isn't that

Messier-Cross/Kelly

1    true, for the Government?

2    A.    They build ships for the Government, but it's a

3    private contractor.

4    Q.    And the people who buy their ships is the United

5    States Government; isn't that true?

6    A.    I would assume so.

7    Q.    You were --

8    A.    I suppose anybody can buy them.  It's a private

9    contractor.  You could buy one, I suppose.

10   Q.    And you worked there for 18 years; isn't that

11   true?

12   A.    Yes.

13   Q.    Now, sir, when you fly your plane, who licenses

14   you?

15   A.    Um, the FAA.

16   Q.    Do you know what the FAA stands for, those

17   initials?

18   A.    Yes.

19   Q.    What is it?

20   A.    Federal -- um, Federal Aviation Administration.

21   Q.    You agree that's the United States FAA?

22   A.    It's -- I assume it's a division.

23   Q.    And that includes all the United States, not just

24   the District of Columbia and Guam?

25   A.    That I wouldn't know.  I --

Messier-Cross/Kelly

1   Q.    Well, you live in Maine.  You live in Maine,

2   right?

3   A.    Yes.

4   Q.    You don't live in the District of Columbia; do

5   you, sir?

6   A.    No, I don't.

7   Q.    And you don't live in Guam or any of the

8   territories, correct?

9   A.    Correct.

10  Q.    But you do have an FCC (sic) pilot license for

11  your Piper, correct?

12  A.    Because it's required.

13  Q.    By the FAA, sorry.

14  A.    Yeah, so it's required so I had no choice.

15  Q.    It's required.  And it's from the United States

16  Government; isn't that true?

17  A.    It's just -- I don't -- I don't know who.  It's

18  just from the FAA and that's the only part I

19  understand.

20  Q.    How about can you tell the members of the jury

21  who licenses your towers on your hill; is that the FCC?

22  A.    Um, the -- the people that put their equipment on

23  the tower are licensed by the FCC; in other words, the

24  tower is not licensed by the FCC.  The FCC gives

25  license for the departments like the police, commercial

Messier-Cross/Kelly

1    companies, they have to be licensed by the FCC, but I

2    don't have to.

3    Q.    So the FCC regulates the airwaves?

4    A.    The FCC?

5    Q.    The --

6    A.    Yes, airwaves, yes.

7    Q.    The airwaves.

8    A.    Right, I thought you meant --

9    Q.    So you couldn't have your business but for the

10   FCC issuing licenses; isn't that true?

11   A.    Repeat that one more time?

12   Q.    You couldn't have your tower business if the FCC

13   didn't issue those licenses; isn't that true?

14   A.    Um, I would say so.

15   Q.    And just so we're clear, do you know what the FCC

16   stands for?

17   A.    Federal Communications Commission.

18   Q.    And sir, you have a driver's license; isn't that

19   true?

20   A.    Um, yes.

21   Q.    And you will agree that it's from the state of

22   Maine?

23   A.    Yes.

24   Q.    And it states it on the face of the license;

25   isn't that true?

Messier-Cross/Kelly

1      A.      True.

2      Q.      And sir, you cash your checks from your

3      businesses at Midcoast Federal Credit Union; isn't that

4      true?

5      A.      Yes.

6      Q.      And it's a federal credit union; do you agree?

7      A.      Yes.

8      Q.      And it's backed by the Federal Reserve, correct?

9      A.      Correct.

10     Q.      Now, sir, you told this jury that you attended

11     the Freedom Law School; do you remember that?

12     A.      No, I didn't attend it.  I took a correspondence

13     course.  It was a home correspondence course.

14     Q.      Okay, so you attended it online?

15     A.      No, it was through material and books and tapes,

16     videos.

17     Q.      So you received the packages and studied at home?

18     A.      Yes.

19     Q.      And had DVDs and videos?

20     A.      Yes.

21             (Discussion off the record between counsel)

22     Q.      And sir, you agree you studied the Freedom Law

23     School in 2009; is that correct?

24     A.      Yes.

25     Q.      That's when you joined, studied?

Messier-Cross/Kelly

1    A.    Well, I didn't really join -- well, I did, yes.

2    Q.    Is that correct?

3    A.    It was part of my continuing education.

4    Q.    And yesterday you said you 100 percent agreed

5    with the information from the Freedom Law School?

6    A.    Oh, I don't know if I said 100 percent.  In that

7    you -- you were asking me how much I agreed with them.

8    Q.    So you didn't say you 100 percent agreed with

9    them?

10    A.    No, it was just, you know, information that

11    continued, you know, my learning process.

12    Q.    Okay.

13        (Discussion off the record between counsel).

14    And sir, you filled out an application and joined

15    the Freedom Law School and paid money, correct?

16    A.    Yeah, 9 -- over $9,000.

17    Q.    How much was it?

18    A.    I don't know.  I can't quote the amount, but I

19    think it was 95, $9,700.

20    Q.    You paid that in cash?

21    A.    Yes.

22    Q.    You took a photograph of the cash, correct?

23    A.    Yes.

24    Q.    And you took a photograph of the cash with a Form

25    1099 next to it; is that correct?

