UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | Criminal No. 14-CR-00083-DBH |
| | § | |
| F. WILLIAM MESSIER and | § | |
| DAVID EVERETT ROBINSON | § | |

DEFENDANT MESSIER'S SENTENCING MEMORANDUM
AND MOTION FOR NON-GUIDELINES SENTENCE

TO THE HONORABLE D. BROCK HORNBY, UNITED STATES DISTRICT JUDGE:

## I.  INTRODUCTION

NOW COMES William "Bill" Messier ("Messier"), by and through his attorneys of record, Michael Louis Minns, Ashley Blair Arnett, and William Maselli, and respectfully requests the Court to consider the following information in determining his sentence.

## II.  OVERVIEW

Messier respectfully requests a sentence of probation, with conditions of house arrest and community service, in lieu of imprisonment.  The Pre-Sentencing Report ("PSR") discusses this possibility.  (PSR, ¶ 54.) This sentence would enable him, as explained below, to continue his radio tower and airport communication system maintenance, a service that is vital to the safety of area residents and pilots.  This sentence additionally would allow Messier to continue care for his brother who has cardiac problems, has had heart surgery, and is now dying. Such a sentence would serve the purposes of sentencing while accounting for Messier's advanced age and infirmity.  It would save the Bureau of Prisons ("BOP") medical care expenses, which will only increase in the future as Messier's chronic health conditions worsen.

This Memorandum presents the Court with information about and examples of Bill Messier's background, nature, and character, as well as several mitigating factors the Court must consider under 18 U.S.C. § 3553(a) in fashioning the appropriate sentence. Messier respectfully requests the Court to consider this information in light of the advisory Sentencing Guidelines and the factors contained in § 3553(a), and decide on a sentence that is sufficient but not greater than necessary to satisfy the purposes of sentencing as set forth in § 3553(a).

### III.  SENTENCING LAW

The ultimate task facing this Court is to fashion a reasonable sentence based on the United States Sentencing Guidelines ("USSG" or the "Guidelines"), the sentencing factors in § 3553(a), and the application of the Court's considerable discretion.  *See Kimbrough v. United States*, 552 U.S. 85 (2007).

Justice Scalia, in his concurring opinion in *Cheek*, a quarter of a century ago, opined that the *Cheek* standard should cover non-willful beliefs as to the applicability of the law, as the majority wrote, but that also it was not rational to create a separate standard for non-willful beliefs as to the constitutionality of the law.  *Cheek v. United States*, 498 U.S. 192, 207-09 (1991) (Scalia, J., concurring).  A similar but different paradox exists with the Sentencing Guidelines.  The courts struggled with this for decades and ultimately split the baby.  A strict application of the Guidelines was deemed to be unconstitutional, but the Guidelines were still left to be interpreted on a case-by-case basis, and then, after giving a suitable reason, the court could deviate from the Guidelines.

### A.  Sentencing Guidelines Are Advisory

The Sentencing Guidelines are not mandatory; they are guidelines only.  In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court excised the provision of the Sentencing Reform Act that made the Guidelines mandatory, and held that district courts must still consider the Guidelines range, but they must also consider the other directives set forth in § 3553(a). *Booker*, 543 U.S. at 244-45.  "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."  *Gall v. United States*, 552 U.S. 38, 49 (2007).  While "the Guidelines should be the starting point and the initial benchmark," they "are not the only consideration."  *Id*. at 49.  The district court must "consider all of the § 3553(a) factors" and "must make an individualized assessment based on the facts presented."  *Id*. at 49-50.  A sentencing court is to "give serious consideration to the extent of any departure from the Guidelines," then "explain [the] conclusion that an unusually lenient or an unusually harsh sentence is appropriate in a particular case with sufficient justifications."  *Id*. at 46.  Thus, the Supreme Court has significantly broadened the range of sentencing choices dictated by the specific facts of a case.  *See, e.g.*, *Kimbrough*, 552 U.S. 85 (courts may vary from Guidelines ranges based solely on policy considerations, including disagreements with Guidelines).  These cases mean that a district court is free to make its own reasonable application of the § 3553(a) factors, and after due consideration, decline to impose a sentence based on the Guidelines.  *See Kimbrough*, 552 U.S. at 113 (Scalia, J., concurring).  Likewise, the First Circuit has affirmed sentences that "honored the competing concerns of mercy and punishment."  *United States v. Almenas*, 553 F.3d 27, 37 (1st Cir. 2009) (consideration of applicable § 3553(a) factors, including the defendant's physical (chronic neck and back pain) and mental (severe depression and psychosis) disabilities, was appropriate, warranting substantial downward departure).  *See also*

*United States v. Bernal*, 884 F.2d 1518, 1521 (1st Cir. 1989) (district court properly considered individual mitigating factors of defendant's age, which was 62 years, and health, rather than "sentenc[ing] him in an impermissibly rigid, mechanistic manner").

**B.  Section 3553(a) Factors**

Section 3553(a) of Title 18 requires courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2…."  Section 3553(a)(2) states that these purposes are:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)    to afford adequate deterrence to criminal conduct;
(C)    to protect the public from further crimes of the defendant; and
(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2)(A)–(D).