Messier-Cross/Kelly

1   A.    I don't recollect.

2   Q.    Do you remember why you took a picture, a

3   photograph of the money that you sent to the Freedom

4   Law School?

5   A.    Yes.

6   Q.    Why is that?

7   A.    Because I wanted to make sure if anything

8   happened or if the money got lost, I could have a

9   picture to show that I mailed it to them because I

10  don't deal with banks and didn't have any checking

11  account, I don't believe, at the time so I just dealt

12  with cash.

13         MS. KELLY:  May I approach, Your Honor?

14         THE COURT:  Yes.

15  BY MS. KELLY:

16  Q.    I'm showing you what's been marked by the

17  Government as Government's Exhibit 67.  Do you

18  recognize your handwriting on this document?

19  A.    Yes.

20  Q.    Is that your signature?

21  A.    Yes, it is.

22  Q.    And does it refresh your recollection with

23  regards to how much you paid to join the Freedom Law

24  School?

25  A.    Yes.  $9,760, yes.

Messier-Cross/Kelly

1   Q.    Sir, does this application to join the Freedom

2   Law School have a date on it?

3   A.    March 29, 2012.

4   Q.    March 29th of 2012?

5   A.    Yes.

6   Q.    So that's different from the chart where it says

7   2009, correct?  You agree that's a different date?

8   A.    Yes, they are different dates.

9   Q.    And this is the photograph, in fact, that you

10   took --

11   A.    Yes.

12   Q.    -- of the stacks of $100 bills?

13   A.    Yes.

14   Q.    And sir, in the left-hand corner here, is that a

15   Form 1099 I see?  Take a look, please.

16   A.    It is, but I don't recognize it.

17   Q.    You don't recognize the handwriting on the Form

18   1099?

19   A.    I'm not denying it, but chances are I put that

20   there just to show the amount, but I wasn't referencing

21   it was 1099.  It was just I needed something to put

22   down to show what the total amount was because you

23   couldn't tell there was $9,000 there.  It had nothing

24   to do with the actual 1099.

25   Q.    So you pulled out this 2012 Form 1099 and wrote

Messier-Cross/Kelly

1   $9,760 on it to use as a receipt?

2   A.    Basically a receipt, yes.

3   Q.    And did you mail that Form 1099 to the IRS?

4   A.    No, I didn't.

5   Q.    Did you mail that Form 1099 to the people at the

6   Freedom Law School?

7   A.    It was stapled on there, yes.

8   Q.    You what?

9   A.    If it was stapled on that, with all that cash, I

10  assume I sent it.

11  Q.    So you gave them a 1099 for your payment?

12  A.    It was a 1099, but like I said, basically it was

13  just kind of a receipt.

14        MS. KELLY:  Your Honor, I'd like to move

15  Government's Exhibit 67 into evidence.

16        MR. MINNS:  I have no objection.

17        MR. VINCENT:  No objection from Mr. Robinson.

18        THE COURT:  Admitted.

19  BY MS. KELLY:

20  Q.    And sir, you agree -- you agree that March 29,

21  2012, was after you received service of the notice of

22  levy from the IRS; isn't that true?

23  A.    Say that one more time?

24  Q.    March 29, 2012 --

25  A.    And that references what?

Messier-Cross/Kelly

1   Q.    You already had received notice of the levies

2   from Jolene Hendershot; isn't that true?

3   A.    I believe the notices started in February.  Was

4   that 2012?  I was going by the date on the levy.  Is

5   that what you're referencing?

6   Q.    Yes.  Talking about that date.

7   A.    Okay, yes.

8   Q.    And by March 29, 2012, sir, you had already

9   received contact from Mr. Patrick Frie; isn't that

10  true?

11  A.    Probably in a letter mainly.

12  Q.    And that's when you purchased this Royal Freedom

13  Package for $9,000, correct?

14  A.    Um, I'm not sure of exactly what the date was.

15  Q.    Well --

16  A.    Well, I know you showed me the date on that.  I'm

17  trying to connect that with Patrick Frie.

18  Q.    Okay.  Sir, did I hear you say you didn't have a

19  checking account in 2012?

20  A.    Um, maybe -- yeah.  The only time I closed the

21  account is when the IRS levied my money and then I

22  stopped -- I didn't close it, I just stopped using it.

23  Q.    So you did have --

24  A.    Prior to that, then yes, I'm sorry, I probably

25  did have a checking account.

Messier-Cross/Kelly

1    Q.    So you did have a checking account?

2    A.    Yes.

3    Q.    In 2012, correct?

4    A.    Yes.  Like I said, I have trouble with dates.

5    Q.    Sure.  And you could have written a check to

6    Freedom Law School, correct?

7    A.    I could have, but they required cash.  I believe

8    they required cash.

9    Q.    Oh, did they?

10   A.    I think it says right on there.  Doesn't it say

11   cash?

12          THE COURT:  Wait for a question.

13          THE WITNESS:  I'm sorry.

14   BY MS. KELLY:

15   Q.    Let's see.  It says, send either postal money

16   orders with pay to the line blank or cash by priority

17   mail or certified mail or registered mail.

18   A.    So I paid it cash.

19   Q.    Well, it does accept postal money orders, sir,

20   correct?