Section 3553(a) further directs sentencing courts to consider, among several factors, "the nature and circumstances of the offense and the history and characteristics of the defendant," and "any pertinent policy statement … issued by the Sentencing Commission." *Id.*, § 3553(a)(1), (5).

**1.  Just punishment/promote respect for the law**

The sentence imposed should be one that promotes respect for the law and provides just punishment. "Respect for the law is promoted by punishments that are *fair* … not those that simply punish for punishment's sake." *United States v. Stern*, 590 F. Supp.2d 945, 956 (N.D. Ohio 2008).  "[A] sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Id*. at 957(citations

omitted).  On April 4, 2013, at the 15th Annual National Action Network Convention, Attorney

General Eric Holder had this to say about current sentencing law:

> Too many people go to too many prisons for far too long for no good law
> enforcement reason.  It is time to ask ourselves some fundamental questions about
> our criminal justice system.   Statutes passed by legislatures that mandate
> sentences, irrespective of the unique facts of an individual case, too often bear no
> relation to the conduct at issue, breed disrespect for the system, and are ultimately
> counterproductive.  It is time to examine our systems and determine what truly
> works.  We need to ensure that incarceration is used to punish, to rehabilitate, and
> to deter – and not simply to warehouse and forget.[1]

A court can choose to grant a sentence variance or departure and impose a sentence of

probation, home detention and community service, even in a case in which the Guidelines

recommend a sentence of life.  In *United States v. Wadena*, 470 F.3d 735 (8th Cir. 2006), for

instance, the Eighth Circuit held that there was no prohibition on a variance to probation, even

when the Guidelines called for imprisonment.

Probation is punishment.  In *Gall*, 552 U.S. 38, the Court approved the district court's

procedure and its exercise of discretion in explaining that a sentence of probation was not an

"'act of leniency'" but instead a "'substantial restriction of freedom'" when Gall was sentenced

to 36 months' probation:

> "[Gall] will have to comply with strict reporting conditions along with a three-
> year regime of alcohol and drug testing. He will not be able to change or make
> decisions about significant circumstances in his life, such as where to live or
> work, which are prized liberty interests, without first seeking authorization from
> his Probation Officer or, perhaps, even the Court.  Of course, the Defendant
> always faces the harsh consequences that await if he violates the conditions of his
> probationary term."

*Id* at 44 (quoting from sentencing record).  Another district court also explained the punitive

consequences inherent in the felony conviction itself as well as probation:  "[Defendant's]

adjudication as a felon, after a long lifetime of strict adherence to society's norms, along with the obligations of probation, home detention, and a fine, are of themselves just punishment." *United States v. Testerman*, 446 F. Supp. 2d 640, 643 (W.D. Va. 2006). It cannot be denied that a felony conviction and probation, with the attendant loss of freedoms, serves to punish.

### 2. Afford adequate deterrence to criminal conduct

A non-Guidelines sentence can adequately serve to deter. *See United States v. Prosperi*, 686 F.3d 32, 48 (1st Cir. 2012) (affirming sentence of home monitoring and probation in lieu of incarceration and approving sentencing court's explanation that the sentence imposed provided an adequate deterrent effect on others as well as defendants); *Testerman*, 446 F. Supp. 2d at 643 (finding "that a nonguideline sentence will adequately deter Testerman and others from similar conduct based on his advanced age [and] his previous law-abiding life," among other factors).

### 3. Protect the public from further crimes/recidivism

When the defendant is of advanced age, a sentence of probation can afford adequate protection of the public from further crimes by that defendant; it is undisputed that older defendants are less likely to be recidivist than younger ones. The Sentencing Commission's empirical research shows that offenders over the age of 50, with a criminal history score of I, have the lowest recidivism rate of all offenders. *See* U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 28.[2]

### 4. Provide the defendant most effectively with training, care, and treatment

---

[1] Text of the speech is available at: http://www.justice.gov/opa/speech/attorney-general-eric-holder-speaks-15th-
[2] The recidivism report is available at: http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf.

Section 3553(a)(2)(D) requires the sentencing court to consider how "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." *See United States v. Molignaro*, 649 F.3d 1, 2 (1st Cir. 2011) (every criminal sentence must bear fair relationship to objectives in § 3553(a)(2)(D), and court must consider sentencing alternatives including probation and supervised release). *See also United States v. Pineyro*, 372 F. Supp. 2d 133 (D. Mass. 2005) (under § 3553(a)(2)(D) and USSG § 5H1.4, downward departures warranted based on poor and worsening medical condition, where BOP failed to show it could provide defendant with needed medical care, defendant was not likely to commit future offenses, and he had strong family ties).