21   A.    It says that, yes.

22   Q.    You didn't send a money order drawn on your

23   Treasury account on your birth certificate; did you?

24   A.    I wasn't really aware of that.  I wasn't that

25   experienced yet or had fully learned about the Treasury

Messier-Cross/Kelly

1    account and the birth certificate.  That came later.

2    Q.    So on March 29th -- or excuse me, March 29th,

3    2012, you weren't aware of the Treasury account that's

4    held with your birth certificate, but on April 4th,

5    2012, when you submitted that money order to Jolene

6    Hendershot, you were?

7    A.    I don't quite understand what you're getting at.

8    Q.    When you said that you didn't pay with the money

9    order drawn on your strawman, the birth certificate

10   posted to the Treasury account, you call it a strawman,

11   correct?

12   A.    That's correct.  But I didn't fully understand

13   that part yet.

14   Q.    So on March 29th, 2012, you didn't understand

15   your strawman account yet?

16   A.    Basically not really.

17   Q.    Hadn't learned about the redemption theory?

18   A.    I was starting to -- all this stuff was coming

19   together over a period of time.

20   Q.    Um-hmm.  But by April 4, 2012, less than a week

21   later, you were familiar enough with your strawman that

22   you submitted a money order to Jolene Hendershot at the

23   IRS, correct?

24   A.    If that's -- if those are the dates, I would

25   assume, yes.  I mean you're getting me confused right

Messier-Cross/Kelly

1  now.  I'm sorry.

2  Q.   So you're a quick learner.  You learned it in a

3  week, less than a week?

4        THE COURT:  Argumentative, counsel.

5  BY MS. KELLY:

6  Q.   You would agree that's less than a week?

7        THE COURT:  The dates are there, counsel.

8  Let's move on.

9  BY MS. KELLY:

10  Q.   Sir, you agree the other -- one of the things you

11  got from the Freedom Law School for your money was

12  blank forms and templates, correct?

13  A.   I really couldn't -- I really don't remember.

14  Q.   Sir, Freedom Law School provided you with a

15  non-negotiable charge back stamp that you put on the

16  document sent to the IRS?

17  A.   I don't believe so.

18        MS. KELLY:  May I approach?

19        THE COURT:  Yes.

20  BY MS. KELLY:

21  Q.   Showing you what's been marked as Government's

22  Exhibit 68.  Take a look at those documents, please.

23  Do you recognize those documents, sir?

24  A.   Not fully.

25  Q.   And sir, would you describe these as the go by

1   that you used to send your letters to the IRS and

2   Jolene Hendershot?

3   A.    I don't believe I sent that to Jolene Hendershot.

4   Q.    It's fair to say that you copied the language and

5   the format from this letter, you and others perhaps,

6   copied the language and format from the letter and sent

7   it to Ms. Hendershot; isn't that true?

8            MR. MINNS:  Pardon me, Your Honor, this did

9   not come from -- oh, I apologize.

10            MR. VINCENT:  Has this been identified on the

11   record?

12            THE COURT:  Yes.

13            MR. VINCENT:  As what?

14            MR. CHAPMAN:  68.

15            MR. MINNS:  I'm withdrawing what I said.  I'm

16   mistaken.

17            THE COURT:  Go ahead, Ms. Kelly.

18            MS. KELLY:  I'm sorry, Your Honor?

19            THE COURT:  Go ahead.  You may need to repeat

20   the question.

21   BY MS. KELLY:

22   Q.    Sir, you agree that these are the documents that

23   you used as the format or the basis for those letters,

24   a non-negotiable charge back that you sent to Jolene

25   Hendershot?

Messier-Cross/Kelly

1    A.    I did not do those forms and I did not send that.

2    Q.    No, you didn't send this letter, correct?

3    A.    Well, I didn't send any of that.

4    Q.    This is what you received from the Freedom Law

5    School, correct?

6    A.    No, I don't believe the Freedom Law School had

7    mentioned anything about strawman and those overlays

8    that you're showing me.  What I -- I got books and

9    tapes.  I don't -- none of that, I don't believe any of

10   that stuff came from the Freedom Law School.

11   Q.    So it's your position that the Freedom Law School

12   didn't have anything to do with these documents?

13   A.    I don't believe so.  I never seen any documents

14   like that from Freedom Law School.

15   Q.    You don't dispute that these are the types of

16   documents that you had, correct?  These are your

17   documents?

18   A.    They're really not my documents.

19   Q.    They're documents that other people wrote that

20   you were studying, correct?

21   A.    Yes, I was studying.

22   Q.    And you copied them for your own purposes,

23   correct?

24   A.    I did not copy them.  I just used them and looked

25   at in -- for reference.

Messier-Cross/Kelly

1    Q.    Okay.  It's not your position that you invented
2    the bill of exchange, correct?
3    A.    I didn't invent it, no.
4    Q.    And it's not your position that you invented the
5    strawman, correct?
6    A.    I didn't invent it, no.
7    Q.    It's not your position that you invented the
8    redemption theory, correct?
9    A.    No, it wasn't my idea.
10   Q.    Right.  Those are ideas you purchased off the
11   Internet, correct?
12   A.    Ideas about what?
13   Q.    The strawman, the redemption theory, the UCC.
14   You purchased that off the Internet, correct?
15   A.    Some of it from the Internet.
16   Q.    And some of it from books and tapes?
17   A.    Some from books and -- yes.
18   Q.    And so those letters and stamps that you
19   submitted to the IRS, you got those from other people,
20   correct?
21   A.    Yeah.  I didn't do that.
22   Q.    From your research, correct?
23   A.    Right.
24   Q.    And in fact, the Freedom Law School information
25   they provided actually told you not to use the

1   redemption theory, correct?