5.  **Nature of offense and characteristics of the defendant**

Section 3553(a) requires the sentencing court to consider, "the nature and circumstances of the offense and the history and characteristics of the defendant," and "any pertinent policy statement … issued by the Sentencing Commission."  18 U.S.C. § 3553(a)(1), (5).  The courts have recognized that among the factors for consideration is, when applicable, the fact that the defendant has family obligations or responsibilities, such as the need to care for a gravely ill family member.  *See United States v. Thavaraja*, 740 F.3d 253, 262 (2d Cir. 2014) (affirming below-Guidelines sentence where court took into consideration family responsibilities, notwithstanding § 5H1.6's statement that family circumstances are not "ordinarily relevant" in determining whether a departure is warranted, because the a sentencing court must consider "the history and characteristics of the defendant" "in determining the particular sentence to be imposed" under § 3553(a)(1)).  Thus, the courts order, and affirm, downward departures when

the defendant was needed to care for family member.  *E.g.*, *United States v. Pereira*, 272 F.3d 76, 82 (1st Cir. 2001).

## C.  Factors Supporting Downward Departure

### 1.  Departure based on advanced age

The Guidelines provide, "Age may be a reason to impose a sentence below the applicable guideline range *when the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration*."  USSG § 5H1.1 (emphasis added).

Elderly prisoners present health and management problems and greater costs to the prison system, and they are vulnerable to abuse.  According to a 2015 report from the Office of the Inspector General, the aging of the BOP is facing a crisis in regard to the aging of its population.  *See* Office of the Inspector General, U.S. Dep't of Justice, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (May 2015).[3]  The report summary contains several conclusions, relevant here, including:

- The "BOP institutions lack appropriate staffing levels to address the needs of an aging inmate population and provide limited training for this purpose."

- Aging inmates are more costly to incarcerate, costing eight percent more to incarcerate than a younger inmate.  Further, in FY 2013, in institutions with the highest percentage of aging inmates, the BOP spent an average of $10,114 per inmate on medical costs, while institutions with the lowest percentage of aging inmates spent an average of $1,916 per inmate.

- Programming opportunities to help aging inmates reenter the community are inadequate as there are no standardized programs specifically designed for aging inmates.  "As a result, aging inmates either participate in programs that may not meet their needs or are left idle, not participating in any activities."

---

[3] The OIG Report is available at:  https://oig.justice.gov/reports/2015/e1505.pdf.

Citing the report, the Seventh Circuit very recently addressed the question—which is presented in this case—of whether incarceration of an elderly defendant serves the important purposes gained by the Guidelines and sentencing statute:

> "Aging prisoners," defined as prisoners 50 years old or older, cost the federal prison system about 8 percent more than younger prisoners, and these excess costs, mainly medical, rise with age. *See* Office of the Inspector General, U.S. Dept. of Justice, "The Impact of an Aging Inmate Population on the Federal Bureau of Prisons," May 2015, https://oig.justice.gov/reports/2015/e1505.pdf. The Inspector General's study also finds that only 8 percent of inmates aged 60 to 64 who were released between 2006 and 2010 were rearrested for new crimes within three years, compared to 19 percent who were 50 to 54.

> [T]he considerations that we've listed should be part of the knowledge base that judges, lawyers, and probation officers consult in deciding on the length of sentences to recommend or impose.   There is no indication that these considerations received any attention in this case.   We do not criticize the district judge and the lawyers and probation officers for the oversight; recognition of the downside of long sentences is recent and is just beginning to dawn on the correctional authorities and criminal lawyers.   Neither the Justice Department nor the defendant's lawyer (or the probation service) evinced awareness in this case of the problem of the elderly prison inmate.   Some judges, however, have drawn attention to the problem in their opinions.   It is time we all awakened to it.

> *[I]n thinking about the optimal sentence in relation to the problem of the elderly prisoner, probably the judge's primary focus should be on the traditional triad of sentencing considerations:   incapacitation*, which prevents the defendant from committing crimes (at least crimes against persons other than prison personnel and other prisoners) until he is released, *general deterrence* (the effect of the sentence in deterring other persons from committing crimes), and *specific deterrence* (its effect in deterring the defendant from committing crimes after he's released.

*United States v. Presley*, 790 F.3d 699, 702-03 (7th Cir. 2015), *as corrected* (Jun. 17, 2015) (case citations omitted).[4]

---

[4] The Government has responded to *Presley* by offering a letter stating that the BOP can provide medical care.  The letter does not have the advantage of the published case, *Presley*—that advantage being a court decision after hearing both sides, as opposed to unexamined, unilateral hearsay.  Regardless, even if, *arguendo*, the letter is taken

Other factors, such as a lower rate of recidivism among older defendants as compared to younger defendants, also support sentences that keep older defendants out of prison. *See United States v. Fahm,* 13 F.3d 447, 450 (1st Cir. 1994) (younger defendant poses greater risk of recidivism than older defendant); *United States v. Willis*, 322 F. Supp. 2d 76, 85 (D. Mass. 2004) ("Incarceration of a single inmate costs the tax payer $22,519.32 per year, as Probation reported. Community confinement of one person costs $17,708 per year. Home detention, needless to say, costs much less."); *United States v. Baron*, 914 F. Supp. 660, 664 (D. Mass. 1995) (*citing* Molly Fairchild James, *The Sentencing of Elderly Criminals*, 29 Am. Crim. L. Rev. 1025 (1992), for point that keeping elderly, infirm people imprisoned can cost up to three times more than imprisonment of younger offenders, and concluding, "[A]s well as being costly, imprisonment is not efficacious particularly where the offender is not as likely to commit future crimes as a younger offender.").