2   A.    No.  When I got the package from Freedom Law

3   School, I just opened it up.  I went through it to see

4   what was involved, but I really didn't study that much

5   about everything that was in it.  I looked at the

6   videos mostly.

7   Q.    Okay.  So where it says that the strawman

8   redemption theories are based on the tooth fairy and

9   unicorn theories, you didn't read that?

10  A.    No.  I got the strawman off the Internet, YouTube

11  videos.

12  Q.    And when you paid $9,000 for information from the

13  Freedom Law School, fair to say you wanted to read

14  what's in it?

15  A.    I what?

16  Q.    Fair to say you wanted to read what's in it for

17  $9,000?

18         THE COURT:  Argumentative, counsel.

19         MS. KELLY:  Your Honor, may I approach?

20         THE COURT:  Yes.

21         (Discussion off the record between counsel)

22         MS. KELLY:  May I approach, Your Honor?

23         THE COURT:  Yes.

24  BY MS. KELLY:

25  Q.    Take a moment to read --

1          THE COURT:  What's the Government's Exhibit?

2          MS. KELLY:  69, Your Honor.

3          THE COURT:  Thank you.

4    BY MS. KELLY:

5    Q.    All right.  Now, sir, you'll agree that this

6    is -- this document, "Learning How to Respond to IRS

7    Letters," is part of the package you got from Freedom

8    Law School, correct?

9    A.    I believe so, yes.

10   Q.    And this particular document 69 that I showed

11   you, the title is "When and How to Respond to IRS

12   Letters", correct?

13   A.    Correct.

14   Q.    And after reviewing the document, sir, does it

15   refresh your recollection that you reviewed it?

16   A.    I reviewed it.

17   Q.    Do you remember reviewing this document?

18   A.    I remember reading -- yeah, but I don't remember

19   everything that was in it right now at this point.

20   Yeah, I'm familiar with it.

21   Q.    Okay.  So I'm going to ask you to read to the

22   jury -- I'm going to read to the jury, and correct me

23   if you see me misspeak, okay?

24   A.    Yes.

25   Q.    There are a lot of baseless legal theories

Messier-Cross/Kelly

1   floating around the movement.  We do not air those

2   issues because after reviewing them, we found them to

3   be baseless as the tooth fairy and the unicorn theory.

4   They all sound good, but were without legal foundation.

5   The most common baseless theories that are promoted out

6   there are -- did I read that correctly?

7   A.    Yes.

8   Q.    Anything having to do with Uniformed Commercial

9   Code, UCC; did I read that correctly?

10  A.    Yes.

11  Q.    Sovereign or state citizenship theories?

12  A.    Yes.

13  Q.    Did I read that correctly?

14  A.    Yes.

15  Q.    14th Amendment related theories?

16  A.    Yes.

17  Q.    Strawman redemption theories?

18  A.    Yes.

19  Q.    And I'm just going to jump down here, yellow

20  fringe flag argument?

21  A.    Yes.

22  Q.    Is that what you were talking about yesterday

23  when you talked about the flag?

24  A.    Yes.  But those are all -- can I see that

25  document one more time?

Messier-Cross/Kelly

1    Q.    Sure.

2    A.    See, they mention a lot of baseless legal

3    theories.

4    Q.    Um-hmm.

5    A.    But who is -- you know, that's one opinion,

6    someone else's opinion about this.

7    Q.    Well, that's the Freedom Law School's opinion;

8    isn't it?

9    A.    It could be anybody's, yes.  That's their

10   opinion.

11   Q.    Well, you agree it's on Freedom Law School

12   letterhead?

13   A.    It's on their letterhead.

14   Q.    And it came in the package you purchased for

15   $9,000; you agree with that, correct?

16   A.    Correct.

17   Q.    Sir, yesterday you read from Defendant's Exhibit

18   M-3, which I'll show you, and you told this Court that

19   you relied on this form letter dated December 11, 1997;

20   do you remember that?

21   A.    Yeah, it was one of the letters, yes.

22   Q.    And your lawyer asked you to read the underlined

23   sentence in that letter?

24   A.    Yes.

25   Q.    Do you remember reading the underlined sentence

Messier-Cross/Kelly

1    in the letter?

2    A.    Yes.

3    Q.    I would ask that you read the underlined sentence

4    and the sentence that comes immediately following it,

5    please, for the jury.

6    A.    You are correct in your assertions that the word

7    liable, or the terminology liable for income taxes is

8    not included in any section of the Internal Revenue

9    manual.  However, the 16th Amendment to the United

10   States Constitution provides that Congress shall have

11   the power to lay and collect taxes on incomes from

12   whatever sources.