For all of these reasons related to a defendant of advanced age—the general problem of the elderly prison population, the specific problem of providing adequate care for an elderly defendant, the cost of such care as compared to the lower cost of probation, the potential danger to an elderly and infirm defendant who is imprisoned, and the lesser risk of recidivism—courts have regularly sentenced older defendants to probation instead of imprisonment. *See, e.g.*, *United States v. Sabino*, 274 F.3d 1053 (6th Cir. 2001) (affirming three-level downward departure sentence of 72-year-old defendant based upon several factors, including age and physical

---

to be 100% accurate it fails to show:  (1) the expense to the government; (2) whether Messier would receive care equal to what would be provided in the private sector; and (3) a concession that, even the BOP can provide medical care, it would still be an unnecessary burden on the BOP.  In other words, even if the federal prison system can supply adequate care, *is the system better off doing it in this matter?*  The Government's letter ignores this area.  If Messier had been convicted for impeding the Government by shooting at federal agents, then this burden on the federal prison system would certainly make sense.  Under the facts in this case, it does not.

ailments, combined with no evidence of any physical threat to others and no flight risk); *United States v. Johnson*, 71 F.3d 539, 544-45 (6th Cir. 1995) (noting that elderly defendant with multitude of health problems could qualify for a downward departure under § 5H1.4); *United States v. Baron*, 914 F. Supp. 660, 664 (D. Mass. 1995) (finding appropriate a downward departure from level 18 to level 10, and sentencing 76-year-old defendant to one year of probation, with six months of term served in home detention).

### 2.  Departure based on medical condition

A defendant's medical condition is a factor that can be considered by the Court in considering a downward departure and/or a downward variance.  Guidelines § 5H1.4 provides that "an extraordinary physical impairment may be a reason to impose a sentence below the guideline range; *e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment*."  USSG § 5H1.4 (emphasis added).  In addition, as noted, § 3553(a)(2)(D) requires the sentencing court to consider the need to provide medical care "in the most effective manner."

When the Guidelines were considered mandatory, a downward departure was authorized under USSG § 5H1.4 for "extraordinary physical impairment."  *See, e.g.*, *United States v. Martin*, 363 F.3d 25 (1st Cir. 2004) (three-level downward departure proper, and possibly more on remand, where several serious medical conditions made the defendant's health fragile, the court was not convinced that the BOP could adequately provide for the defendant's medical needs, and evidence showed "a high probability that lengthy incarceration will shorten Martin's life span").  Under the now-advisory Guidelines, a variance based on a defendant's physical condition is allowed even if it is not extraordinary.  *Accord Willis*, 322 F. Supp. 2d at 82 (Section

5H1.1 does not speak in terms of "*extraordinary*" age or infirmity, but simply uses the terms "elderly and infirm").  For instance, in *Almenas*, 553 F.3d 27, the First Circuit affirmed a 43-month downward variance based on defendant's chronic neck pain and his mental and emotional condition.  *See also United States v. Duhon*, 541 F.3d 391 (5th Cir. 2008) (60 months' probation upheld for possessing 15 images of child pornography, despite Guidelines range of 27-33 months, in light of first-time offender's need to continue medical treatment with his psychologist); *United States v. McFarlin*, 535 F.3d 808 (8th Cir. 2008) (affirming three years' probation/home confinement based on defendant's serious health problems).

### 3.  Variance based on the defendant's "good works"

The sentencing court may reach a downward variance based on charitable "good works." *See, e.g.*, *United States v. Milo*, 506 F.3d 71, 72-73 (1st Cir. 2007) (defendant facing 151 to 188 months was sentenced to time served (18 days) based on numerous factors including his prior good works); *United States v. Taylor*, 499 F.3d 94, 100 (1st Cir. 2007) (defendant's "extensive service to his community" warranted downward departure under USSG § 5H1.11), *vacated on other grounds*, 552 U.S. 1092 (2008).  *See also United States v. Warner*, No. 14-1330, 2015 WL 4153651 (7th Cir. Jul. 10, 2015) (affirming sentence of probation for conviction of evading more than $5.6 million in taxes, where district court found defendant's charitable works to be primary mitigating factor in reaching lenient sentence); *United States v. Germosen*, 473 F. Supp. 2d 221, 229 (D. Mass. 2007) (court was permitted to consider, among various factors, defendant's record of prior good works); *United States v. Mehta*, 307 F. Supp. 2d 270 (D. Mass. 2004) (defendant convicted of tax evasion entitled to five-level reduction based on "charitable, or public service" and "similar prior good works"; sentenced to three years' probation).

## IV.  APPLICATION OF 18 U.S.C. § 3553(a) AND USSG COMPELS A SENTENCE OF PROBATION HERE.

### A.  Messier's History, Characteristics, and Good Works

Section 3553(a)(1) requires the sentencing court to consider the history and characteristics of the defendant.  There are many mitigating factors in connection with Messier's history and personal characteristics that this Court should consider when determining his sentence.  Accordingly, applying the § 3553(a) factors, the Court should sentence Messier to probation, or in the alternative to home confinement.