13   Q.    You agree that that says, Congress -- Congress

14   has the power to lay and collect taxes on income from

15   whatever sources, correct?

16   A.    If -- but you have to define the word --

17            THE COURT:  Is that what it says?

18            THE WITNESS:  Pardon?

19            THE COURT:  The question is, is that what the

20   document says?  Her question to you is does the

21   document say that?

22   A.    Oh, yes.  The document says that.

23   BY MS. KELLY:

24   Q.    Now, sir, you have a business lawyer, correct,

25   Chris Livesay?

A.    He's a high school personal friend of mine.   We
went to high school together.

Q.    And he's also your business lawyer, correct?

A.    He's retired now, but, yes.   Yes, he did the real
estate.

Q.    Real estate.   And you've been using him for
years, correct?

A.    For what?

Q.    You've been using him for years?

A.    I've -- I've used -- when the occasion arise, I
would use him.

Q.    You used him for legal matters involving your
daughter Lisa, correct?

A.    Yes.

Q.    For property matters?

A.    Yes.

Q.    You used him for property matters involving Gail
Huddy, correct?

A.    Yes.

Q.    And you knew Mr. Robinson was not a lawyer,
correct?

A.    Correct.

Q.    So sir, it's fair to say that you could have used
Mr. Livesay to file your lawsuits in Bath County -- in
the Town of Bath, correct?

Messier-Cross/Kelly

1   A.    I don't believe so.  He just specified in real

2   estate.  He's a reality lawyer, so I don't know -- I

3   don't know if he had that capacity or capability to do

4   it.  It never got brought up.

5   Q.    So instead you used Mr. Robinson as a lawyer?

6   A.    Not as a lawyer, but as an educated person that

7   studied like I have and learned different things,

8   different --

9   Q.    And sir, both your lawsuits were dismissed,

10  correct?

11  A.    Yes.

12  Q.    And, in fact, the second lawsuit, the magistrate,

13  Judge Kravchuk, issued an opinion; isn't that true?

14  A.    I believe there was an opinion, but I don't

15  recollect what it was.

16  Q.    And so you received that opinion certified mail

17  from Crown Atlantic; isn't that true?

18  A.    A certified letter from Crown Atlantic?  I don't

19  remember.

20  Q.    And you knew that that opinion was from a judge,

21  correct?

22  A.    Can't be sure.

23  Q.    Well, the document said it was from a judge,

24  correct?

25  A.    I would have to see the document.

Messier-Cross/Kelly

1          THE COURT:  What's the exhibit number,

2     counsel?

3          MS. KELLY:  24-G, which has already been

4     admitted.

5     BY MS. KELLY:

6     Q.    And you filed your lawsuit in a court, correct,

7     Mr. Messier?

8     A.    In a court?

9     Q.    Yes.  You filed your lawsuit in the court,

10    correct?

11    A.    Correct.

12    Q.    Where judges work, correct?

13    A.    Where what?

14    Q.    Where judges work, correct?

15    A.    I believe so.

16    Q.    And so in the opinion that came out of the court,

17    it's fair to say if it states it's from a judge, it's

18    highly probable it's from a judge, correct?

19    A.    Correct.

20    Q.    And so did you read the opinion where Judge

21    Kravchuk described your arguments as well-worn tax

22    protester arguments?  Well-worn taxpayer protest

23    arguments?  Did you read that part of the opinion?

24          MR. VINCENT:  Judge, I don't remember him

25    testifying that he remembered reading this opinion.

Messier-Cross/Kelly

1           THE COURT:  I'm not sure, but let's ask him if

2    he's read it.

3    A.    I'm not sure what you're asking.

4           THE COURT:  The first question is did you ever

5    read the opinion?

6    A.    Um, I can't remember.

7    BY MS. KELLY:

8    Q.    You can't remember if you read the opinion in a

9    lawsuit that you filed?

10   A.    I more than likely did, but I don't -- I mean I

11   don't remember.

12   Q.    You're the one who filed --

13   A.    I'm sure I read it.

14   Q.    You're sure you read it?

15   A.    I'm probably sure I read it, yes, but it didn't

16   stick in my mind.

17   Q.    Do you remember reading this line in the opinion,

18   on the top, in the final analysis, plaintiff's

19   complaint is simply a conglomeration of well-worn

20   taxpayer protest arguments.  These arguments have been

21   considered and uniformly rejected by the courts for

22   years.

23   A.    And that was their opinion, yes.

24   Q.    You remember reading that?

25   A.    Yes.

Messier-Cross/Kelly

1  Q.    And you disagreed with that opinion; isn't that

2  true, sir?

3  A.    I disagreed, yes.  It was their opinion against

4  my opinion.

5  Q.    Sir, you like to use cash for your purchases?

6  A.    I like what?

7  Q.    You like to use cash for your purchases?

8  A.    Yes.

9  Q.    You purchased your plane with $52,000 in cash?

10  A.    Correct.

11  Q.    You purchased, in July of 2014, a Toyota with

12  cash?

13  A.    Yes, I did.

14  Q.    You like to receive cash?

15  A.    I've been like that since I was a child.  I just

16  like cash.

17  Q.    And you like to receive cash as a form of

18  payment?