### 1.  Bill Messier's personal history, characteristics, and health

Messier is 71 years old.  He was born in Brunswick, Maine, and Maine is where he has lived most of his adult life.  After he graduated from high school in 1963, Messier enlisted with the United States Army National Guard.  He was honorably discharged in 1971 (PSR ¶ 46).  From 1963 until 1981, Messier worked at Bath Iron Works in Bath, Maine, supporting electronic combat systems on Navy ships that were being built and/or overhauled at the facility.  He left his employment at Bath in order to concentrate his efforts in operating his own radio business, Active Communications, in Brunswick.  He operated that business until he sold it in approximately 1992.

In addition to having his pilot's license, Messier has earned several radio-related licenses such as General Radio Telephone Operator, Certified FCC Technician, Amateur Radio License, certified communication technician, and many more (PSR ¶ 42).

Messier is of advanced age and in poor health.  Messier was born with only one kidney.  In 2008, he was diagnosed with prostate cancer and in 2009, he underwent prostate removal surgery.  An April 2015 colonoscopy revealed seven polyps that were removed.  Messier's

primary care physician, David Hill, M.D., has explained that when Messier is exposed to stresses he cannot control, his body produces "an inordinate amount" of catechol amines, a chemical compound the body produces to prepare the person for "flight or fight." Dr. Hill expounded, "In prolonged or excessive amounts they can cause high blood pressure and considerable organ damage in the body." (Ex. 12.)

Messier's advanced age and fragile health, alone, could constitute a factor for a non-custodial confinement sentence.

In addition to Messier's own poor health, Messier's brother has serious cardiac problems and is now dying. Messier has become his brother's sole caretaker. Messier has been providing care to his brother, in his brother's trailer. Such a family responsibility may be considered by the Court as justifying a departure or variance. *Thavaraja*, 740 F.3d at 262. For this reason, as well, Messier requests a non-incarceration sentence. If the Court imposes a sentence of home confinement, Messier requests that it be delayed, if possible, until his brother is dead.

### 2. Character letters and evidence of good works

Since selling Active Communications in 1992, Messier has applied his love and knowledge of both radios and aviation by volunteering his time updating and repairing radio communication equipment at the local airport. Messier also maintains a commercial cell tower on his property, which is a vital service to the local fire, police, and other emergency services. As explained by Gary Howard, who served as Fire Chief of the Town of Brunswick for 25 years, the Town has come to rely on Messier's "knowledge and ability of communications equipment" to maintain the radio transmitting equipment. (*See* Ex. 13.) This sentiment was echoed by Benjamin LaCharite ("LaCharite"), the manager of FlightLevel Aviation, the Fixed Base

Operator at the Brunswick Executive Airport.  (*See* Ex. 15.)  LaCharite stated that Messier has offered his skills, free of charge, in maintaining the Air-to-Ground and Ground-to-Ground communications and by programming "all of our components to work flawlessly for every situation presented."  (*Id*.)  "These services are critical to the safe and secure operation of the aircraft and my team of ground handlers."  (*Id*.)

Numerous friends and acquaintances have written letters to provide the Court with insight into Messier's giving and supportive nature.  If there were one point that could be garnered from all the letters, it is Messier's willingness to selflessly help those who are in need of his expertise. The letters were previously provided to the Court; below is a brief summary of a select few:

| Letter Writer | Summary | Ex. # |
|---|---|---|
| Geoffrey P. Bates | Mr. Bates leases land from Messier for his building and radio tower.  He writes that Messier has always helped in maintaining the building and tower, including making sure there was access during stormy winters, and by providing security for the equipment there.  Due to the widespread theft of copper, Mr. Bates fears "that without his constant presence, my and all the many other businesses at his tower site would be subjected to physical damage.  Since the tower site is crucial to the safety of the entire Brunswick area, this would be crucial." | 2 |
| Bob Bittner | Mr. Bittner, who has known Messier for several years, has been in the radio broadcasting business for over 40 year.  He relates how Messier has always shown a "willingness to repair electronic items for myself and many others."  Messier safeguards "important emergency radio transmitting services (police, fire) for the Town of Brunswick, Maine" by always going "the extra mile for them to make sure there's no interruption of service." | 4 |

| Letter Writer | Summary | Ex. # |
|---|---|---|
| Kenneth P. Caron | Mr. Caron worked with Messier at Bath Iron Works, where, through Messier's mentoring, Mr. Caron was able to "quickly advance to skilled worker rating of A-Specialist Electrician." He writes that Messier supports the Merry meeting Amateur Radio Association by locating a repeater on one of his towers, at no cost, and also "provides free labor to support the radio installation and operations" to support the development of the Brunswick Executive Airport. He concludes that sentencing Messier to prison "would not serve society any good." | 6 |
| D.J. Merrill | Mr. Merrill has known Messier for several years. Both are passionate about aviation and radios. He has volunteered along with Messier in many repair projects at the airport. "I have known Bill to be someone always willing to step in to help, is very generous with his time and knowledge, and frankly is a positive asset to our local community." | 18 |
| Ervin C. Deck | Mr. Deck, the manager for the Wiscasset Municipal Airport, recognized Messier's volunteer support in researching and installing a new public address system at the airport. | 9 |
| Steven Bellefleur | Mr. Bellefleur writes that Messier "is like the father, grandfather, and best friend I've never had." Messier has taken him and his family flying on numerous occasions, always without payment. He cites an example of Messier's generosity where Messier gave a mutual friend nearly $2,000 to pay for an operation on the friend's dog. "How this kind man hides such a huge heart withing [sic] his tiny, fragile, stature is beyond me." He feels that "any type of incarceration at this point in his life would not be good for Bill, nor the community he supports around him, myself included." | 3 |
| Mary Fournier | Ms. Fournier has known Messier for over 40 years. She relates Messier's generosity in that he offers "free flights to anyone who shows an interest." His generosity was also shown when Ms. Fournier's dog needed surgery. "Bill handed me $600.00 immediately to help with [the] vet bills." She finds Messier to "be an honest, generous, intelligent person with integrity who is an asset to his community and friends." | 11 |