19  A.    I get payments normally by checks.

20  Q.    Well, you received cash for the rent from Mr.

21  Wood; is that correct?

22  A.    Oh, yes, I did.  Him, yes.

23  Q.    And you received rent from Gail Huddy in the form

24  of cash, correct?

25  A.    Yeah, they wanted to pay me something for me

——————————— Messier-Cross/Kelly ———————————

 1   giving them over the free house.  They didn't feel

 2   comfortable unless they could give me something so they

 3   agreed to that, not me.  They would have had the house

 4   for free, but they felt uncomfortable getting a free

 5   house.

 6   Q.    And you received cash from Geoffrey Bates for

 7   lease pavements after 2012, correct?

 8   A.    Yes.

 9   Q.    And sir, it's fair to say that you didn't receive

10   any money orders drawn on people's birth certificates

11   drawn on the Treasury from your customers to pay for

12   cell tower service; did you?

13   A.    No.

14   Q.    You never received that; did you?

15   A.    No.

16   Q.    You received check or cash, correct?

17   A.    Yes.

18   Q.    And sir, it's fair to say you disagree with the

19   income tax law?

20   A.    No, I agree with the income tax laws the way

21   they're written.  It's just I disagree with the way

22   they're administered.

23   Q.    So you agree that the tax laws are valid?

24   A.    Yes.

25   Q.    You just don't like the way that they administer

Messier-Cross/Kelly

1   them?

2   A.    That's correct.

3   Q.    You think it's unfair to collect taxes from you?

4   A.    It's fair to collect property taxes from me.   I

5   pay all my regular taxes, yeah.   I don't argue with

6   that.

7   Q.    Well, I'm talking about income taxes.   You

8   disagree with income tax laws?

9   A.    No, I agree with the income tax laws, I just

10  disagree with the way they're being administrated.

11  Q.    So you agree that the law requires that you pay

12  income taxes, correct?

13  A.    The word if required, and I'm --

14  Q.    So then you disagree with the law; is that

15  correct?

16  A.    No.   I'm just saying that if you're required --

17  Q.    Okay.

18  A.    -- to pay an income tax.   I'm not disagreeing.

19  Q.    And it's your position that income and wages are

20  not taxable, correct?

21  A.    Not on your personal labor.

22  Q.    And you agree that the 13th Amendment, which

23  abolished slavery, should have abolished taxes on

24  people, correct?

25  A.    Should what, abolish?

Messier-Cross/Kelly

1    Q.    Abolish taxes from people, correct?

2    A.    All I remember reading about that was that the

3    13th Amendment did not create any new taxes.

4    Q.    And it's your position that the 16th Amendment

5    was never ratified?

6    A.    I believe it was not correctly ratified.

7    Q.    Correct?

8    A.    Correct.

9    Q.    And it's your position that only corporations owe

10   taxes and pay taxes, correct?

11   A.    Correct.

12   Q.    And it's your position that only citizens of the

13   District of Columbia and federal territories, including

14   Guam, are required to pay taxes?

15   A.    Yeah.  They're part of the United States, not the

16   United States of America.

17   Q.    And sir, you agree that you have a disagreement

18   with the tax code of the United States of America;

19   isn't that true?

20         THE COURT:  Asked and answered, counsel.

21   Asked and answered.

22         MS. KELLY:  One moment, Your Honor?

23         THE COURT:  Yes.

24         MS. KELLY:  Sir, I don't have any further

25   questions for you at this time.  Thank you.

1          THE COURT:  Thank you, Ms. Kelly.

2          THE WITNESS:  You're welcome.

3          MS. KELLY:  And Your Honor, I'm going to put

4   the Government's exhibit over here.

5          THE COURT:  You're not moving it into

6   evidence?

7          MS. KELLY:  I moved it into evidence, Your

8   Honor.

9          THE COURT:  Which one?

10          MS. KELLY:  67.

11          THE COURT:  67?  That's fine, thank you.  Mr.

12   Minns, you may redirect.

13          MR. MINNS:  Your Honor, can I approach with

14   this sign?

15          THE COURT:  Yes.

16                     REDIRECT EXAMINATION

17   BY MR. MINNS:

18   Q.   Bill, if you enrolled in Freedom Law School in

19   2012 and if we've made a mistake --

20          MS. KELLY:  Objection, Your Honor, he's

21   testifying.

22          THE COURT:  Well, let me hear the question.

23   BY MR. MINNS:

24   Q.   If you enrolled in 2012, did we make a mistake on

25   putting that date down?

Messier-Redirect/Minns

1   A.    It's possible.

2   Q.    And if you did it in March of 2012, is it -- you

3   couldn't have relied on it in 2009; is that correct?

4           MS. KELLY:  Objection, Your Honor.

5           THE COURT:  You're leading.

6   BY MR. MINNS:

7   Q.    Okay.  Could you have relied on it in 2009?

8   A.    No.

9   Q.    Okay.  And I believe you've already corrected the

10  mistake we made on the time in the military service.