| Letter Writer | Summary | Ex. # |
|---|---|---|
| Raisa M. Bittner | Ms. Bittner thinks Messier "is a fine, gentle and generous human being."  One weekend, when Ms. Bittner was suffering from a toothache, Messier traveled 12 miles and brought her a bottle of "natural pain killer, not available in most places." | 5 |

These letters, and the many others provided to the Court, show a man who is generous to a fault with his time, his money, and his knowledge.  Messier respectfully requests that the Court consider his prior good works and his ongoing service to his community and submits that these factors warrant a sentence of probation.

**B.  Application of Statutory Factors to a Sentence of Probation for Messier**

All of the above-described characteristics of Messier—his history, age, health, positive reputation in the community, and extraordinary giving nature—compel a conclusion that a sentence of probation is appropriate here.  Further, such a sentence would meet the required factors listed in § 3553(a)(2).

**1.  Probation would be just punishment for Messier.**

Messier has had a life of public service and he intends to continue that lifestyle of service by repairing and maintaining radio equipment, safeguarding his cell tower, and providing funds for those in need.  The Court could order community service which Messier will continue to provide, unless incarcerated, regardless.  As shown above, a large portion of his work for the Town of Brunswick and the local Brunswick airport is done free of charge.  Messier does not even take deductions for his out-of-pocket expenses or mileage.  Messier's felony conviction will have an ever-lasting effect on his reputation in the community; some companies have stopped renting tower space because of this case.  However, this will not dissuade him from continuing to

provide help where and when help is needed.

Messier is currently sending monthly payments to the IRS towards his past due taxes, penalties and interest. The IRS has collected (at the highest rate with no deductions) all of the taxes, penalties and interest for tax years 2000 – 2004. In addition, in response to the conviction, he has hired an enrolled agent to prepare past returns and future returns, in order to help keep him current on his tax obligations. A sentence of probation would allow him to continue to pay toward these obligations.

Messier is now in a state of depression. The belief system that has guided him, and of which the jury acquitted him, has come up short. His reputation, which is of great importance to him, has been seriously and permanently damaged, his wealth has been depleted, his health has declined, and his place in the universe is no longer certain. No one following the case believes that Messier has not already been punished a great deal. Incarceration will serve no valuable function. His plight is like that of the defendants in *Prosperi*, who the First Circuit recognized were punished sufficiently by the conviction and probation when it echoed the sentencing court:

> I think it is very difficult at times, for those of us who are judges or prosecutors or lawyers, to put ourselves in the shoes of a person with no prior experience with the criminal justice system who finds himself or herself accused of a crime. I do not think, sometimes, we fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong that they committed.

686 F.3d at 48.

The Court is faced with taking a valuable and unique resource away from the community, and the only resource available to Messier's brother, or imposing a non-incarceration sentence, where even a short probationary term for Messier is likely to become a lifetime restriction on his

liberty.  Probation, along with the felony conviction itself, will constitute just punishment for Messier.

**2.  Probation will afford adequate deterrence to criminal conduct.**

The mere fact that Messier has been prosecuted and convicted will deter others from engaging in this type of conduct.  A sentence of probation will be sufficient to meet the deterrence goal set forth in § 3553(a).  *See Prosperi*, 686 F.3d at 48 (affirming probation as sufficient sentence that provided adequate deterrent on the defendants from any future criminal conduct as well as having deterrent effect on others)

**3.  Probation will prevent recidivism.**

As shown, offenders over the age of 50, like Messier, with a criminal history score of I, like Messier, have the lowest recidivism rate.  *See Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 28.

Messier has zero criminal history points.  (PSR, ¶ 30.)  As a result, he poses the lowest possible risk of recidivism.  Messier does not pose a danger to the public.

The fact is that if Messier had never met Robinson he would not be facing sentencing at all.  Robinson, the educated mentor of this senior alliance, acted as Messier's unlicensed attorney and as a result Messier lost money, overpaid on his tax obligations for 2000 to 2004, spent a fortune in legal fees, and lost business.  Since Robinson's day as the Attorney General of the Republic of Maine have come to an end there is no more likelihood of another "corrupt endeavor" charge or a conspiracy charge.  And, sufficient instructions can be entered into a probation order to guarantee compliance with the law in the future.