11  It was the year before, not the year after?

12  A.    Yes.

13  Q.    And at nearly 71, it is possible you have made

14  some mistakes; is that --

15          MS. KELLY:  Objection, Your Honor.

16  A.    Yes.

17          THE COURT:  Overruled.

18  Q.    Do you follow the tax laws obediently?

19  A.    Obediently?  What was the --

20  Q.    Do you follow the tax laws, Bill?  Do you obey

21  them?

22  A.    Yes, I do obey them.

23  Q.    You obey all court orders.  When a judge gives

24  you an order, do you obey it?

25  A.    I definitely do.

Messier-Redirect/Minns

1           MR. MINNS:  Your Honor, could I approach with

2   Government's Exhibit 69?

3           THE COURT:  Yes.

4   BY MR. MINNS:

5   Q.    I'm on the second page of Government's

6   Exhibit 69.  Would you read the highlighted portion on

7   the --

8           MS. KELLY:  Your Honor, I object.  This has

9   not been moved into evidence.  69?

10          THE COURT:  It's not in evidence yet, no.  Are

11  you offering it?

12          MR. MINNS:  I'm happy to offer it.  If the

13  Government has no objection, I'll offer it.

14          THE COURT:  Are you asking to read it to

15  himself?  I don't know what you're asking to do.

16          MR. MINNS:  The Government asked him to read

17  it and I'm asking -- to read from it and I'm asking him

18  to read another section from it.

19          THE COURT:  Objection?

20          MS. KELLY:  My objection was it was not moved

21  into evidence is my objection.

22          THE COURT:  Is there objection to his reading

23  a section that you --

24          MS. KELLY:  No.  He can certainly read it.

25          MR. VINCENT:  Judge, could I see a copy of

Messier-Redirect/Minns

1    that before?

2              MR. MINNS:  Oh --

3              THE COURT:  Yes.

4              MR. MINNS:  Could I make sure that --

5              (Discussion off the record between counsel)

6         May I approach the witness?

7              THE COURT:  Yes.

8    BY MR. VINCENT:

9    Q.    Could you read those two lines on the second page

10   of Government's Exhibit 69 that came from the Freedom

11   Law School?

12   A.    Yes.  It says for a more detailed rebuttal of

13   these and other false arguments, go to the website of

14   famous freedom lawyer Larry BeCraft and his specific

15   page on the storied arguments at the website.

16   Q.    Bill, why didn't you go to the famous freedom

17   lawyer recommended by Freedom Law School, Larry

18   BeCraft, for this case?

19   A.    I really don't know.

20   Q.    Well, did you do everything that Freedom Law

21   School suggested?

22   A.    Did I do everything they suggested?

23   Q.    Yes, sir.

24   A.    No, I did not.

25   Q.    Did you read every -- well, did you read every

1   piece of the materials that you received from Freedom

2   Law School?

3   A.    Not every piece.  A lot of it, but some of it I

4   might have skipped over.

5           MR. MINNS:  If I can approach the witness

6   again?

7           THE COURT:  Yes.

8   BY MR. MINNS:

9   Q.    Would you read the highlighted part on Page 3.

10           THE COURT:  Is the question did you read or

11   could you read it?

12           MR. MINNS:  Would you read the highlighted

13   portion.

14           MS. KELLY:  Your Honor, is this refreshing his

15   recollection?

16           THE COURT:  You're asking him to read aloud in

17   court?

18           MR. MINNS:  Yes, Your Honor.

19   A.    This is a big lie that the IRS must have you

20   believe in in order to have you surrender your rights

21   and the information the IRS needs from you under your

22   own oath to enslave you.

23   Q.    That's good, thank you.  Did you -- do you

24   remember whether or not you went to the website of the

25   famous freedom lawyer Larry BeCraft?

Messier-Redirect/Minns

1    A.    Yes, I have.

2              MS. KELLY:  Objection, asked and answered.

3              THE COURT:  Overruled, the answer stands.

4    BY MR. MINNS:

5    Q.    When you're talking about the United States and

6    the United States of America, do they share the same

7    Constitution?

8    A.    No, they don't.  They are two separate

9    Constitutions.

10   Q.    Are your positions regarding the tax laws based

11   on your research of the tax code or based on your

12   knowledge of one of the two Constitutions?

13   A.    I didn't quite understand that, sir.

14   Q.    It's probably two questions.  Did you -- did you

15   base your understanding of the tax code on the tax code

16   itself?

17   A.    Yes, the tax code itself.

18   Q.    Did you base your understanding of the tax code

19   on one of the two Constitutions of the two different

20   Americas?

21   A.    No.

22             MR. MINNS:  Thank you, Bill.  Thank you, Your

23   Honor.  Thank you.

24             THE COURT:  Thank you, Mr. Minns.  Mr.

25   Vincent.

Messier-Recross/Vincent

1          MR. VINCENT:  Thank you, Your Honor.

2                    RECROSS EXAMINATION

3     BY MR. VINCENT:

4     Q.    During the Government's cross-examination of you,

5     Bill, you were asked --

6               THE COURT:  Keep your voice up to the

7     microphone.  He's having trouble hearing you.

8     Q.    You were asked if you agreed with that you obeyed

9     the tax laws?

10    A.    Yes, I obey the tax laws.

11    Q.    So your disagreement with the Government is not

12    that you disagree with the laws, but that you disagree

13    with the interpretation of the laws as they're imposed?