**4.  Probation will provide Messier most effectively with needed treatment and care.**

As noted, § 3553(a)(2)(D) requires the sentence "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

The Guidelines sentence is an effective sentence of life imprisonment. William Messier is 71 years old and in poor health. Sentencing him within the recommended Guidelines range would effectively mean he would spend the rest of his life in prison. It is Dr. Hill's opinion that incarcerating Messier would subject him "to high blood pressure and its side effects which include: hemorrhagic or thrombotic strokes, kidney failure, congestive heart failure and myocardial infarction" and he doubts that Messier "would survive the term of his incarceration because of any one of these health issues." (*See* Ex. 12.)

On the other hand, a sentence of probation would appropriately meet the § 3553(a)(2)(D) factors of providing Messier with the correctional treatment and medical care he needs. He should be in an environment where he can meet with a trained physician to discuss his "beliefs." He now has a treating psychiatrist and is currently receiving regular treatment. He is making huge steps in following laws he does not believe relate to him. He will be doing this for the balance of his life.

## C.  The Applicable Guidelines Range Is 27 to 33 Months.

As noted, the Court must determine as a benchmark the applicable Guidelines range. *Gall*, 552 U.S. at 49. The Government in the PSR has suggested that Messier receive 33 months to 41 months in prison, based on the Probation Officer's determination of a Total Offense Level of 20 and a Criminal History Category of I. (*See* PSR, ¶ 50.) However, there are mistakes in the Probation Officer's calculations. Proper calculation of the Guidelines range results in a lower

sentence range under the Guidelines for the Court to use as its benchmark.

The Guidelines as written, but not as examined from the specific facts of this case, allow a court to calculate the amount of money that Messier "corruptly endeavored" to avoid paying. The PSR makes reference in several places (e.g., PSR, ¶¶ 12, 13), to the charges involving failure to file. While it is true that Messier did not file for 2000-2004, he was acquitted of failure to file. The jury found him guilty only of corrupt endeavor and conspiracy, i.e., challenging the levy amount of $172,094.42. Messier was found not guilty of failing to file taxes in 2008–2012 (Counts Three through Seven).

The PSR is wrong in two aspects of Paragraph 13: "[T]the offense involved failure to file tax returns and a more accurate determination of tax loss cannot be made ..." (PSR, ¶ 13; *see also id. at* ¶ 19.) First, the offense on which Messier was convicted did not involve failure to file but corrupt endeavor. The proper Guidelines section for determining the Basic Offense Level is not § 2T1.1 but § 2T1.9, Conspiracy to Impede, Impair, Obstruct, or Defeat Tax. Second, tax loss *can* be accurately determined.[5] The only tax loss related to what Messier was convicted of—corrupt endeavor and conspiracy to corruptly endeavor—was the specific amount of amount of $172,094.42, which was the amount of the levy.

It is undisputed that the amount of the lien that Messier was convicted for corruptly endeavoring to defeat was $172,094.42. Base on $172,094.42, the Offense Level on the Tax

---

[5] Any other method of determining tax loss would also be irrationally high because of the atrocious record keeping, and late filing. In this situation, the taxpayer loses out. Much of the deductible expenses and other items that would normally substantially reduce Messier's tax debt will never be recovered. The year 2005 cannot be accurately determined. The Government is relying on a letter that may or may not have been written by Messier, that may or may not be accurate, that has no support for it. No licensed tax preparer would complete a return based on it. The figures simply cannot be relied on. Of course, the Government could, as it did in other years, reconstruct the actual income, but it has chosen not to.

Table is 16, plus two levels for involving others, which equals 18, and that, with a Criminal History Category of I, calculates out on the Sentencing Table to be 27-33 months.

**D. Application of the Factors to Sentence Messier to Probation Is in Line with Substantial Judicial Authority.**

All of these factors weigh in favor of a non-imprisonment sentence for Messier.[6]   The Court's conclusion that Messier should receive only probation would be in keeping with similar non-incarceration sentences imposed under similar circumstances.

A case from the Court's sister district, the District of Massachusetts, is on point both in terms of the factual circumstances—a criminal tax case and an elderly, infirm defendant—and the court's application of the law.  *Willis*, 322 F. Supp. 2d 76.  As in the present case, the defendant, Willis, had doctors confirm his "serious and substantial health problems, which, combined with his age [69 years old], would put him at risk were he to go to jail." *Id.* at 84.

> The issue is one of degree.  Willis has an inordinate number of potentially serious medical conditions.  It seems imminently logical the Willis is at an age where these medical conditions will invariably get worse.  It seems logical that being away from his support structure, both family and doctors, will invariably exacerbate his conditions.  It seems logical that were he to go to jail for three years between the ages of 69 and 71 that he will emerge in substantially worse shape than he is now, if he does not die before completing his sentence.  It seems logical that while the BOP can care for him, the costs of that care are bound to escalate.  Finally, it seems logical that his conditions at least put him in the zone that enables me to balance the cost of home detention vs. jail, whether home confinement will be "equally efficient as and less costly than incarceration,"

---

[6] A downward departure is also permitted pursuant to USSG § 5K2.0 based on the combination of factors presented in this Motion.  The Guidelines state:

> The Commission does not foreclose the possibility of an extraordinary case that because of a *combination* of such characteristics or circumstances, differs significantly from the "heartland" cases covered by the guidelines in a way that is important to the statutory purposes of sentencing, even though none of the characteristics or circumstances individually distinguishes the case.