14    A.    That's correct.

15              MS. KELLY:  Objection to the form of that

16    question, Your Honor.

17              THE COURT:  Overruled.

18    BY MR. VINCENT:

19    Q.    Well, when you -- how long have you known -- I

20    believe you testified you've known David Robinson for

21    about nine months before these tax issues came up?

22              MS. KELLY:  This is beyond the scope of the

23    cross-examination.

24              THE COURT:  It is beyond the scope, counsel.

25              MR. VINCENT:  I'm laying a foundation for a

Messier-Recross/Vincent

1    question, Judge.

2          THE COURT:  Get to it.

3    BY MR. VINCENT:

4    Q.    You testified you've known David Robinson for

5    approximately nine months before your tax issues became

6    a problem?

7    A.    Approximately.

8    Q.    Would it be fair to say that you provided David

9    with information about your expertise about the tax

10   code?

11   A.    Yes, I did.

12   Q.    And would it be fair to say that he provided you

13   with his expertise about the strawman theory?

14   A.    Yes, he did.

15   Q.    And in fact, that overlay exhibit that you were

16   shown that the Government asked you if it came from

17   Liberty Law School (sic), didn't that, in fact, come

18   from Mr. Robinson?

19   A.    Yes.

20   Q.    Did you share your research theories with Mr.

21   Robinson?

22   A.    Did I share what?

23   Q.    Your research theories with Mr. Robinson.

24   A.    Oh, yes.

25   Q.    And it didn't include just tax stuff?

Messier-Recross/Vincent

```
 1   A.    No.  It would come -- you know, a lot of things.

 2   Q.    You talked about, for example, the Government's

 3   involvement with the weather in the ionosphere?

 4   A.    Oh, yes, definitely.  He was an engineer and I

 5   was -- you know, we shared a lot of technical theories

 6   and I --

 7   Q.    Did he know anything about the Government's

 8   manipulation of the weather?

 9            MS. KELLY:  Your Honor, I object.

10            THE COURT:  Sustained.

11   BY MR. VINCENT:

12   Q.    When you talked to him about the Government's

13   manipulation of the weather, did he contribute any

14   information back to you about that?

15   A.    Not that I --

16            MS. KELLY:  Objection.

17            THE COURT:  Sustained.

18   A.    No.

19            THE COURT:  You don't have to answer the

20   question.

21   BY MR. VINCENT:

22   Q.    What's a non-tax filer?

23   A.    A what?

24   Q.    A non-tax filer.

25   A.    A person that doesn't require to pay --
```

Messier-Recross/Vincent

```
 1            MS. KELLY:  Objection, Your Honor.

 2            THE COURT:  Just a moment.

 3            MS. KELLY:  Objection, Your Honor, foundation.

 4   BY MR. VINCENT:

 5   Q.    The Government in their cross-examination asked

 6   you if you were a non-tax filer.

 7   A.    That's correct.  I'm a non-filer.

 8   Q.    And what does that mean to you?

 9   A.    That means I'm not a person that's required to

10   file an income tax.

11   Q.    Now, you testified on cross-examination that this

12   Freedom Law School information, you only looked at the

13   videos?

14   A.    Yes.

15   Q.    And then you said you -- then you were shown some

16   documents in the materials?

17   A.    Yes.

18   Q.    Do you have a recollection of actually having

19   looked at those documents?

20   A.    Vaguely.

21   Q.    You testified yesterday, you said you'd only

22   reviewed about ten percent of the Liberty Law School

23   (sic) material?

24   A.    I had so many documents coming and then this

25   Freedom Law School course stuff came and I was going
```

Messier-Recross/Vincent

1    through it, you know, and picking and choosing what I

2    thought was fairly interesting.

3    Q.    Ever been involved in a lawsuit in your life

4    other than the two you filed by Mr. Robinson in this

5    case?

6    A.    No.

7    Q.    Ever had any experience of having been brought

8    into court --

9    A.    No.

10   Q.    -- as a party to a lawsuit?

11   A.    No.  I have a clean record all my life.

12   Q.    Mr. Robinson assisted you with some of his

13   expertise?

14   A.    Yes, he did.

15   Q.    And you provided expertise to him?

16   A.    Yes, I did.

17         MR. VINCENT:  Nothing further, Your Honor,

18   thank you.

19         THE COURT:  Thank you, Mr. Vincent.  Anything

20   further, Ms. Kelly?

21         MS. KELLY:  No, Your Honor.

22         THE COURT:  All right.  Thank you, Mr.

23   Messier.  You may step down.  Just leave the exhibits

24   there, thank you.  And ladies and gentlemen, we will

25   take the first recess.  Thank you for being patient

1  while we finished the testimony before the break.  We

2  will take 15 minutes.

3        (Jury excused.  Time noted:  10:29 a.m.)

4           (Recess called).

5           (End of excerpt).

6              **C E R T I F I C A T I O N**

7  I, Dennis Ford, Official Court Reporter for the United

8  States District Court, District of Maine, certify that

9  the foregoing is a correct transcript from the record

10  of proceedings in the above-entitled matter.

11  Dated:  May 19, 2015

12              /s/ Dennis Ford

13              Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25