USSG § 5K2.0, cmt. (emphasis added).

> U.S.S.G. § 5H1.1, or whether "home detention may be as efficient as, and less costly than, prison" as it is described in U.S.S.G. § 5H1.4.
>
> …
>
> Mr. Willis is not likely to be a recidivist; incapacitation at his age, with these conditions, could be a death sentence.   Retribution does not justify his incarceration.  *The offense is not a crime of violence; the victim, the IRS, will be repaid.  Nor is there any danger that this departure will open an exception through which many defendants will seek to pass.*

*Id.* at 84-85 (emphasis added) (sentencing Willis to two years' probation, six months of which in home detention, and ordering payment to the IRS).   Other district courts have considered the same factors and reached similar conclusions.  *See United States v. Schrader*, No. 11-CR-13, 2013 WL 257208, at *1 (E.D. Wis. Jan. 23, 2013) (three years' probation, well below advisory Guidelines range of 57-71 months, sufficed to punish, protect the public, and deter, given the defendant's advanced age and lack of criminal record); *Testerman*, 446 F. Supp. 2d 640, 643 (probation would adequately deter defendant and others, and was appropriate considering defendant's advanced age, age-related health problems, and previous law-abiding life; "[n]o proper purpose would be served by requiring Testerman to go to prison"); *United States v. Scannepico*, No. CRIM.A. 87-309, 1988 WL 28926, at *1 (E.D. Pa. Mar. 16, 1988) (defendant of "advanced age and deteriorating health" given probation).   *See also United States v. Menyweather*, 447 F.3d 625 (9th Cir. 2006) (eight-level departure for combined circumstances of diminished capacity and family circumstances was reasonable); *United States v. Jones*, 158 F.3d 492 (10th Cir. 1998) (affirming departure from sentencing range of 12 to 18 months to a sentence of six months' home confinement and three years' probation based on community service and support in the community among other factors); *United States v. Hollingsworth*, 81 F.3d 171 (9th Cir. 1996) (affirming probation as downward departure for elderly and infirm persons despite

Guidelines range of 78 to 97 months;  sentence was especially apt given that the defendant had already paid $500,000 and incurred $175,000 in tax consequences).

The very same can be said of Messier as of the defendant in *Willis*:  Messier, like Willis, suffers from "potentially serious medical conditions" and "is at an age where these medical conditions will invariably get worse."   Messier, like Willis, will suffer exacerbation of his conditions if he were taken away from his support structure, including his doctors, would "emerge in substantially worse shape than he is now, if he does not die before completing his sentence"; "[Messier] is not likely to be a recidivist"; "incapacitation at [Messier's] age, with these conditions, could be a death sentence"; "[r]etribution does not justify his incarceration" given that his offense was not a crime of violence and the IRS will be repaid; and Messier, too, is the appropriate candidate to be kept out of jail for both reasons of economy and benevolence.

## VI.  CONCLUSION

"'The best policy considerations can be unnecessarily cruel when applied rigidly and without exception to individual human beings ... Some [offenders] would be destroyed by a term in prison. There are defendants for whom prison incarceration makes no sense.'  Mr. Baron is one such human being."  *United States v. Baron*, 914 F. Supp. 660, 664 (D. Mass. 1995) (citations omitted).  Messier is another such person for whom incarceration makes no sense and who would be destroyed by any term of imprisonment.  As set out above, the mitigating factors present in Messier's case support a departure or variance from the Guidelines.   When the mitigating qualities are evaluated under the requirements of § 3553(a), a sentence of probation would be reasonable as sufficient, but not greater than necessary, to achieve the goals of sentencing.

Respectfully submitted on August 20, 2015.


                                        *s/* Michael Louis Minns
                                        **Michael Louis Minns**
                                        Ashley Blair Arnett
                                        MICHAEL LOUIS MINNS, P.L.C.
                                        9119 S. Gessner, Suite One
                                        Houston, TX 77074
                                        Tel.: (713) 777-0772
                                        Fax: (713) 777-0453
                                        Email: mike@minnslaw.com
                                                ashley@minnslaw.com

                                        William D. Maselli
                                        98 Washington Avenue
                                        Portland, ME 04101
                                        Tel.: (207)-780-8400
                                        Fax: (207) 879-2619
                                        Email: maselli@securespeed.net

                                        Attorneys for Defendant F. William Messier


                        **CERTIFICATE OF SERVICE**

On August 20, , 2015 I, Ashley Blair Arnett, attorney for the Defendant F. William

Messier, filed this motion with the United States District Court District of Maine electronic filing

system. Based on my training and experience with electronic filing in the federal courts, it is my

understanding that a copy of this request will be electronically served upon the parties upon its

submission to the Court.

                                        s/Ashley Blair Arnett
                                        **Ashley Blair Arnett**
                                        Attorney for Defendant F. William Messier